UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM E. UNDERLAND and MARK SCHALLER, *on behalf of themselves and all others similarly situated,*

Plaintiffs,

- against-

DENNIS ALTER , WILLIAM A. ROSOFF, PHILIP M. BROWNE, DAVID B. WEINSTOCK, ROBERT S. BLANK, MAX BOTEL, THOMAS COSTELLO, DANA BECKER DUNN, ROBERT LUBNER, OLAF OLAFSSON, MICHAEL STOLPER and KPMG LLP,

Defendants.

10-Civ.-3621 (CMR)

**JURY DEMANDED**

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933**

## INTRODUCTION

1. This is a securities class action alleging that the defendants caused the Advanta Corporation ("Advanta" or the "Company") to sell hundreds of millions worth of RediReserve variable rate certificates and investment notes (referred to collectively as "RediReserve notes") through registration statements and prospectuses that contained untrue statements of material fact and omitted material facts in violation of the Securities Act of 1933 (the "1933 Act").

2. Advanta was a risky mono-line credit card issuer that primarily marketed its cards to small businesses. By the start of the Class Period, June 24, 2007 through November 8, 2009, Advanta was in the midst of a catastrophic business downturn, largely as a result of what were later revealed to be a plethora of unsafe, unsound and illegal business practices.

3. Seeking to stave off Advanta's looming collapse, the defendants caused Advanta to raise money through the sale of RediReserve notes, which were unsecured debt securities.

4. Defendants sold the RediReserve notes through an unorthodox manner. Companies typically accomplish large debt offerings by hiring an investment bank that organizes the sale of the debt securities to sophisticated institutional investors such as pension funds. However, throughout the Class Period, Advanta's credit rating was "below investment grade," limiting Advanta's "access to unsecured, institutional debt." Accordingly, Advanta eschewed the formal debt markets and targeted the RediReserve notes directly at "mom-and-pop" investors. Advanta advertised the RediReserve notes in newspapers around the country and capped the maximum investment in these notes at $500,000, an amount too small for most institutional investors. As these distribution methods indicate, the RediReserve notes were intended for individual investors who would hold the RediReserve notes to maturity and collect

the interest paid on the notes. Indeed, Advanta's public filings stated: "We do not expect there will be a trading market for the investment notes or the RediReserve certificates."

5. Despite the fact that Advanta marketed RediReserve notes directly to individual investors, defendants failed to accurately describe Advanta's business practices and the state of Advanta's business in the registration statements and prospectuses used to sell the RediReserve notes. According to the RediReserve registration statements, Advanta was a prudent company with a "very strong" financial condition that was competently managing the risks involved in offering credit cards to small businesses admist an economic downturn. In fact, as was later revealed by two cease and desist orders from the Federal Deposit Insurance Corporation (the "FDIC") and the FDIC's Material Loss Review, these representations were untrue and/or failed to disclose that: (1) Advanta was engaged in unsafe and unsound banking practices that had caused "significant financial deterioration"; (2) Advanta operated with inadequate capital for its risk profile; (3) Advanta operated in a manner that did not sustain satisfactory earnings performance to maintain sufficient capital for its risk profile; (4) Advanta was engaged in illegal and unfair business practices, including unjustifiably and unreasonably increasing the rates it charged its credit card holders; (5) Advanta's management had failed to develop an adequate contingency plan for responding to an early amortization of the bank's credit card securitizations and, accordingly, failed to incorporate an adequate plan into the bank's capital planning model; and (6) Advanta was failing to incorporate adverse credit trends into its loan loss methodology and was understating its loan losses.

6. Meanwhile, the true facts were:

A. As described in an order dated June 30, 2009 ("FDIC Order #1), the FDIC determined that Advanta[1] was engaged in "unsafe or unsound banking practices" and that these practices had caused "significant financial deterioration" such that, in a cease and desist order issued on June 30, 2009, the FDIC ordered Advanta to retain competent management capable of operating Advanta in a "safe and sound manner." The FDIC further ordered that Advanta's Board of Directors (the "Board") "shall increase its participation in the affairs of the Bank." The disarray was so severe that the FDIC ordered Advanta to submit a plan for discontinuance of deposit-taking operations and the voluntary termination of deposit insurance after the repayment in full of all deposits.

B. As described in FDIC Order #1, the FDIC found that Advanta operated with inadequate capital for its risk profile and that Advanta required a plan addressing, *inter alia*, its: (i) current and future capital requirements; (ii) level of concentrations of credit; and (iii) volume of adversely classified assets.

C. As described in FDIC Order # 1, Advanta operated in a manner that did not sustain satisfactory earnings performance to maintain sufficient capital for Advanta's risk profile.

[1] The Order was directed at Advanta's most important subsidiary, the Advanta Bank Corp. ("Advanta Bank"). According to the 2007 Registration Statement, Advanta "primarily fund[s] and operate[s] [its] business credit card business through Advanta Bank Corp., which offers a variety of deposit products that are insured by the Federal Deposit Insurance Corporation (the "FDIC") in accordance with applicable FDIC regulations and limits." Advanta Bank also issued Advanta's credit cards.

D. As described in the second order from the FDIC ("FDIC Order #2") and a July 1, 2009 press release, the FDIC determined that Advanta was unfairly increasing the interest rate it charged its customers even when customers had neither exceeded their limits nor were delinquent in making payments on their accounts. The FDIC further determined that Advanta had failed to adequately notify accountholders that their interest rates were increasing. These violations resulted in a $150,000 fine and Advanta having to pay $21 million in restitution for the "substantial injury" it caused customers.

E. As described in the FDIC's Material Loss Review, dated October 2010, Advanta did not have an adequate contingency plan for addressing an early amortization of the bank's credit card securitizations and did not incorporate an adequate plan into its capital planning model.

F. Advanta overstated its financial position by failing to maintain an adequate allowance for loan and lease losses and failed to incorporate into its allowance for loan and lease loss methodology: (1) the impact of the early amortization of the bank's securitization trust; (2) anticipated and actual changes in portfolio behavior associated with the continued economic downturn, the aggressive re-pricing strategy and the cut-off in credit card account utility; and (3) the impact of management's change to a 120-day charge-off period.

7. In short, in the RediReserve registration statements, defendants painted far too rosy a picture of the state of Advanta's business and materially understated the risk of investing in the RediReserve notes.

8. The defendants in this action are those individuals and entities responsible for causing Advanta to file untrue registration statements for the RediReserve notes. Advanta's directors signed and vouched for the untrue registration statements and KPMG LLP ("KPMG"), Advanta's auditor, vouched for the financial statements that were incorporated into the registration statements. This action involves solely strict liability and negligence claims under the 1933 Act. Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

9. As a result of the deficient business practices described above, Advanta entered bankruptcy on November 8, 2009. At that time, Advanta reported that approximately $138 million in notes were outstanding.

**<u>JURISDICTION AND VENUE</u>**

10. The claims alleged herein arise under §§ 11, 12(a)(2) and 15 of the 1933 Act. *See* 15 U.S.C. §§ 77k, 771(a)(2) and 77o.

11. Jurisdiction is conferred by § 22 of the 1933 Act and venue is proper pursuant to § 22 of the 1933 Act.

12. Venue is appropriate because the violations of law complained of herein substantially occurred in this District, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein. Each of the individual defendants and KPMG LLP conducted business in this District.

## PARTIES

13. Plaintiff William E. Underland acquired RediReserve notes traceable to the untrue registration statement complained of herein. A certification detailing Mr. Underland's transactions in RediReserve notes was filed in this court as Dkt. No. 20-4.

14. Plaintiff Mark Schaller acquired RediReserve notes traceable to the untrue registration statement complained of herein. A certification detailing Mr. Schaller's transactions in RediReserve notes was filed in this court as Dkt. No. 20-5.

15. Advanta is not a defendant in this action. Advanta is headquartered at Welsh & McKean Roads, P.O. Box. 844, Spring House, PA, 19477 and is a financial holding company that, along with its subsidiaries, provides credit cards to small business. Advanta entered bankruptcy on November 8, 2009.

16. Defendant Dennis Alter ("Alter") served as Chairman of the Board and as Advanta's Chief Executive Officer ("CEO"). Alter signed and vouched for the untrue registration statement complained of herein. According to the FDIC's Material Loss Review, as of December 2007, Alter controlled 32 percent of Advanta's Class A voting stock and was the largest individual shareholder.

17. Defendant William A. Rosoff ("Rosoff") served as Vice Chairman of the Board and as Advanta's President. Rosoff signed and vouched for the untrue registration statement complained of herein.

18. Defendant Philip M. Browne ("Browne") served as Advanta's Senior Vice President and Chief Financial Officer ("CFO"). Browne signed and vouched for the untrue registration statement complained of herein.

19. Defendant David B. Weinstock ("Weinstock") served as Advanta's Vice President and Chief Accounting Officer ("CAO"). Weinstock signed and vouched for the untrue registration statement complained of herein.

20. Defendant Robert S. Blank ("Blank") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

21. Defendant Max Botel ("Botel") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

22. Defendant Thomas Costello ("Costello") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

23. Defendant Dana Becker Dunn ("Dunn") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

24. Defendant Ronald Lubner ("Lubner") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

25. Defendant Olaf Olafsson ("Olafsson") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

26. Defendant Michael Stolper ("Stolper") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

27. Defendants Alter, Rosoff, Browne, Weinstock, Blank, Botel, Costello, Dunn, Lubner, Olafsson, and Stolper are collectively referred to herein as the "Individual Defendants."

28. Defendant KPMG is an international accounting and auditing firm that served as Advanta's outside auditor. Throughout the Class Period, KPMG vouched for the accuracy of Advanta's financial statements, which were incorporated into the untrue registration statement complained of herein.

## SUBSTANTIVE ALLEGATIONS

29. This is a securities class action brought on behalf of persons who, between June 24, 2007 and November 8, 2009, purchased RediReserve notes traceable to a registration statement filed with the U.S. Securities and Exchange Commission (the "SEC") on August 18, 2006 (the "Registration Statement") as amended on February 28, 2007 (the "2007 Amendment"), February 28, 2008 (the "2008 Amendment"), February 9, 2009 (the "February 2009 Amendment"), and March 13, 2009 (the "March 2009 Amendment") (collectively, the "Amendments").

### I. Defendants Caused Advanta to File the Untrue Registration Statement and Amendments Thereto in Connection with The Shelf Registration of Advanta Notes to Individual Investors

A. The Registration Statements and Amendments Thereto

30. Defendants caused the Registration Statement to be filed with the SEC so that Advanta could commence a shelf registration and sale of RediReserve notes. Pursuant to the Registration Statement and the Amendments thereto, Advanta offered $500 million worth of RediReserve notes. A shelf registration is a type of registration that allows the issuer to register a set of securities and then sell them over time as needed. Thus, in this case, defendants caused Advanta to register $350 million worth of notes on August 18, 2006 and an additional $150 million worth of notes on February 9, 2009. Advanta was then able to sell these notes periodically, including throughout the Class Period.

31. The Registration Statement incorporated Advanta's subsequent annual reports on SEC Form 10-K, which were made pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"):

> "We incorporate by reference in this prospectus all the documents listed below and any filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange

Act after the date of this prospectus and before all the securities offered by this prospectus have been sold or de-registered"

32. Pursuant to federal law, the Registration Statement further provided that:

"(b) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof."

33. Thus, pursuant to this provision, Advanta's subsequent annual reports acted as registration statements in connection with the shelf registration and sale of RediReserve notes for purposes of determining liability under the 1933 Act.

34. On February 28, 2007, defendants caused Advanta's Annual Report on SEC Form 10-K for the fiscal year ended December 31, 2006 to be filed with the SEC. Under federal law and the terms of the Registration Statement, this annual report was incorporated by reference into the Registration Statement and acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to Advanta's Annual Report, dated February 28, 2007, as the 2007 Amendment. The 2007 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

35. On February 28, 2008, defendants caused Advanta's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 to be filed with the SEC. Under federal law and the terms of the Registration Statement, this annual report was incorporated by reference into the Registration Statement and acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to

Advanta's Annual Report, dated February 28, 2008, as the 2008 Amendment. The 2008 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

36. On February 9, 2009, defendants caused to be filed a post-effective amendment to the Registration Statement. The post-effective amendment registered an additional $150,000,000 in new RediReserve notes and re-registered $60,000,000 in unsold notes. Under federal law and the terms of the Registration Statement, for the purposes of determining liability under the 1933 Act, "each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof." Thus, the post-effective amendment filed on February 9, 2009 acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to the February 9, 2009 post-effective amendment as the February 2009 Amendment. The February 2009 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

37. On March 13, 2009, defendants caused Advanta's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 to be filed with the SEC. Under federal law and the terms of the Registration Statement, this annual report was incorporated by reference into the Registration Statement and acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to Advanta's Annual Report, dated March 13, 2009, as the March 2009 Amendment. The March 2009 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

B. The RediReserve Notes

38. The RediReserve notes at issue in this case are senior, unsecured debt securities of Advanta. The RediReserve notes rank junior to all secured debt of Advanta. The notes are non-negotiable and it does not appear that any secondary market ever developed for them. As Advanta stated in its public filings: "We do not expect there will be a trading market for the investment notes or the RediReserve certificates."

39. The RediReserve notes paid holders varying interest rates depending upon how much a particular individual invested in the notes and the duration of the note.

40. Advanta did not establish a so-called "sinking fund," security or other precaution to protect the RediReserve notes in the event that Advanta was unable to pay. In addition, the RediReserve notes were not insured or guaranteed by the FDIC. Thus, holders of RediReserve notes depended solely on Advanta's revenues from operations and other sources of funds for repayment of principal and interest upon a RediReserve note's maturity.

41. In November 2009, upon its entrance into bankruptcy, Advanta indicated that there was approximately $138,000,000 of principal and accrued and unpaid interest on outstanding debt securities in the form of retail Investment Notes and RediReserve Certificates.

C. Defendants Caused Advanta to Target Individual Investors

42. Defendants intended for individual investors, rather than sophisticated institutional investors, to buy the RediReserve notes.

43. Advanta advertised the RediReserve notes in newspapers and capped investment in the RediReserve notes at $500,000, measures evincing an intent to sell to individual investors as opposed to institutions.

44. Advanta's own SEC filings referred to the target customers for the RediReserve notes as "retail investors." Advanta also referred to the RediReserve notes as "retail notes." Advanta further noted that its sold these "retails notes . . . predominantly on a direct basis" to retail investors. Based on a review of the February 2009 Amendment, it appears that an individual could invest in RediReserve notes with as little as $100.

## II. The Registration Statement, as Amended, Contained Numerous Untrue Statements of Material Fact and Omitted Material Facts

45. The Registration Statement, as amended, dramatically overstated the strength of Advanta's business and financial strength and omitted numerous material facts about Advanta's illegal and unsound business practices.

### A. Untrue Statements and Omissions of Material Fact in the 2007 Amendment

46. On February 28, 2007, the 2007 Amendment reported: "Our principal objective is to use our information-based strategy to continue to prudently grow our business and increase our profitability. Based on our experience and expertise in analyzing the credit behavior and characteristics of our customers, we have developed an extensive database of customer information and attributes. We use this information, in conjunction with proprietary credit scoring, targeting and other sophisticated analytical models we have developed, to market our product offerings and services to prospective customers and to manage our relationships with our existing customers. ***We continually monitor our customer segments and validate our models based on actual results, and use this information to refine and improve our analytical assumptions***." [emphasis added].

47. The 2007 Amendment also represented: "We have developed sophisticated models for assessing the creditworthiness of applicants. Using a proprietary credit scoring system, we evaluate common applicant characteristics and their correlation to credit risk. We

regularly validate and update our scoring models to maintain and enhance their predictive power."

48. These statements were untrue and omitted material facts because, in fact, Advanta was being operated in an "unsafe and unsound" manner and operated in a manner that failed to sustain satisfactory earnings performance. Moreover, the FDIC determined that Advanta had failed to incorporate anticipated and actual changes in portfolio behavior into its loan loss methodology.

B. Untrue Statements and Omissions of Material Fact in the 2008 Amendment

49. On February 28, 2008, the 2008 Amendment reported Advanta's financial results for that year and stated "we continually seek new ways to develop and strengthen our relationships with our customers and the small business community." This statement was untrue and omitted material facts because:

• Beginning in at least June 2007, Advanta had been actively damaging its relationships with its customers through an aggressive campaign involving over 1 million repricing actions on existing credit cards that, according to the FDIC, violated Section 5 of the Federal Trade Commission Act, which prohibits unfair acts or practices. Specifically, Advanta unfairly imposed credit card increases based on criteria that were neither known nor communicated to customers. In addition, the bank did not adequately notify customers that their applicable interest rate had been increased, did not disclose the amount of the increased rate, did not effectively disclose customers' right to opt-out of the rate increase, and did not provide customers with sufficient time to exercise their right to opt-out. Ultimately, Advanta agreed to pay a $150,000 fine and $21 million in restitution for the "substantial injury" Advanta caused customers.

• Advanta's repricing campaign also violated Regulation B, which implements the Equal Credit Opportunity Act, by failing to send sufficient notice letters providing customers with explanations for the adverse actions.

• In addition to being illegal, Advanta's actions damaged relationships with customers by imposing severe price increases on them that, according to the FDIC, made it "very difficult for customers already struggling to make their minimum payments to cure any outstanding delinquency." According to the FDIC, over 68 percent of the credit card portfolio was repriced and large numbers of accountholders received substantial rate increases that raised their annual percentage rates, in some cases, to as high as 37 percent. According to the FDIC, these rapid rate increases led to higher charge-off levels in the second half of 2008.

50. The 2008 Amendment stated: "We have developed sophisticated models for assessing the creditworthiness of applicants. Using a proprietary credit scoring system, we evaluate common applicant characteristics and their correlation to credit risk. We regularly validate and update our scoring models to maintain and enhance their predictive power." This statement was untrue and omitted material facts because, as the FDIC concluded, Advanta was being operated in an unsafe and unsound manner, was not updating its credit portfolios to account for changes in portfolio behavior associated with the economic downturn, and was using an aggressive re-pricing strategy.

51. The 2008 Amendment further represented that "Management believes that at December 31, 2007, Advanta Bank Corp. was in compliance with the capital adequacy requirements to which it was subject." This statement was untrue and omitted material facts because:

• As the FDIC confirmed in its cease and desist order, Advanta operated with insufficient capital for its risk profile as a risky monocline credit card issuer. Accordingly, the FDIC later revealed that Advanta required a plan addressing: (i) current and future capital requirements; (ii) level of concentrations of credit; and (iii) the volume of adversely classified assets.

• Advanta was overstating its financial position by maintaining inadequate loan and lease losses. Thus, the amount of capital that Advanta reported was overstated.

• Advanta's capital planning model did not incorporate an adequate contingency plan for Advanta to survive an early amortization event for its credit card securitizations. By discussing Advanta's compliance with capital requirements, the 2008 Amendment put the issue "in play," triggering an obligation to disclose this fact.

52. The 2008 Amendment indicated that for 2007, Advanta had net income of approximately $72 million and had a provision for loan losses of approximately $58 million. This was untrue because Advanta was understating its loan losses and, in calculating loan losses, failing to account for changes in customer behavior driven by the economic downturn and Advanta's aggressive repricing.

53. The 2008 Amendment represented that Advanta calculated its allowance for loan losses as follows:

> Receivables on the consolidated balance sheets are presented net of the allowance for receivable losses. ***The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio***. We establish the allowance for receivable losses through provisions charged to earnings. We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. ***The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectability of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and***

> ***prevailing economic conditions***. Since our business credit card receivable portfolio is comprised of smaller balance homogeneous receivables, we generally evaluate the receivables collectively for impairment through the use of a migration analysis as well as the consideration of other factors that may indicate increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts that have been re-aged or entered a workout program. A migration analysis is a technique used to estimate the likelihood that a receivable or pool of receivables will progress through various delinquency stages and charge off. The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. Changes in economic conditions, the composition and risk characteristics of the receivables portfolio, bankruptcy laws or regulatory policies could impact our credit losses. A 10% change in the allowance for business credit card receivable losses at December 31, 2007 would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $6.7 million. [emphasis added]

54. This statement was untrue and contained omissions of material fact because, as stated by the FDIC, Advanta was not calculating its loan loss allowance as described in the 2008 Amendment. To the contrary, Advanta ignored the adverse credit effects caused by its aggressive repricing campaign and the economic downturn and, consequently, took an inadequate allowance for loan losses.

55. The 2008 Amendment contained a report from KPMG, in which KPMG represented:

> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

KPMG further represented:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2007 and 2006, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.

56. Thus, KPMG certified that Advanta's reported financial results, particularly its net income and loan loss provision were correct. But these measures were not correct for the

reasons set forth in the various FDIC orders and reports. Advanta's loan loss provision was inadequate and, as a consequence, income was also overstated because, according to Advanta's SEC statements, provisions for loan losses was charged against earnings. Moreover, Advanta lacked effective internal controls over financial reporting because it was not correctly calculating its loan losses or accurately presenting its financial state.

C. Untrue Statements and Omissions of Material Fact in the February 2009 Amendment

57. The February 2009 Amendment represented: "Using our direct marketing and information-based expertise, [Advanta] identify[ies] potential customers and provide[s] a high level of service tailored to the needs of small businesses" and represented "Our strategy in Advanta Business Cards is to maximize long-term profits by attracting and retaining high credit quality customers and deepening our customer relationships." These statements were untrue and omitted material facts because of the reasons set forth above.

58. Concerning Advanta's monitoring of its credit data, the February 2009 Amendment represented: "We continually monitor our customer segments and validate our models based on actual results, and use this information to refine and improve our analytical assumptions" and stated "We have developed sophisticated models for assessing the creditworthiness of applicants." The February 2009 Amendment also represented: "We continually monitor the credit quality of our business credit card customers and adjust the pricing and/or credit line size on their accounts based on a variety of factors, including changes in a customer's credit standing and other factors indicating a risk of future nonpayment." These statements were untrue and omitted material facts for the reasons set forth above.

59. The February 2009 Amendment expressly incorporated Advanta's SEC Form 8-K filed on January 22, 2009. In the incorporated SEC Form 8-K, Advanta indicated that, contrary

to "recent media," "Early amortization for our business credit card master trust is avoidable and the Company does not expect it to occur. The Company has repricing options and other structuring alternatives available to it." The incorporated SEC Form 8-K further stated "[t]he financial condition of the Company is very strong and our cash and short-term investment position has been increased in the fourth quarter from the $1.8 billion we reported as of September 30, 2008."[2] These statements were untrue and contained material omissions because:

• Advanta was not a in a "very strong" financial condition. As a result of the economic downturn, Advanta's aggressive repricing and weak underwriting, Advanta was nearing collapse by early 2009.

• Advanta was understating its loan losses and failing to adequately provision for deteriorating customer credit behavior, which also caused it to overstate its financial condition.

• The statement regarding "amortization" put the issue at play, triggering a duty to disclose the fact that Advanta did not have an adequate contingency plan for dealing with an amortization event and had not incorporated an adequate plan into its capital management plan.

D. Untrue Statements and Omissions of Material Fact in the March 2009 Amendment

60. On March 13, 2009, the March 2009 Amendment reported that "We use an information-based strategy to prudently operate our business" and represented that "we continually seek new ways to develop and strengthen our relationships with our customers and the small business community." These statements were untrue and omitted material facts because of the reasons set forth above.

61. The March 2009 Amendment represented: "We have developed models for assessing the creditworthiness of applicants. Using a proprietary credit scoring system, we

[2] The February 2009 Amendment also expressly incorporated the 2008 Amendment.

evaluate common applicant characteristics and their correlation to credit risk. Although we regularly validate and update our scoring models in order to maintain and enhance their predictive power, the challenging economic environment has made it more difficult to predict the credit performance of our customers." The March 2009 Amendment also represented that "Delinquencies and charge-offs are closely monitored by management in our collections and credit departments." This statements was untrue and omitted material facts for the reasons set forth above.

62. The March 2009 Amendment stated that: "We believe that we have helped position ourselves for the current challenging economic environment by increasing our levels of cash and liquid assets throughout 2008 and maintaining strong capital levels." This statement was untrue and omitted material facts because Advanta's capital was inadequate for its risk profile and overstated due to Advanta's failure to correctly recognize loan losses.

63. The March 2009 Amendment further indicated that: "Also, we are under no obligation to fund new receivables on our balance sheet whether or not there is an early amortization. We can do so for the accounts we choose and to the degree we choose. ***Therefore, we do not expect an early amortization to cause a serious reduction of our strong levels of liquidity***. Our expectation is that we would use our tools to prevent an early amortization unless we conclude that it is to our advantage not to do so." [emphasis added] This statement was untrue and omitted material facts because Advanta did not have an adequate contingency plan for dealing with an early amortization. Therefore, Advanta did not have an adequate basis for representing that an early amortization would not "cause a serious reduction of [its] strong levels of liquidity." Moreover, by discussing the possible effects of an amortization, Advanta put the issue "in play," triggering a duty to disclose that Advanta did not have an adequate plan.

64. The March 2009 Amendment stated that for 2008, Advanta had net income of approximately negative $44 million and a reserve for credit losses of approximately $123 million. The allowance for losses was purportedly calculated as follows:

> Receivables on the consolidated balance sheets are presented net of an allowance for receivable losses. The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio. We establish the allowance for receivable losses through provisions charged to earnings. We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectability of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions. Since our business credit card receivable portfolio is comprised of smaller balance homogeneous receivables, we generally evaluate the receivables collectively for impairment through the use of a migration analysis as well as the consideration of other factors that may indicate increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts that have been re-aged or entered a workout program. A migration analysis is a technique used to estimate the likelihood that a receivable or pool of receivables will progress through various delinquency stages and charge off. The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. Changes in economic conditions, the composition and risk characteristics of the receivables portfolio, bankruptcy laws or regulatory policies could impact our credit losses. A 10% change in the allowance for business credit card receivable losses at December 31, 2008 would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $10.3 million.

65. These statements were untrue and omitted material facts for the reasons set forth above.

66. The March 2009 Amendment contained a report from KPMG, in which KPMG represented:

> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

KPMG also represented:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2008 and 2007, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles.

67. Thus, KPMG certified that Advanta's reported financial results, particularly its net income and loan loss provision were correct. But these measures were not correct for the reasons set forth in the various FDIC orders and reports. Advanta's loan loss provision was inadequate and, as a consequence, income was also overstated because, according to Advanta's SEC statements, provisions for loan losses was charged against earnings. Moreover, Advanta lacked effective internal controls over financial reporting because it was not correctly calculating its loan losses or accurately presenting its financial state.

## III. The Truth Emerges

68. On July 1, 2009, Advanta filed an SEC Form 8-K making the two FDIC orders publicly available. The restitution payments required in connection with Advanta's credit card repricing further weakened Advanta financially.

69. On November 8, 2009, without prior notice to the FDIC, Advanta filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. As the FDIC later explained, a major cause of Advanta's failure was the fact that it did not develop an adequate contingency plan for dealing with an early amortization event. This failure contributed to additional loan losses when an amortization event occurred in 2009, ultimately leading to Advanta's failure. At that time, Advanta represented that approximately $138 million in notes were outstanding.

70. On December 16, 2009, the FDIC found that there was a "substantial threat" that yet another of Advanta's subsidiary banks, Advanta Bank, would "engage in violations of law and/or unsafe or unsound business practices" and instituted a proceeding to determine whether an appropriate order should be issued against the subsidiary bank under the provisions of section 8(b) of the Federal Deposit Insurance Act. Among other things, the FDIC charged that the Advanta Bank's Board of Directors, which included defendants Alter, Rosoff, Costello and Browne, lacked independence from Advanta Bank's bankrupt parent company, Advanta, which was "in need of capital." The FDIC further charged that Advanta Bank failed to maintain adequate records and that Alter, Rosoff, Costello and Browne "hindered" the FDIC's efforts to monitor the financial condition of the Advanta Bank.

71. During October 2010, the FDIC made available its Material Loss Review for Advanta.

72. In light of Advanta's bankruptcy, it is unclear to whether the Class will be able to recoup the principal and interest owed them in connection with the RediReserve notes.

**RELIANCE PRESUMED**

73. Because Plaintiffs and members of the Class acquired RediReserve notes prior to the issuance of an earnings statement covering a 12 month period after the issuance of the Registration Statement, as amended by the 2007 Amendment, the 2008 Amendment, the February 2009 Amendment and March 2009 Amendment, reliance on the Registration Statement is presumed under the 1933 Act.

**CLASS ACTION ALLEGATIONS**

74. Plaintiffs bring this action as a class action on behalf of a class consisting of all persons or entities who, during the Class Period, acquired RediReserve notes pursuant and/or

traceable to the Registration Statement, as amended by the 2007 Amendment, the 2008 Amendment, the February 2009 Amendment and March 2009 Amendment, and were damaged thereby (the "Class"). The Class Period runs from June 24, 2007 through Advanta's bankruptcy on November 8, 2009. Excluded from the Class are defendants, members of their immediate family and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

75. The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Advanta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' conduct in violation of federal law that is complained of herein.

77. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

78. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether Defendants violated the 1933 Act; whether the Registration Statement, as amended by the 2007 Amendment, the 2008 Amendment, the February 2009 Amendment and March 2009 Amendment, misrepresented and/or omitted

facts about the business operations and/or management of Advanta; and to what extent the members of the Class have sustained damages and the proper measure of damages.

79. A class action is superior to all other available methods for fair and efficient adjudication of this controversy since joinder of member is impracticable. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Violations of the 1933 Act Against All Defendants

80. Plaintiffs repeat and reallege each and every allegation contained above.

81. This Count is brought pursuant to § 11 of the 1933 Act, 15 U.S.C. § 77k, on behalf of the Class, against all defendants. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

82. The Registration Statement, as amended, contained untrue statements of material facts, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

83. The Individual Defendants were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants signed or authorized the signing of the Registration Statement as amended. KPMG consented to the incorporation of the audited financial statements into the Registration Statement, as amended. The Individual Defendants and KPMG did not make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Registration Statement, as amended, were true and without omissions of any material facts and were not misleading.

84. By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, § 11 of the 1933 Act.

85. Plaintiffs acquired RediReserve notes pursuant and/or traceable to the Registration Statement, as amended, for the offering.

86. Plaintiffs and the Class have sustained damages. At the time they purchased RediReserve notes, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2009. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## SECOND CAUSE OF ACTION

### Violations of §12(a)(2) of the 1933 Act Against the Individual Defendants

87. Plaintiffs repeat and reallege each and every allegation contained above. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

88. By means of the defective Registration Statement, as amended, the Individual Defendants assisted in the sale of the Company's securities to Plaintiffs and the other members of the Class.

89. The Registration Statement, as amended, was inaccurate as detailed above. The Individual Defendants owed Plaintiffs and the other members of the Class who acquired

RediReserve notes pursuant to the Registration Statement, as amended, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, as amended, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Individual Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement, as amended, that are set forth above.

90. At the time they purchased RediReserve notes, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2009.

91. By reason of the conduct alleged herein, the Individual Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who acquired RediReserve notes pursuant to the Registration Statement, as amended, sustained substantial damages in connection with their acquisition of RediReserve notes. Accordingly, Plaintiffs and the other members of the Class who hold such shares have the right to rescind and recover the cash value of the consideration exchanged for their shares, and hereby tend their shares to the Individual Defendants.

## THIRD CAUSE OF ACTION

### Violations of § 15 of the 1933 Act Against the Individual Defendants

92. Plaintiffs repeat and reallege each and every allegation contained above.

93. This Cause of Action is brought pursuant to § 15 of the 1933 Act against the Individual Defendants. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless

misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

94. Each of the Individual Defendants was a control person of Advanta by virtue of his or her position as a director, senior officer and/or major shareholder of the Company, which allowed each of the Individual Defendants to exercise control over Advanta and its operations.

95. Each of the Individual Defendants was a culpable participant in the violations of § 11 of the 1933 Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement, as amended, and having otherwise participated in the process which allowed the offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as Class Representatives;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/ injunctive or other relief as deemed appropriate by the Court.

**JURY DEMANDED**

Plaintiffs hereby demands a trial by jury.

DATED: January 13, 2011

THE WEISER LAW FIRM, P.C.

/s/ Patricia C. Weiser

Patricia C. Weiser (PA #78295)
Robert B. Weiser (PA #81575)
Brett D. Stecker (PA #86242)
Jeffrey J. Ciarlanto (PA #205838)
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

SCOTT + SCOTT LLP
Thomas L. Laughlin IV
500 Fifth Avenue, Floor 40
New York, NY 10110
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

SCOTT + SCOTT LLP
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092

*Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Jeffrey J. Ciarlanto, hereby certify that, on January 13, 2011, I caused a true and correct copy of Plaintiffs' Amended Class Action Complaint for Violation of the Securities Act of 1933 to be served upon the following counsel for Defendants via ECF:

Dechert LLP
Michael L. Kichline
Sarah L. Wyatt
2929 Arch Street
Philadelphia, PA 19104

Ballard, Spahr, Andrews and Ingersoll LLP
Edward D. Rogers
Ruth S. Uselton
1735 Market Street
51st Floor
Philadelphia, PA 19103

Mayer Brown LLP
Stanley J. Parzen
71 S. Wacker Dr.
Chicago, IL 60606

/s/ Jeffrey J. Ciarlanto
Jeffrey J. Ciarlanto