## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------- :
WILLIAM E. UNDERLAND and MARK     :
SCHALLER, *on behalf of themselves and all*  :
*others similarly situated,*             :
                              :
                Plaintiffs,       :
                              :
       v.                    :    10-Civ.-3621 (CMR)
                              :
DENNIS ALTER , WILLIAM A. ROSOFF,  :
PHILIP M. BROWNE, DAVID B.        :
WEINSTOCK, ROBERT S. BLANK, MAX  :
BOTEL, THOMAS COSTELLO, DANA    :
BECKER DUNN, RONALD LUBNER, OLAF :
OLAFSSON, MICHAEL STOLPER and   :
KPMG LLP,                       :
                              :
                Defendants.   :
---------------------------------------------------------- :

## <u>ORDER</u>

     **AND NOW**, this _____ day of _____, upon consideration of

the Motion of the Advanta Defendants to Dismiss the Amended Complaint (the "Motion") and

the accompanying memorandum, the plaintiffs' response thereto, and the Advanta Defendants'

reply, it is hereby ORDERED as follows:

     1.     The Motion is GRANTED.

     2.     The Amended Complaint is dismissed in its entirety with prejudice as to the

Advanta Defendants.

                                         BY THE COURT:

                                         _____

                                         Hon. Cynthia M. Rufe, U.S.D.J.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------- :
WILLIAM E. UNDERLAND and MARK     :
SCHALLER, *on behalf of themselves and all*  :
*others similarly situated,*            :
                               :
            Plaintiffs,       :
                               :
     v.                     :   10-Civ.-3621 (CMR)
                               :
DENNIS ALTER , WILLIAM A. ROSOFF,  :
PHILIP M. BROWNE, DAVID B.      :
WEINSTOCK, ROBERT S. BLANK, MAX  :
BOTEL, THOMAS COSTELLO, DANA   :
BECKER DUNN, RONALD LUBNER, OLAF :
OLAFSSON, MICHAEL STOLPER and   :
KPMG LLP,                   :
                               :
            Defendants.     :
---------------------------------------------------------- :

## MOTION OF THE ADVANTA DEFENDANTS
## TO DISMISS THE AMENDED COMPLAINT

Defendants Dennis Alter, William A. Rosoff, Philip M. Browne, David B. Weinstock,

Robert S. Blank, Max Botel, Thomas Costello, Dana Becker Dunn, Ronald Lubner, Olaf

Olafsson, and Michael Stolper (the "Advanta Defendants") hereby move this Honorable Court,

pursuant to Federal Rule of Civil Procedure 12(b)(6) and the provisions of the Private Securities

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, for the entry of an Order dismissing the

Amended Complaint with prejudice as to all Advanta Defendants.  Grounds supporting this

Motion are set forth in the accompanying Memorandum.  The Advanta Defendants respectfully

request oral argument.

Dated:  February 28, 2011                    Respectfully submitted,


                                             s/ Sarah L. Wyatt
                                             Steven B. Feirson (21357)
                                             Michael L. Kichline (62293)
                                             Sarah L. Wyatt  (91623)
                                             Dechert LLP
                                             Cira Centre, 2929 Arch Street
                                             Philadelphia, PA 19104
                                             (215) 994-4000

                                             *Attorneys for Dennis Alter, William A. Rosoff,*
                                             *Philip M. Browne, David B. Weinstock,*
                                             *Robert S. Blank, Max Botel, Thomas Costello,*
                                             *Dana Becker Dunn, Ronald Lubner, Olaf*
                                             *Olafsson, and Michael A. Stolper*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------------- :

WILLIAM E. UNDERLAND and MARK                                :
SCHALLER, *on behalf of themselves and all*                  :
*others similarly situated,*                                 :
                                                             :
                                   Plaintiffs,               :
                                                             :
            v.                                               :    10-Civ.-3621 (CMR)
                                                             :
DENNIS ALTER , WILLIAM A. ROSOFF,                            :
PHILIP M. BROWNE, DAVID B.                                   :
WEINSTOCK, ROBERT S. BLANK, MAX                             :
BOTEL, THOMAS COSTELLO, DANA                                 :
BECKER DUNN, RONALD LUBNER, OLAF                            :
OLAFSSON, MICHAEL STOLPER and                                :
KPMG LLP,                                                    :
                                                             :
                                   Defendants.               :
----------------------------------------------------------- :

## MEMORANDUM IN SUPPORT OF THE MOTION OF
## THE ADVANTA DEFENDANTS TO DISMISS THE AMENDED COMPLAINT

Steven B. Feirson
Michael L. Kichline
Sarah L. Wyatt
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
Phone: (215) 994-4000
Fax: (215) 994-2222

Attorneys for the Advanta
Defendants

February 28, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 5

I.     ADVANTA COLLAPSES AS A RESULT OF THE ECONOMIC CRISIS ................. 5

II.    THE AMENDED COMPLAINT .............................................................. 6

    A.   The Challenged Statements....................................................... 6

    B.   Alleged Basis of Falsity ............................................................ 7

        1.   The OIG Report ............................................................ 7

        2.   The FDIC's Cease-and-Desist Orders ................................. 10

LEGAL STANDARDS ................................................................................... 11

I.     UNDER THE APPLICABLE PLEADING STANDARD, THIS COURT MUST
      ASSESS THE PLAINTIFFS' COMPLAINT FOR PLAUSIBILITY ........................... 11

II.    THE COURT MUST DISMISS THE PLAINTIFFS' SECTION 11 AND 12(a)(2)
      CLAIMS IF THE COMPLAINT FAILS TO ADEQUATELY ALLEGE A
      MATERIALLY FALSE OR MISLEADING STATEMENT OF FACT ....................... 12

    A.   A Section 11 or 12(a)(2) Claim Fails if the Complaint Does Not
        Adequately Allege That the Statement Was False or Misleading ...................... 12

    B.   The Plaintiffs Must Establish That the Misleading Statement or Omission
        Was Material ....................................................................... 14

        1.   Vague Statements of General Optimism Are Immaterial Puffery .......... 15

        2.   The Bespeaks Caution Doctrine and the PSLRA's Safe Harbor
            Protect Forward-Looking Statements ...................................... 16

ARGUMENT ............................................................................................. 17

I.     PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE STATEMENT ..................... 17

    A.   The Statements About Financial Performance or Prospects Are Not
        Actionable ......................................................................... 17

        1.   Plaintiffs Fail to Allege Any Facts to Show That Defendants Did
            Not Genuinely or Honestly Believe the Statements When Made ........... 19

        2.   Each of the Statements is Also Inactionable for a Number of
            Independently Dispositive Reasons .......................................... 21

    B.   Advanta's Descriptions of Its Methodology for Assessing and Monitoring
        Customer Creditworthiness Are Not Actionable ................................. 25

    C.   Advanta's Statements About Its Commitment to Strengthening Customer
        Relationships Are Not Actionable ............................................... 27

**TABLE OF CONTENTS**
(continued)

**Page**

II.    THE PLAINTIFFS' SECTION 11 AND 12(a)(2) CLAIMS AGAINST
       DEFENDANT BLANK ARE BASED ON A SINGLE STATEMENT IN THE
       2006 10-K, AND ARE THEREFORE ESPECIALLY FEEBLE ................................... 29

III.   BECAUSE THE UNDERLYING SECTION 11 AND 12(a)(2) CLAIMS FAIL,
       THE SECTION 15 CLAIMS ALSO FAIL .................................................................... 30

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) .................................................................................................11, 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...........................................................................................................15

*Bastian v. Petren Resources Corp.*,
    892 F.2d 680 ..................................................................................................................1, 2

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .....................................................................................................11, 12

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ...............................................................................................14

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
    114 F. Supp. 2d 316 (D.N.J. 2000) ...............................................................................12, 16

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978) ...............................................................................................14

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ...............................................................................................15

*First Nationwide Bank v. Gelt Funding Corp.*,
    820 F. Supp. 89 (S.D.N.Y. 1993) .......................................................................................18

*Galati v. Commerce Bancorp, Inc.*,
    220 Fed. Appx. 97 (3d Cir. 2007) .......................................................................................25

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ...............................................................................................14

*Hinerfeld v. United Auto Group*,
    1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ......................................................18

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004) ...........................................................................................12, 16

*In re Adolor Corp. Sec. Litig.*,
    616 F. Supp. 2d 551 (E.D. Pa. 2009) ...........................................................................12, 13, 20

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)......................................................................15, 28

*In re Aetna Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)......................................................................16, 22

*In re ATI Techs., Inc., Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) ..............................................................25

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..........................................................................15

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) ....................................................................... passim

*In re Home Health Corp. of Am. Sec. Litig.*,
    1999 U.S. Dist. LEXIS 1230 (E.D. Pa. Jan. 28, 1999) ...................................16

*In re IKON Office Solutions, Inc.*,
    277 F.3d 658 (3d Cir. 2002)............................................................................14

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002)....................................................................12, 14

*In re Numerex Corp. Sec. Litig.*,
    913 F. Supp. 391 (E.D. Pa. 1996) ...................................................................16

*In re PMA Capital Corp. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005)..................................30

*In re RAIT Fin. Trust Sec. Litig.*,
    2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008) ...............................11

*In re U.S. Interactive, Inc. Sec. Litig.*,
    2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002)......................... passim

*In re Union Carbide Class Action Sec. Litig.*,
    648 F. Supp. 1322 (S.D.N.Y. 1986)................................................................12

*In re Wachovia Corp. ERISA Litig.*,
    2010 U.S. Dist. LEXIS 79971 (W.D.N.C. Aug. 6, 2010)................................18

*Key Equity Investors Inc. v. Sel-Leb Mktg.*,
    246 Fed. Appx. 780 (3d Cir. 2007)..................................................................25

*Klein v. Gen. Nutrition Cos.*,
    186 F.3d 338 (3d Cir. 1999)................................................................30

*Malack v. BDO Seidman, LLP*,
    617 F.3d 743 (3d Cir. 2010)................................................................4

*Parnes v. Gateway 2000*,
    122 F.3d 539 (8th Cir. 1997) .............................................................16

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004)......................................4, 5, 6, 13

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................16

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) ..............................................................4

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991).....................................................................13, 19

Defendants Dennis Alter, William A. Rosoff, Philip M. Browne, David B. Weinstock, Robert S. Blank, Max Botel, Thomas Costello, Dana Becker Dunn, Ronald Lubner, Olaf Olafsson, and Michael Stolper (the "defendants" or the "Advanta Defendants") submit this memorandum in support of their Motion to Dismiss the Amended Complaint.

## INTRODUCTION

> No social purpose [is] served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation.
>
> *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990).

In late 2007, Advanta Corp. ("Advanta" or the "Company"), an issuer of credit cards to small businesses, began to experience the early effects of what we now know went on to become the worst financial crisis since the Great Depression.  In September 2007, Advanta publicly announced that delinquencies were beginning to rise in a few industry segments; by October this trend began to spread and appear more generally throughout the portfolio; and by late November Advanta announced that, because of the volatility and lack of certainty in the economy, it could not prudently provide guidance on its expected financial performance in 2008.  Indeed, Advanta explicitly warned that the worsening economy presented "inherent and specific challenges" and "had and may continue to have a significant impact on our results." Advanta Corp. 2007 10-K, Exh. A, at 26.  Moreover, Advanta warned that the negative impact the "deterioration in the U.S. economy" had on the credit quality of Advanta's customers could "continue or worsen."  *Id.*

By the fall of 2008, the financial crisis peaked as the economy teetered on the brink of total collapse.  In a span of weeks, a series of unprecedented – and, indeed, previously unimaginable – events engulfed the economy.  The federal government seized Fannie Mae and

Freddie Mac.  Lehman Brothers filed for bankruptcy and literally disappeared over night.  The government rescued AIG from catastrophe with an $85 billion emergency bailout.  The Dow Jones average fell more than 750 points in one day – the largest one-day point drop in history. The Treasury Department announced its plan to inject $250 billion of capital into the nation's banking system.  And, on October 23, 2008, Federal Reserve Chairman Alan Greenspan testified before Congress that "we are in the midst of a once-in-a-century credit tsunami."

In the face of Advanta's warnings and these unprecedented events, and only four days after Chairman Greenspan's dire assessment, William Underland – the plaintiff in this putative class action – purchased $40,000 worth of unrated and unsecured notes issued by Advanta.[1]  In early 2009, Underland bought another $20,000 note and Plaintiff Schaller bought approximately $36,000 worth of notes.[2]  The plaintiffs were willing to purchase these notes, risky as they were, because they offered correspondingly high yields, with the top annual percentage yields ranging from an extraordinarily high 7.50% to an even higher 12.05%.[3]

There was never any question that these notes were risky investments even in the best of economic times.  Indeed, even the plaintiffs acknowledge in their complaint that Advanta was a "risky" business, Am. Compl. ¶ 2, that its "below investment grade" credit rating required the Company to sell its debt in an "unorthodox manner," *id*. ¶ 4, that the notes were unsecured, *id*. ¶ 38, that they were not protected by a "sinking fund" in the event of default, *id*. ¶ 40, and that they

---

[1]    *See* Exhibit B attached to Plaintiffs' Motion for Appointment As Lead Plaintiffs (Dkt. # 20-4).

[2]    *Id.; see also* Exhibit C attached to Plaintiff's Motion for Appointment As Lead Plaintiff (Dkt. # 20-5).

[3]    *See* Advanta Corp. Form 424B3 filed July 1, 2007, attached as Exh. B; Advanta Corp. Form 424B3 filed July 5, 2009, attached as Exh. C.

By way of comparison, non-inflation-protected savings bonds issued by the U.S. Treasury between November 2008 and April 2009 earned a fixed interest rate of 1.30%.  *See* http://www.treasurydirect.gov/indiv/research/indepth/ebonds/res_e_marketbonds.htm.

were not insured or guaranteed by the FDIC, *id*.  These and other risks were thoroughly disclosed in the registration statement pursuant to which the notes were issued.  *See* Registration Statement of August 18, 2006, Exh. D, at 11-13; *see also id*. at 1 (noting, in boldface, that investing in the notes "involves risks" and directing prospective investors to the risk factors presented in the registration statement).

Although these risks were explicitly disclosed and well understood from the start, no one could have foreseen the tsunami that would lead to the demise of Advanta.  Ultimately, after weathering the storm for two years and after extraordinary efforts to save the Company failed, Advanta succumbed to bankruptcy in November 2009.  At that time, the Company estimated that approximately $138 million in outstanding principal and interest was due on the notes.

The named plaintiffs in this action bring securities claims and seek to represent a proposed class of investors who purchased Advanta notes between June 2007 and November 2009 – a period that coincides almost to the month with the progressive worsening of the Great Recession and the worsening of Advanta's financial condition.  In other words, these are not investors who purchased notes during a period of sunshine and rosy forecasts.  No, these investors – with full warning of the risks – ventured into the economic storm of the century in search of outsized investment returns.  But, fortunately for these plaintiffs, all has not been lost.  Despite the risks they knowingly took, it appears that they will recover the vast majority of their investment losses.  They are expected to receive payment of somewhere between 64.4% and 100% of their losses through the bankruptcy proceedings pending in the District of Delaware. *See* Disclosure Statement for Debtors' Joint Plan under Chapter 11 of the Bankruptcy Code, Exh. E, at DS-9.

Instead of acknowledging that any loss they may sustain on their investments was caused by their voluntary assumption of risk and by the economic crisis, the plaintiffs now seek to pin the blame for the entirety of any prospective loss on the defendants. In doing so, the plaintiffs attempt to use the securities laws to force the defendants, as officers and directors of a public company, to insure against the investment losses the plaintiffs suffered when they knowingly purchased risky securities in a *credit* card company "in the midst of a once-in-a-century *credit* tsunami." This approach is a perversion of the securities laws. *See Malack v. BDO Seidman, LLP*, 617 F.3d 743, 752 (3d Cir. 2010) ("The establishment of investor insurance is contrary to the goals of securities laws."); *Searls v. Glasser*, 64 F.3d 1061, 1069 (7th Cir. 1995) ("The federal securities laws should not be mistaken for insurance against risky investments. . . ."); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) ("The securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken.").

In light of all this, it is not surprising that the Amended Complaint fails to state any legally cognizable claim. First, because the vast majority of the challenged statements are statements of opinion or belief, or are forward-looking statements, virtually the entire Amended Complaint should be dismissed for failure to allege ***any facts*** to show that the defendants did not genuinely believe the statements they made. ***In fact, the plaintiffs specifically disclaim any allegations of fraud or knowing misstatements.*** Second, most of the statements fail for additional separate and independent reasons. For example, many of the forward-looking statements were accompanied by the explication of appropriate risk factors and, therefore, are protected by the bespeaks caution doctrine. Others are classic examples of "puffery" that no reasonable investor would find significant. The plaintiffs' fine-tooth combing of the registration

-4-

statement amendments has yielded no actionable misstatement and the Amended Complaint
should be dismissed with prejudice.

## **BACKGROUND**

### I.      ADVANTA COLLAPSES AS A RESULT OF THE ECONOMIC CRISIS.

During the class period, Advanta was one of the nation's largest credit card issuers in the
small business market.  Advanta Corp. 2007 10-K, Exh. A, at 2.[4]  Advanta operated its business
primarily through Advanta Bank Corp. (the "Bank"), a wholly-owned subsidiary, and funded its
business through securitization transactions and sales of notes to retail investors.  *See id.* at 2,
16, 29.  In the securitization transactions, Advanta sold the majority of its credit card
receivables – i.e., payments due from customers – to a trust.  The trust then sold some of the
rights to these receivables to investors – primarily sophisticated institutional investors.  As
customers made payments on their Advanta credit card balances, the trust would make
payments to the securitization investors.  The trust would also use some portion of the customer
payments to purchase more receivables from Advanta and then sell the rights to those
receivables to investors.  *See id.* at 43-44.

As the economy rapidly deteriorated during 2008 and 2009, small businesses, which
constituted Advanta's customer base, were among the hardest hit.  Advanta's customer defaults
grew to unprecedented levels, which adversely affected Advanta's financial condition as well as
that of the securitization trust.  By June 10, 2009, the level of Advanta's customer defaults had
triggered a provision in the securitization trust agreements designed to protect the securitization
investors by causing early amortization.  *See* Form 8-K of Advanta Corp. filed June 10, 2009,
Exh. F.  As a result of early amortization, the principal payments due to the securitization

---

[4]      Relevant excerpts of the registration statement and the challenged Amendments, including the
challenged 10-Ks, are attached hereto.

investors were accelerated and nearly all of the credit card payments that Advanta received from its customers were directed to pay down the securitization investors' principal. *Id.* Because the securitizations could no longer fund credit card purchases, Advanta closed all of its customer cards, barring them from any further use. *Id.*

After weathering the storm for over two years, in November 2009, Advanta and several of its subsidiaries – though not the Bank – filed for bankruptcy protection. In March 2010, the Federal Deposit Insurance Corporation, which had considered the Bank "undercapitalized" as of September 2009, took over as Receiver of the Bank. *See* Form 8-K of Advanta Corp. filed March 22, 2010, Exh. G.

## II.      THE AMENDED COMPLAINT

The plaintiffs sue the defendants under Sections 11 and 12(a)(2) of the Securities Act of 1933, which impose liability on individuals for signing registration statements or prospectuses that contain materially false or misleading statements. The original registration statement for the risky notes at issue in this action was filed on August 18, 2006. According to the plaintiffs, the actionable misstatements are to be found not in the original registration statement but in four subsequent filings that acted as amendments to that original registration statement: in Advanta's 2006 10-K, filed on Feb. 28, 2007 (the "2007 Amendment"); in the 2007 10-K, filed on Feb. 28, 2008 (the "2008 Amendment"); in a post-effective amendment to the original registration statement, filed on Feb. 9, 2009 (the "February 2009 Amendment"); and in the 2008 10-K, filed on March 13, 2009 (the "March 2009 Amendment") (collectively, the "Amendments").

### A.      The Challenged Statements

Having picked through the Amendments, the plaintiffs challenge several limited categories of statements:

- **Statements about Advanta's financial condition or prospects.**  The plaintiffs challenge a number of statements of subjective analysis that Advanta made about its financial condition and future prospects.  In particular, the plaintiffs attack as false (i) the Company's estimates of the amount of losses it would suffer in the future as a result of expected customer defaults on their loans; (ii) the Company's prediction about whether it would be able to avoid early amortization of its securitization trust and, if not, how such an event would affect Advanta's financial condition; (iii) the Company's prediction about whether its capital levels would prove adequate in the future and the Company's statement of its belief that it had complied with capital requirements; and (iv) general statements that the Company's financial condition was "very strong."

- **Descriptions of Advanta's methodology for assessing and monitoring customer creditworthiness.**  The plaintiffs allege that in calculating its customers' creditworthiness, Advanta did not use the assumptions that the plaintiffs, in retrospect, now believe should have been used.  The plaintiffs do not, however, allege that Advanta did not actually use the methodology it claimed to use.

- **Statements about Advanta's commitment to seeking to strengthen customer relationships.**  The plaintiffs challenge statements about Advanta's commitment to "strengthening customer relationships."

**B.      Alleged Basis of Falsity**

In contending that these statements were false or misleading, the plaintiffs rely *exclusively* on the content of three documents issued by the FDIC *after* the issuance of the Amendments the plaintiffs challenge in this action.  However, these documents, on their face, do not provide any factual support for the conclusory assertions that the challenged statements were false or misleading at the time they were made.

**1.      The OIG Report**

When the Bank was closed on March 19, 2010, the FDIC's Deposit Insurance Fund purportedly incurred a material loss.  As required by Section 38(k) of the Federal Deposit Insurance Act, the FDIC's Office of the Inspector General undertook a material loss review, whose findings it summarized in a report issued in October 2010 (the "OIG Report").  *See* OIG Report, Exh. H, at 1, 22.[5]  The report consisted of an evaluation of the FDIC's supervision of the

---

[5]      All references to the OIG Report are to its main body, as distinct from its executive summary.

Bank; a determination as to why the Bank's problems allegedly caused a material loss to the Deposit Insurance Fund; and recommendations to prevent future losses.  *Id*. at 1.

In the report, the Inspector General concluded, *inter alia*, that the Bank failed because management did not accurately foresee future contingencies.  In particular, the Inspector General targeted the fact that management believed that it had the resources to avert an early amortization of the securitization trust.  *Id*. at 5.  Therefore, management had no reason to believe it would need to plan for such an event.  *Id*.  The Inspector General concluded that management's beliefs and predictions about its ability to avert an early amortization turned out to be wrong, and that as a result the Bank incurred increased loan losses that ultimately led to its insolvency.  *Id*.

The Inspector General in no way suggested, however, that management did not genuinely believe that the Bank would be able to avert an early amortization event.  Rather, the report shows that the Bank, like so many other businesses in 2008 and 2009, and indeed like the FDIC itself, was unable to predict the magnitude and duration of the economic crisis.  *See, e.g.*, OIG Report at 6 (noting that the Bank began to see a significant increase in delinquencies and charge-offs only as the result of the rapidly deteriorating economic conditions of 2008 and 2009); *id*. at 17 (acknowledging that not even the FDIC could foresee with perfect precision all the "various economic and market risk factors faced by the bank due to its securitization activities").

As the report acknowledges, the FDIC had provided extensive ongoing supervision of the Company between 2006 and 2010, including regular on-site risk management examinations and semiannual capital market reviews of the Bank intended to identify key risks.  *Id*. at 11-12.  The result of the FDIC's close supervision and frequent examinations of the Bank, including frequent on-site examinations, was that **until May 2009 the FDIC rated the Bank as a "well-performing institution" with very sound performance metrics** – such as capital ratios in

excess of 20%, returns on average assets in excess of 5.50%, and maintenance of cash and Federal funds sold ranging from 22% to 32% of total assets. *Id*. at 13; *see also id*. at 28 (describing the FDIC's rating metrics). Moreover, **the FDIC considered Advanta to be "Well Capitalized" until June 30, 2009.** *Id*. at 20. The FDIC's oversight also revealed that:

- The risks inherent in the Bank's unique monoline operational structure and rapid loan growth were "mitigated by the Bank's maintenance of Tier 1 Leverage and Total Risk-Based capital ratios in excess of 20 percent and growing levels of on-balance sheet liquidity in the form of cash and Federal funds sold." *Id*. at 16.

- As of September 2006 the Bank's securitization activities were well managed and accepted by the market. *Id*. at 18.

- The Bank was maintaining increasing levels of liquidity, with cash and Federal funds sold growing, as a percentage of total assets, from 22% in June 2006 to 32% in June 2007 to 44% by year-end 2007. *Id*.

It was not until November 2008, about a year into the recession, that the FDIC required the bank's contingency funding plans to incorporate scenarios that contemplated early amortization. *Id*. at 18. It was not until May 2009 – after having survived the first year and a half of the recession intact – that the Bank saw its performance rating downgraded. *Id*. at 13. And it was not until September 2009 – almost two years into the recession – that the FDIC began to consider the Bank "Undercapitalized." *Id*. at 20.

Although the report concluded that "earlier and greater supervisory emphasis . . . could have been expressed" regarding the Bank's ability to deal with future contingencies, the report made clear that it was making that assessment "in hindsight." *Id*. at 11; *see also id*. at 16, 19. In other words, despite its extensive supervision of the Bank, the FDIC itself had been unable to foresee that the Bank's financial condition would one day prove inadequate to withstand the unprecedented economic tsunami. The report was intended to be, and indeed was, an exercise in hindsight.

2.      **The FDIC's Cease-and-Desist Orders**

In June 2009, a month after the FDIC first downgraded the Bank's performance ratings in May 2009, the FDIC issued two cease-and-desist orders.  The orders took effect on June 30, 2009 and were disclosed by Advanta Corp. in an 8-K filing with the SEC.  *See* Form 8-K of Advanta Corp. Filed June 30, 2009, Exh. I.  In the first cease-and-desist order (the "First Order"), the FDIC – looking into the future – mandated what the FDIC believed the Bank needed to do to adapt and survive in the dramatically changing economic environment.  The second cease-and-desist order (the "Second Order") related to the Bank's compliance with *consumer* laws.  Neither order had anything to do with what the plaintiffs are complaining about in this action.

a.      **The First Order**

Far from establishing that the Bank engaged in any misconduct, the First Order implemented a number of preventative restrictions on the Bank to ensure that it continued to function in a "safe and sound" manner during the ongoing economic crisis.  *See* First Order attached to Form 8-K (June 30, 2009), Exh. I.  In particular, the First Order required that in the future the Bank "maintain its Tier 1 Leverage Capital ratio at a level of no less than 5 percent and Total Risk-Based Capital ratio equal to or greater than 10 percent. . . ."  *Id.* at 5.  The Bank's prior capitalization levels *had met these levels.  See* Item 1.01 attached to Form 8-K (June 30, 2009), Exh. I.  In short, the purpose of the First Order was not to condemn the Bank's past conduct.  Rather, in June 2009, with the economy in a state of great flux and uncertainty, the FDIC sought to ensure through the First Order that, going forward, the Bank would be able to continue to maintain its financial health.  In imposing these restrictions, the FDIC in no way made any findings or expressed any opinions concerning the Bank's *past* business practices.  The plaintiffs' attempt to suggest otherwise finds no support in the materials they rely upon.

-10-

b.     The Second Order

The Second Order was concerned solely with consumer protection issues, not the Bank's financial condition.  The Second Order alleged that the Bank had raised the interest rates on certain customer accounts and marketed its Cash Back Rewards program in violation of consumer protection laws.  As a consequence, the FDIC believed that the Bank had been "unjustly enriched" and certain consumers hurt.  Second Order attached to Form 8-K (June 30, 2009), Exh. I, at 2.  As a result, the FDIC ordered that the Bank should pay restitution to certain customers affected by these practices.  The Order did not allege that this conduct caused any harm to Advanta's *own* financial condition.  In fact, the FDIC alleged just the contrary.

## LEGAL STANDARDS

I.     **UNDER THE APPLICABLE PLEADING STANDARD, THIS COURT MUST ASSESS THE PLAINTIFFS' COMPLAINT FOR PLAUSIBILITY.**

As the U.S. Supreme Court has recently articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), to survive a motion to dismiss under Rule 12(b)(6) requires more than making "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements."  *Iqbal*, 129 S. Ct. at 1949.  Rather, the complaint must plead facts stating a "plausible" claim for relief.  *Twombly*, 550 U.S. at 570.  "[S]tating . . . a claim requires a complaint with enough factual matter . . . to suggest the required element.  Therefore, a claim may be dismissed when the facts alleged and the *reasonable* inferences drawn therefrom are legally insufficient to support the relief sought."  *In re RAIT Fin. Trust Sec. Litig.*, 2008 U.S. Dist. LEXIS 103549, at *13 (E.D. Pa. Dec. 22, 2008) (internal quotation marks and citations omitted) (emphasis added) (citing *Twombly*, 127 S. Ct. at 1965, in

addition to Third Circuit precedent).[6]

## II.    THE COURT MUST DISMISS THE PLAINTIFFS' SECTION 11 AND 12(a)(2) CLAIMS IF THE COMPLAINT FAILS TO ADEQUATELY ALLEGE A MATERIALLY FALSE OR MISLEADING STATEMENT OF FACT.

Liability under Sections 11 and 12(a)(2) is premised on a materially false or misleading statement of fact in a registration statement or prospectus (including amendments thereto). *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004); *In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *18-19 (E.D. Pa. Aug. 23, 2002).

### A.    A Section 11 or 12(a)(2) Claim Fails if the Complaint Does Not Adequately Allege That the Statement Was False or Misleading.

To state a viable claim under Sections 11 or 12(a)(2), a plaintiff must specifically identify the allegedly false facts or omissions in the registration statement and then allege sufficient facts to explain why they were false.  As the Supreme Court made clear through *Twombly* and *Iqbal*, bare conclusions will not suffice.  *See Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323-24 (D.N.J. 2000) (finding that complaint failed to allege that any statements in the registration statement were actually false); *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) (explaining that plaintiffs cannot "assert vaguely that a false and misleading impression was created").

Section 11 and 12(a)(2) claims normally do not require scienter.  When, however, those claims are based on allegedly false or misleading statements of subjective analysis, then as a practical matter the plaintiff must in effect establish the existence of scienter.  This is so because,

---

[6]    "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993).  Thus, the documents in which the challenged statements appear, as well as the three documents on which the plaintiffs rely for their falsity allegations, are properly considered on the present Motion.  In addition, on a motion to dismiss a court may take judicial notice of other SEC-filed documents.  *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 573 n.20 (E.D. Pa. 2009); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

as the U.S. Supreme Court observed in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), "statements of reasons or beliefs . . . are factual" insofar as they are "statements that the directors do act for the reasons given or hold the belief stated." *Id*. at 1092.[7]  As such, they may be false only as "misstatement[s] of the psychological fact of the speaker's belief in what he says." *Id*. at 1095.  *See also Podany,* 318 F. Supp. 2d at 154 (citing *Virginia Bankshares* and explaining: "[I]n false statement of opinion cases . . . , the falsity and scienter requirements are essentially identical. . . .  Essentially, proving the falsity of the statement 'I believe this investment is sound' is the same as proving scienter, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion.").

From this principle courts have distilled the rule that statements of subjective analysis are actionable under the securities laws only if the plaintiff establishes that the speaker did not genuinely believe them at the time they were made.  *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993) ("[O]pinions, predictions and other forward-looking statements are not *per se* inactionable under the securities laws.  Rather, such statements of 'soft information' may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them."); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 565 (E.D. Pa. 2009) ("Misleading statements of subjective analysis or extrapolation, such as opinions, motives or intentions, or forward looking statements, such as projections, estimates and forecasts may be actionable *if the speaker does not genuinely and reasonably believe them when made*.") (emphasis added).

Congress has also directed that forward-looking statements, which the Private Securities

---

[7]     Although *Virginia Bankshares* dealt with Section 14, that provision is analogous to Sections 11 and 12(a)(2) except that it involves proxy statements rather than registration statements or prospectuses. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 372 n.14 (3d Cir. 1993) (*Virginia Bankshares* is "instructive" in addressing Section 11 claims).

Litigation Reform Act of 1995 (the "PSLRA") defines as including statements "containing a projection of revenues, income . . ., earnings . . . per share, capital expenditures, dividends, capital structure, or other financial items," as well as statements "of future economic performance," 15 U.S.C. 78u-5(i)(1), are actionable *only* if made "with actual knowledge" that the statement was false or misleading, 15 U.S.C. 78u-5(c)(B). *See also In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *26 ("[T]he PSLRA looks to the state of mind of the person making the disclosure and grants protection if the plaintiff cannot prove that the forward-looking statement, even if unaccompanied by cautionary language, was made with actual knowledge . . . that the statement was false or misleading.") (internal quotation marks omitted) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir. 1999)).

Courts have universally rejected pleading falsity or fraud by hindsight.  Therefore, a plaintiff cannot show the requisite subjective falsity by pointing to the mere fact that the projection or opinion turned out to be wrong.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."); *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("We have been clear that fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy.").  As the Third Circuit has put it, "the law does not expect clairvoyance."  *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).

### B.    The Plaintiffs Must Establish That the Misleading Statement or Omission Was Material

Not every misstatement or omission is actionable under the securities laws.  In order to survive a motion to dismiss, a plaintiff must adequately allege that the misstatement or omission

was material.  "[F]or a misrepresentation or omission to be material there must be a *substantial likelihood* that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)) (emphasis added).

In addition, certain types of statements are made immaterial as a matter of law:

### 1. Vague Statements of General Optimism Are Immaterial Puffery.

Reasonable investors understand that not every statement of optimism made by a company is a guarantee of future performance or a statement of "hard fact" about the company's operations.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (holding that "vague and general statements of optimism constitute no more than 'puffery' and are understood by reasonable investors as such," and are thus not actionable) (internal quotation marks omitted). Thus, vague expressions of optimism unaccompanied by specific guarantees or specific facts contained in a company's offering documents are mere "puffery" and not actionable as a matter of law.  *In re U.S. Interactive, Inc.*, 2002 U.S. Dist. LEXIS 16009, at *34 (noting that a "reasonable investor would *expect* a professional services firm to say that it was the *best* at integrating [certain] skills" and that "[s]uch 'puffing' would not significantly alter the 'total mix' of information available to a reasonable investor") (emphases added); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) ("Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts.").

## 2. The Bespeaks Caution Doctrine and the PSLRA's Safe Harbor Protect Forward-Looking Statements

Protection for forward-looking statements is well established in the securities laws. The PSLRA's safe-harbor provision provides that forward-looking statements are not actionable under the securities laws if they are identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Aetna Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).

The bespeaks caution doctrine is the common-law analogue to the safe harbor's protection for forward-looking statements, as it too "protects 'forecasts, opinions or projections [if they] are accompanied by meaningful cautionary statements [and] did not affect the 'total mix' of information the document provided investors.'" *In re Home Health Corp. of Am. Sec. Litig.*, 1999 U.S. Dist. LEXIS 1230, at *23 (E.D. Pa. Jan. 28, 1999) (quoting *In re Donald J. Trump*, 7 F.3d at 371). Such statements are considered immaterial as a matter of law. *In re Donald J. Trump*, 7 F.3d at 369, 371-72.[8]

---

[8] Courts in the Third Circuit and elsewhere universally recognize the bespeaks caution doctrine and routinely dismiss Section 11 claims based on this doctrine. *See id.* (affirming dismissal of Section 11 claim under the bespeaks caution doctrine); *In re Adams Golf Inc. Sec. Litig.*, 2004 U.S. App. LEXIS 18030, at *28-29 (3rd Cir. 2004) (affirming dismissal of Section 11 claims under the bespeaks caution doctrine); *Castlerock*, 114 F. Supp. 2d at 325-26 (same); *In re Numerex Corp. Sec. Litig.*, 913 F. Supp. 391, 399 (E.D. Pa. 1996) (same); *see also Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (affirming dismissal of Section 11 case based on bespeaks caution doctrine); *Parnes v. Gateway 2000*, 122 F.3d 539, 548 (8th Cir. 1997) (same).

## ARGUMENT

### I.  PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE STATEMENT

#### A.  The Statements About Financial Performance or Prospects Are Not Actionable.

The vast bulk of the challenged statements – relating to future credit and receivable

losses, early amortization, capital levels and strength of financial condition – are plainly

statements of belief or opinion, or forward-looking statements.  Because the plaintiffs fail to

allege any facts to demonstrate a lack of a genuine belief in the statements when made, the

statements are not actionable.  Alternatively, the statements are immaterial as a matter of law.

- **Provisions for future credit losses[9] and predictions about receivable losses**

Advanta's financial metrics concerning losses were not statements of present fact; they

did not represent the actual amount of losses that Advanta had incurred as of that time.  Rather,

the provision for credit losses, a non-cash charge to income, represented the amount of loan

principal that Advanta predicted it would never realize in the future as a result of customers'

defaulting on their loans.

Similarly, the allowance for receivable losses represented the value of Advanta's loan

receivables, including interest, that it predicted it would never see.[10]  *See generally* Am. Compl.

---

[9]      The plaintiffs use the terms "credit losses" and "loan losses" interchangeably.  However, in the Amendments that the plaintiff challenges, the term "credit loss" is used exclusively.

[10]      Calculating this value allowed Advanta to calculate in turn its net assets.  As Advanta explained in its 2007 10-K, *see* Exh. A, at 28-29:

> Receivables on the consolidated balance sheets are presented net of the allowance for receivable losses. The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio. We establish the allowance for receivable losses through provisions charged to earnings. We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectibility of receivables in light

¶¶ 52, 53, 64; *see also, e.g.*, *In re Wachovia Corp. ERISA Litig.*, 2010 U.S. Dist. LEXIS 79971, at *23 (W.D.N.C. Aug. 6, 2010) (defining "provisions for credit losses" as "the amount of loans written off the books which negatively impact earnings"). Thus, these financial metrics, based on estimates of future customer payments and defaults, were forward-looking statements. *Cf. First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the future. . . ."), *aff'd*, 27 F.3d 763 (2d Cir. 1994); *Hinerfeld v. United Auto Group*, 1998 U.S. Dist. LEXIS 10601, at *21-22 (S.D.N.Y. July 15, 1998); *see also* Luis Betancourt, Christian Johnson & Sharon Nowakowski, *Mortgage Banking Activities and Mortgage-Backed Securities*, in 5208 Accounting Policy & Practice Portfolios, at A-603 (BNA, 2008) (estimating loan loss reserves necessarily involves "considerable judgment" and is more "of an art . . . [than] a science").

- **Statements about early amortization**

The plaintiffs also challenge Advanta's statements that it did not "expect" early amortization to occur, Am. Compl. ¶ 59 – and that, even if early amortization did occur, the Company did not expect it would cause a significant reduction of its liquidity levels because it was under no obligation to fund new receivables on its balance sheet, Am. Compl. ¶ 63.  These statements were forward-looking because they were predictions about what the Company "expected" to happen in the future – a future that, to put it mildly, was uncertain as the U.S. was in the midst of the economic collapse.

---

of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions.

*See also* Advanta Corp. 2008 10-K, Exh. J, at 29.

-18-

- **Statement about Advanta's belief about future capital levels**

The plaintiffs challenge Advanta's March 2009 statement that "[w]e **believe** that we have helped position ourselves for the current challenging economic environment by increasing our levels of cash and liquid assets throughout 2008 and maintaining strong capital levels." Am. Compl. ¶ 62 (emphasis added). Notably, the plaintiffs do not challenge the statement that Advanta had in fact increased its levels of cash and liquid assets throughout 2008. Rather, the plaintiffs attack the classic forward-looking statement about how Advanta "believed" it would fare in the future, and in particular about how adequate its capital levels would be in the future.

- **Statement about Advanta's belief about its compliance with capital adequacy levels**

The plaintiffs challenge Advanta's statement that management "**believe[d]**" that as of December 31, 2007 the Company "was in compliance with the capital adequacy requirements to which it was subject." Am. Compl. ¶ 51 (emphasis added). By its own terms, this statement was an expression of management's belief.

- **Statement about Advanta's "strong" financial condition.**

The plaintiffs challenge as false Advanta's statement of belief that "[t]he financial condition of the Company is very strong. . . ." Am. Compl. ¶ 59. Again, this is plainly an expression of opinion or belief about the financial condition of the Company.

*       *       *       *       *

For the reasons set forth below, none of these statements is actionable.

1. **Plaintiffs Fail to Allege Any Facts to Show That Defendants Did Not Genuinely or Honestly Believe the Statements When Made.**

Statements of subjective analysis – such as statements of opinion or belief, or forward-looking statements – are not actionable unless the plaintiff establishes that the speaker did not genuinely believe them at the time made. *See Virginia Bankshares*, 501 U.S. at 1090; *In re*

*Donald J. Trump*, 7 F.3d at 368-69; *In re Adolor Corp.*, 616 F. Supp. at 565; *see also In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *23 (explaining that to be actionable under the securities laws, "a statement must be a fact and not an opinion" and "[v]ague expressions of hope by corporate managers are not actionable").

The economic tsunami that rocked the U.S. economy for two years undoubtedly caused some of Advanta's forward-looking or subjective statements to appear, in hindsight, to have been wrong. But that does not mean that the defendants did not genuinely believe them at the time they were made. Rather, the plaintiffs bear the burden of alleging specific facts that demonstrate that the defendants lacked a genuine belief in the truth of the statements as of the time they made them.

Here, the Amended Complaint does not come close to alleging that the defendants lacked a genuine belief about the challenged statements. First, there is not a single fact alleged in the Amended Complaint that establishes lack of a genuine belief. Second, Advanta gave specific warnings that negative economic trends already had adversely affected Advanta's business and that the continuation of such conditions could compromise Advanta's ability to accurately predict future performance.[11] In other words, the defendants expressly warned that their beliefs about future performance necessarily were suspect because of the on-going economic turmoil. So, what is the basis for claiming that the defendants acted with bad intent? As noted above, while the plaintiffs have alleged no facts to show that the defendants did not genuinely believe

---

[11]     As the economy worsened, Advanta specifically warned that the "[d]eterioration of the U.S. economy . . . and the continuing negative trends in economic conditions and disruption in the capital markets have adversely affected our business." Advanta Corp. 2008 10-K, Exh. J, at 13; *see also* Advanta Corp. 2007 10-K, Exh. A, at 26. As result, Advanta disclosed that "it is more difficult to predict the credit performance of our customers and the losses inherent in our portfolio" and that "if the economic downturn continues, the ability and willingness of our small business customers to pay amounts owed to us could continue to be adversely affected." Advanta Corp. 2008 10-K, Exh. J, at 13.

their predictions about they future, they have disclaimed any allegations of fraudulent intent, *see* Am. Compl. ¶¶ 81, 87, 93.  So, plaintiffs in the end actually disclaim the notion that any of the allegedly false statements were made with knowledge of their falsity.  Accordingly, the statements are all inactionable as a matter of law.  The Court need not consider them any further. *See In re Donald Trump*, 7 F.3d at 368-69.

> **2.      Each of the Statements is Also Inactionable for a Number of Independently Dispositive Reasons.**

Each of these statements of subjective analysis is also inactionable for a number of independently dispositive reasons specific to each.

> **a.      Provisions for credit losses and allowance for receivable losses**

As forward-looking statements, the provisions for credit losses and the allowance for receivable losses are protected by the bespeaks caution doctrine and by the PSLRA's safe-harbor.  First, these statements about Advanta's likely losses on outstanding loans were identified as forward-looking statements by the Amendments in which they appeared.  *See, e.g.*, Advanta Corp. 2007 10-K, Exh. A, at 13 (explaining that forward-looking statements include "anticipated payment rates of outstanding loans" and "anticipated delinquencies and charge-offs"); Advanta Corp. 2008 10-K, Exh. J, at 13.  Second, the statements were accompanied by specific, relevant warnings about why they might not accurately predict the future.  For example:

- "Social, economic, environmental and geographic factors can affect levels of customer spending, credit card payments, and other customer behaviors, as well as our ability to predict customer behaviors, in ways that could negatively impact our asset quality and profitability. . . .  Any of these factors could negatively impact the performance of our business credit card portfolio and our profitability through, among other things, . . . increases in delinquencies, . . . increases in charge-offs and credit losses and changes in payment patterns."  Advanta Corp. 2007 10-K, Exh. A, at 16; *see also* Advanta Corp. 2008 10-K, Exh. J, at 18.

- "The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. . . .  A 10% change in the allowance for business credit card receivable losses at

-21-

December 31, 2007 would impact the allowance for receivable losses . . . by $6.7 million." Advanta Corp. 2007 10-K, Exh. A, at 29; *see also* Advanta Corp. 2008 10-K, Exh. J, at 29-30.

And, as the economy worsened, Advanta advised potential investors that it was "more difficult to predict the credit performance of our customers and the losses inherent in our portfolio." Advanta Corp. 2008 10-K, Exh. J, at 13. Therefore, under the bespeaks caution doctrine and under the PSLRA's safe-harbor provision, these forward-looking statements were immaterial and are thus inactionable as a matter of law. *See, e.g.*, *Aetna*, 617 F.3d at 278.

### b.      Statement about early amortization

The plaintiffs claim that the challenged statements about the likelihood of, and the potential implications of, a future early amortization event were false because the Company did not mention that it allegedly lacked an adequate contingency plan for dealing with an amortization event. *See* Am. Compl. ¶¶ 59, 63. However, the plaintiffs merely focus on statements that the Company believed that early amortization would *not* occur. Because the plaintiffs do not allege what Advanta's plan was for early amortization, they can hardly state a plausible claim that the plan was "inadequate." In any event, the plaintiffs' claim is again based only on hindsight.

### c.      Statement about Advanta's "strong" capital levels

The plaintiffs challenge Advanta's statement that "[w]e believe that we have helped position ourselves for the current challenging economic environment by increasing our levels of cash and liquid assets throughout 2008 and maintaining strong capital levels," Am. Compl. ¶ 62, asserting that the statement was false because Advanta's capital was "inadequate for its risk profile and overstated due to Advanta's failure to correctly recognize loan losses." *Id.*

First, the plaintiffs fail to allege (and cannot allege) that Advanta did not in fact increase its levels of cash and liquid assets throughout 2008, nor do they even identify Advanta's actual

capital levels during this period.  In fact, the plaintiffs' conclusory allegation of falsity is at odds with the findings of the very report that they venerate throughout their complaint.  Specifically, the OIG Report notes that Advanta was considered "Well Capitalized" until **June 2009**.  *See* OIG Report, Exh. H, at 20.

Second, the statement is deemed immaterial as a matter of law under the bespeaks caution doctrine.  The March 2009 Amendment, in which the challenged statement appeared, warned that, "[a]lthough we have high levels of capital and liquidity, if the current economic situation continues or worsens it could adversely affect our business, results of operations and financial condition."  Advanta Corp. 2008 10-K, Exh. J., at 13.

The statement's immateriality becomes even more obvious when its context is further examined.  *See In re Donald J. Trump*, 7 F.3d at 369 ("[M]ateriality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it.").  The paragraph in the March 2009 Amendment that preceded the challenged statement described the troubled state of the national economy; explained that the economy was "expected to continue to have a significant impact on our results;" and reported that the deterioration of the economy "has negatively impacted the credit quality of our receivables." Advanta Corp. 2008 10-K, Exh. J, at 27.  *See also id.* at 65 (discussing the current economic environment and noting that "[t]he recent deterioration of the economic environment has negatively impacted our small business customers and has adversely affected our business results").

> d.     **Statement about Advanta's compliance with capital levels**

The plaintiffs' claims based on statements about Advanta's compliance with capital levels must also be dismissed because the plaintiffs have not alleged that the statements were actually false.  The plaintiffs argue that Advanta's statement that management "believe[d]" that

as of December 31, 2007 the company "was in compliance with the capital adequacy requirements to which it was subject,"  Am. Compl. ¶ 51, was false because (i) the FDIC's First Order allegedly confirmed that Advanta operated with insufficient capital for its risk profile; and (ii) Advanta's capital planning model did not incorporate an adequate contingency plan for Advanta to survive early amortization. *See id.*

With respect to the first contention, all that the FDIC's First Order did was impose prospective obligations on Advanta beginning June 30, 2009 aimed at ensuring that Advanta continued to maintain sufficient capital for its risk profile.  *See supra* at p. 10.  The FDIC in no way suggested that Advanta had *not* in the past maintained sufficient capital, let alone that this had been so as of December 31, 2007.[12]

With respect to the second basis of falsity asserted by the plaintiffs, whether or not Advanta had a contingency plan for early amortization has no bearing on whether management was in compliance with capital adequacy requirements – much less whether management *believed* it was in compliance.  The plaintiffs have alleged nothing that would suggest that being in compliance with capital adequacy requirements and/or planning for future capital needs requires having in place a particular publicly disclosed document that is labeled "contingency plan."

   e.  **Statement about the strength of Advanta's financial condition**

The plaintiffs challenge as false Advanta's statement that "[t]he financial condition of the Company is very strong. . . ."  ¶ 59.  This statement is a classic example of puffery and is

---

[12]  Notably, the plaintiffs do not challenge as false the chart that appeared in Advanta's 2007 10-K and the accompanying statement that as of December 31, 2007, Advanta's "bank subsidiaries had capital at levels a bank is required to maintain to be classified as 'well-capitalized' under the regulatory framework. . . ."  Advanta Corp. 2007 10-K, Exh. A, at 85.  Nor do the plaintiffs allege anywhere else what the capital requirements were or how Advanta supposedly failed to comply with them.

therefore inactionable as a matter of law.  *See, e.g., Galati v. Commerce Bancorp, Inc.*, 220 Fed. Appx. 97, 102 (3d Cir. 2007) ("[S]tatements concerning the Company's . . . 'strong performance' . . . constitute nothing more than mere 'puffery. . . .'"); *Key Equity Investors Inc. v. Sel-Leb Mktg.*, 246 Fed. Appx. 780, 785-86 (3d Cir. 2007) (holding as inactionable puffery statement that company was "slated to begin to generate *strong* revenue and earnings growth in 2002") (emphasis added); *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) ("ATI's spin on its historical performance, as . . . conferring a 'strong start,' . . . is puffery."). The plaintiffs have not shown, and cannot show, a substantial likelihood that a reasonable investor would rely on a company's bare assertion that its financial condition is "very strong."

*       *       *       *       *

For all of the reasons stated above, the plaintiffs have failed to state a claim based on the challenged statements of subjective analysis.

### B.    Advanta's Descriptions of Its Methodology for Assessing and Monitoring Customer Creditworthiness Are Not Actionable.

The plaintiffs attack as false Advanta's descriptions of its methodology for evaluating the creditworthiness of its customers.  *See* Am. Compl. ¶¶ 46, 50, 58, 61.  The Company made its creditworthiness assessments on the basis of an extensive database of customer information and attributes.  *See id*.  It continually monitored the actual behavior of its customers and used that information to calibrate and improve its methodology.  *See id*.  Advanta used its creditworthiness assessments to market products to prospective customers and to manage relationships with current customers.  *See id*.  All of this was explained in the descriptions that the plaintiffs now challenge as false.  *See id*.

-25-

According to the plaintiffs, the descriptions were false for two reasons.  First, the plaintiffs note that the OIG Report determined that Advanta had failed to incorporate anticipated and actual changes in portfolio behavior into its methodology for predicting *loan losses*.  *See* Am. Compl. ¶ 48, 50 (presumably alluding to OIG Report, Exh. H, at 10).  But this is irrelevant: even if it were true, the alleged failure of the Company's *loan loss* methodology to adequately take account of customers' actual repayment behavior simply has no bearing on whether the Company's *creditworthiness* methodology failed to take account of its customers' actual credit standing.  To the contrary, and as the Company explained in the very passages the plaintiffs attack, Advanta used the results of its creditworthiness methodology for *marketing* purposes, *not* for calculating loan losses.  The plaintiffs do not even attempt to allege a connection between the Company's creditworthiness methodology and the Company's loan loss methodology.  The plaintiffs' first shot at alleging falsity therefore entirely misses the point.

The plaintiffs next assert that Advanta's descriptions of its creditworthiness methodology must be false because, as the FDIC supposedly found, Advanta was being operated in an "unsafe and unsound" manner and supposedly failed to sustain satisfactory earnings performance.  *See* Am. Compl. ¶¶ 48, 50.  As a threshold matter, the FDIC's First Order – the apparent basis of the plaintiff's assertion that the Company was being operated in an "unsafe and unsound" manner with unsatisfactory earnings performance – did *not* find this to be the case.  In the First Order, the FDIC simply stated that, as of June 30, 2009, it had reason to believe that the Bank "**may** engage in unsafe or unsound banking practices."  First Order attached to Form 8-K (June 30, 2009), Exh. I, at 1 (emphasis added).  It then prospectively imposed on Advanta a number of restrictions to ensure that Advanta would operate in a manner that sustained satisfactory earnings performance.  The FDIC did not conclude that Advanta *was* engaging in such practices or *was*

performing inadequately – let alone that this had been true at those specific periods in the past when the challenged creditworthiness statements were made.  The whole premise of the plaintiffs' argument, therefore, is baseless.

But even if it could be assumed *arguendo* that Advanta did actually have these problems – and had them at the very times the challenged statements were made – the claims based on these statements would still fail.  The plaintiffs merely attack statements describing the methodology and thus can prevail on the claims only by establishing that Advanta did not actually adhere to the methodology it described.  The plaintiffs, however, make no such contention.  All that the plaintiffs appear to be arguing is that, in hindsight, the creditworthiness methodology turned out to be not a good predictor of the likelihood that customers would pay back their loans.  At most, then, the plaintiffs are arguing that the methodology that Advanta employed was flawed.  Such a contention at best alleges a failure to adopt best practices; it in no way suggests that the Company did not actually employ the methodology it claimed to be using and thus made a false statement of fact in violation of the securities laws.

   C.    **Advanta's Statements About Its Commitment to Strengthening Customer Relationships Are Not Actionable.**

The plaintiffs challenge as false Advanta's statements that it was committed to developing and strengthening its relationships with, and profiting from, its customers.  *See* Am. Compl. ¶¶ 49, 57, 60.

These statements are inactionable for two basic reasons.  First, they are precisely the kind of commonplace statements which no reasonable investor would find significant in deciding whether to invest in Advanta.  They are vague descriptions of what essentially every customer-oriented business strives to do: develop and strengthen customer relationships.  Thus, these statements are nothing more than "vague and general statements of optimism" and "constitute no

more than 'puffery' and are understood by reasonable investors as such."  *In re Advanta Corp.*,

180 F.3d at 538 (internal quotation marks omitted).  In *In re U.S. Interactive, Inc. Sec. Litig.*, a

court of this District applied the puffery principle to a pair of statements similar to those

challenged here.  In that case, the plaintiffs had challenged assertions by the defendant company

about its strategy to cultivate relationships with and meet the needs of its customers:

- The strong second quarter operating results reflect our ability to remain nimble, **anticipate the changing needs of our clients,** and pave the way to the next generation of e-business using leading edge technologies. . . .  US Interactive strives to create and deliver innovative solutions . . . .

- Opportunities [are] really bright right now when we look at some of the expansion opportunities in Europe and Asia and the Fortune 500 companies [i.e., the defendant company's potential clients] that are going to finance around our . . . message . . . .

2002 U.S. Dist. LEXIS 16009, at *45-46.  The court held these statements to be immaterial

puffery.  *See id.* at *46 ("These statements are typical of vague and general statements of

optimism that constitute no more than 'puffery' and are understood by reasonable investors as

such. This type of optimistic statement would not alter the 'total mix' of information available to

an investor to make a decision.") (internal quotation marks and citations omitted).  In the instant

case, the challenged statements by Advanta about the Company's customer-oriented focus are

immaterial for the same reason.

        Not only are these statements immaterial; the plaintiffs have failed to allege how they

were even false or misleading.  The plaintiffs allege that the repricing campaign turned out, in

hindsight, to damage some unspecified number of customer relationships.  Even if true, this does

not mean or even suggest that, at the time the statements were made, Advanta *believed* its

repricing strategy was significantly damaging customer relationships, or that it was not in fact

looking for ways to strengthen its customer relationships.  In short, the plaintiffs have not

alleged, in anything other than conclusory fashion, how engaging in repricing campaigns was

-28-

inconsistent with Advanta's focus on strengthening relationships with its customers and profiting from those relationships.

* * * * *

Because the plaintiffs have failed to adequately allege that any of the challenged statements was materially false or misleading at the time made, their section 11 and 12(a)(2) claims should be dismissed in their entirety.

## II.   THE PLAINTIFFS' SECTION 11 AND 12(a)(2) CLAIMS AGAINST DEFENDANT BLANK ARE BASED ON A SINGLE STATEMENT IN THE 2006 10-K, AND ARE THEREFORE ESPECIALLY FEEBLE.

The case for dismissal of the claims against Defendant Blank is particularly compelling. Mr. Blank retired from Advanta's Board in June 2007. Accordingly, the *only* Amendment that Mr. Blank signed was the 2006 10-K (filed on Feb. 28, 2007), and the *only* challenged statement that appears therein is a description of Advanta's methodology for assessing and monitoring its customers' creditworthiness. *See* Am. Compl. ¶¶ 34, 46-47. That statement is inactionable for all of the reasons explained *supra*. In addition, the fact that the statement dates to February 2007 makes even more absurd Mr. Blank's presence in this case: Mr. Blank has been named as a defendant solely for allegedly failing to take account in February 2007 of supposed negative changes in customer behavior that did not even allegedly occur until the economic crisis of late 2008. *See* Am. Compl. ¶ 48 (alleging that the FDIC determined that Advanta had failed to incorporate anticipated and actual changes in portfolio behavior into its loan loss methodology); OIG Report, Exh. H, at 10 (referencing "changes in portfolio behavior associated with the continued economic downturn" of 2008/09). Similarly, the plaintiffs' attempt to use the FDIC's First Order, issued in June 2009, to shed light on past conditions at the Company, *see* Am. Compl. ¶ 48, is especially absurd when the period in question predates June 2009 by more than two years.

-29-

III.     BECAUSE THE UNDERLYING SECTION 11 AND 12(a)(2) CLAIMS FAIL, THE
         SECTION 15 CLAIMS ALSO FAIL.

To establish liability under section 15 of the Securities Act of 1933, a plaintiff must

allege a primary violation of Section 11 or 12(a)(2).  *See Klein v. Gen. Nutrition Cos.*, 186 F.3d

338, 344 (3d Cir. 1999); *In re PMA Capital Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15696, at

*59-60 (E.D. Pa. July 27, 2005).  Because the plaintiffs' claims under sections 11 and 12(a)(2)

fail a s a matter of law, the claims under section 15 must also be dismissed.  *See id.*

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed with

prejudice in its entirety.

Dated:  February 28, 2011                         Respectfully submitted,


                                                  s/ Sarah L. Wyatt
                                                  Steven B. Feirson (21357)
                                                  Michael L. Kichline (62293)
                                                  Sarah L. Westbrook  (91623)
                                                  Dechert LLP
                                                  Cira Centre, 2929 Arch Street
                                                  Philadelphia, PA  19104
                                                  (215) 994-4000

                                                  *Attorneys for Dennis Alter, William A. Rosoff,
                                                  Philip M. Browne, David B. Weinstock,
                                                  Robert S. Blank, Max Botel, Thomas Costello,
                                                  Dana Becker Dunn, Ronald Lubner, Olaf
                                                  Olafsson, and Michael A. Stolper*

-30-

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah L. Wyatt, do hereby certify that on February 28, 2011, I caused a copy of the

foregoing Motion of the Individual Defendants to Dismiss the Amended Complaint and

Memorandum of Law in support thereof, to be served by the Court's ECF system upon the

following:

Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
THE WEISER LAW FIRM, P.C.
Tel: 610.225.2677
Fax: 610.225.2678

Thomas L. Laughlin IV
Scott + Scott LLP
500 Fifth Avenue, Floor 40
New York, NY  10110
Tel: 212.223.6444
Fax: 212.223.6334

Geoffrey M. Johnson
Scott + Scott LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Tel: 216.229.6088
Fax: 216.229.6092

*Attorneys for William E. Underland and
Mark Schaller, and the proposed Class of
similarly situated persons*

Edward D. Rogers
Geoffrey A. Kahn
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 864-8144

Stanley J. Parzen
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7326

*Attorneys for KPMG LLP*

s/ Sarah L. Wyatt
Sarah L. Wyatt