# Exhibit H



# Office of
# Inspector General

**Office of Material Loss Reviews**
**Report No. MLR-11-002**

## Material Loss Review of Advanta Bank Corp., Draper, Utah

**October 2010**



**Executive Summary**

**Material Loss Review of Advanta Bank Corp., Draper, Utah**

Report No. MLR-11-002
October 2010

## Why We Did The Audit

On March 19, 2010, the State of Utah Department of Financial Institutions (UDFI) closed Advanta Bank Corp. (Advanta), Draper, Utah and named the FDIC as receiver.  On April 1, 2010, the FDIC notified the Office of Inspector General (OIG) that Advanta's total assets at closing were $1.1 billion and that the estimated loss to the Deposit Insurance Fund (DIF) was $635.6 million.  As required by section 38(k) of the Federal Deposit Insurance Act (FDI Act), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the OIG conducted a material loss review of the failure of Advanta.  As of September 3, 2010, the estimated loss to the DIF had decreased to $459.1 million.

The audit objectives were to (1) determine the causes of Advanta's failure and the resulting material loss to the DIF and (2) evaluate the FDIC's supervision of the institution, including implementation of the Prompt Corrective Action (PCA) provisions of section 38.

## Background

### Advanta's Organizational Structure and Business Strategy

Advanta was a state-chartered non-member industrial bank that was insured in 1991 and headquartered in Draper, Utah.  Advanta had no branches but conducted its operations on a national level.  The bank marketed depository services though a corporate Web site, provided online banking services, and communicated with customers via the telephone, wire, and mail systems.  Advanta was considered a monoline credit card bank.  Its primary focus was on prime small business credit card customers, and it did not have any other significant banking operations.  Advanta was wholly-owned by Advanta Corp., Spring House, Pennsylvania.  The parent holding company also wholly-owned Advanta Bank, Wilmington, Delaware.  Advanta had one subsidiary, Advanta Business Receivables Corporation (ABRC).  ABRC was involved in Advanta's credit card securitization activities, which, as described below, were a contributing factor in the bank's failure.

### Concepts Associated with Securitizations

Generally defined, the securitization of credit card receivables is the process by which these financial assets are transformed into securities.  Simply stated, a securitization involves an institution selling its credit card receivables to a special purpose trust, which pays for the receivables by selling securities to investors.  The securities sold are backed by the cash flows generated from the credit cards.

Securitizations, when used properly, provide financial institutions with a useful funding, capital, and risk management tool.  Securitization activities are susceptible, however, to economic influences and present other risks that need to be managed and controlled.  Weak underwriting standards, poor servicing, or inadequate liquidity and capital planning are examples of risks, which, if poorly managed, can damage a credit card issuer's reputation and cause serious financial problems.

Performance and termination triggers are embedded in the structure of most credit card securitizations.  These triggers are intended to protect investors against deteriorating credit quality of the underlying pool of credit card receivables by returning principal to the investors as quickly as possible.  Decisions

| **Executive Summary** | **Material Loss Review of Advanta Bank Corp., Draper, Utah** |
|---|---|

regarding early amortization, or a wind-down event, are made by the trustee or, under certain circumstances, upon a vote by the investor certificate holders.  If a securitization goes into early amortization, there are immediate implications for the credit-card-issuing bank's capital and liquidity.  Longer term, the bank's reputation as a credit card originator or servicer is damaged and its revenue stream is impaired.

## Audit Results

### Causes of Failure and Material Loss

Advanta failed due to insolvency brought on by the Board of Directors' (Board) and management's failure to implement risk management practices commensurate with the risks associated with the bank (1) being a monoline small business credit card bank and (2) engaging in significant securitization activity.  In particular, Advanta's Board and management failed to develop adequate contingency plans for responding to an early amortization of the bank's securitizations and failed to incorporate those plans into the bank's capital planning model.  The bank's plan did not include an early amortization event because management believed it could avert an early amortization by supporting the securitization trust through various means.  However, when faced with such an event, those means did not materialize, and the Board and management's handling of the situation resulted in increased loan losses, which ultimately led to the bank's insolvency.

Overall, Advanta's Board and management created a high-risk business strategy that focused on credit card loans to small business customers.  These loans were unsecured, revolving lines-of-credit, with average credit lines greater than an average consumer credit card.  In the years preceding the bank's failure, the FDIC and the UDFI each expressed concern about Advanta's risk management practices and made recommendations for improvement.  However, the actions taken by Advanta's Board and management to address these concerns and recommendations were neither timely nor adequate.

### The FDIC's Supervision of Advanta

The FDIC, in conjunction with the UDFI, provided supervisory oversight of Advanta in the form of risk management and compliance examinations, a visitation, and off-site monitoring and, overall, supervision was quite extensive.  The FDIC's supervisory functions (risk management and consumer protection) coordinated effectively when inter-disciplinary concerns emerged.  In particular, the FDIC's consumer protection function identified, reported on, and coordinated a unified supervisory response with the FDIC's risk management function.  Notably, as a result of this coordination, substantive violations associated with Advanta's credit card re-pricing campaign were identified and corrective actions and penalties were pursued.

The FDIC also prepared semi-annual capital market reviews of the bank intended to identify key risks and assist with supervision.  Further, from the start of the November 2008 examination to the bank's closing on March 19, 2010, examiners were frequently onsite conducting examinations or monitoring the institution's liquidity position.

| **Executive Summary** | **Material Loss Review of Advanta Bank Corp., Draper, Utah** |
|---|---|

Report No. MLR-11-002
October 2010

The FDIC's off-site review program did not detect any significant emerging risks early enough to impact the FDIC's supervisory strategy.  Advanta was flagged for off-site review one time between January 2005 and July 2009.  Specifically, the FDIC's off-site review system identified Advanta for review in May 2009 based on the FDIC's automated review criteria.  The review was completed in July 2009 and identified a high and increasing risk profile.  However, by this time, the bank's credit card securitization had already entered into early amortization, and the FDIC had downgraded the bank on an interim basis to a composite "4" rating.

During its examinations, the FDIC routinely recognized that Advanta maintained a monoline operational structure with assets being primarily funded through securitization activities, and that its operational strategies resulted in a unique and potentially increased risk profile for the bank.  In addition, the FDIC identified and reported on the bank's significant loan growth as early as the September 2006 examination.  However, the FDIC considered the bank's structure and growth to be largely mitigated by the bank's maintenance of Tier 1 Leverage and Total Risk-Based capital ratios in excess of 20 percent and growing levels of on-balance sheet liquidity in the form of cash and Federal funds sold.  In hindsight, earlier and greater supervisory emphasis or concern could have been expressed regarding the failure of the bank's capital allocation model and contingency funding plans to incorporate more extreme stress scenarios.  Such action would have helped ensure adequate capitalization and liquidity to support an unwinding of the securitizations through early amortization, a significant risk associated with Advanta's monoline business strategy.

With respect to PCA, based on the supervisory actions taken, the FDIC properly implemented applicable PCA provisions of section 38 in a timely manner.

## Management Response

On October 1, 2010, the Director, Division of Supervision and Consumer Protection (DSC), provided a written response to a draft of this report.  That response is provided in its entirety as Appendix 4 of this report.  In its response, DSC reiterated the OIG's conclusions regarding the causes of Advanta's failure, pointing out that Advanta failed due to insolvency brought on by the Board and management's failure to implement risk management practices commensurate with the unique nature of Advanta's business model.  With regard to our assessment of the FDIC's supervision of Advanta, DSC summarized the supervisory history described in our report and recognized that it could have required Advanta to incorporate an early amortization scenario in its capital allocation model and contingency funding plans.  DSC also pointed out that beginning in January 2010, institutions engaged in securitization activity, in the manner followed by Advanta, have been required to consolidate securitized assets for financial reporting purposes as a result of the implementation of Statement of Financial Accounting Standards (FAS) 166 and FAS 167.  This accounting change will minimize the capital and liquidity risks associated with early amortization events for institutions following a business model similar to Advanta.

# Contents

| | Page |
|---|---|
| **Background** | 2 |
| Basic Concepts Associated with Securitization and Early Amortization | 3 |
| Advanta's Financial Condition in the Years Preceding Its Failure | 4 |
| **Causes of Failure and Material Loss** | 4 |
| Advanta's Monoline Business Strategy | 5 |
| Advanta's Securitization Activity | 10 |
| **The FDIC's Supervision of Advanta** | 11 |
| Supervisory History | 12 |
| Supervisory Response to Advanta's Monoline Business Strategy | 16 |
| Supervisory Response to Advanta's Securitization Activity | 18 |
| Implementation of PCA | 19 |
| **Corporation Comments** | 21 |
| **Appendices** | |
| 1. Objectives, Scope, and Methodology | 22 |
| 2. Glossary of Terms | 25 |
| 3. Acronyms | 29 |
| 4. Corporation Comments | 31 |
| **Tables** | |
| 1. Financial Condition of Advanta, 2005 to 2009 | 4 |
| 2. Advanta's Examination History from 2006 to 2010 | 12 |
| 3. Advanta's Capital Levels Relative to PCA Thresholds for Well Capitalized Institutions | 20 |
| **Figures** | |
| 1. Advanta's Growth of Loans, Securitizations, and Commitments | 6 |
| 2. Net Charge-Offs and Delinquencies Related to Advanta's Credit Card Portfolio and Securitizations | 7 |
| 3. Advanta Business Card Master Trust's Quarterly Excess Spread | 8 |



**Federal Deposit Insurance Corporation**

3501 Fairfax Drive, Arlington, Virginia 22226

Office of Material Loss Reviews
Office of Inspector General

| | |
|---|---|
| **DATE:** | October 1, 2010 |
| **MEMORANDUM TO:** | Sandra L. Thompson, Director<br>Division of Supervision and Consumer Protection |
| **FROM:** | **/Signed/**<br>Stephen M. Beard<br>Assistant Inspector General for Material Loss Reviews |
| **SUBJECT:** | *Material Loss Review of Advanta Bank Corp., Draper, Utah* (Report No. MLR-11-002) |

As required by section 38(k) of the Federal Deposit Insurance Act (FDI Act), and as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Financial Reform Act), the Office of Inspector General (OIG) conducted a material loss review (MLR) of the failure of Advanta Bank Corp. (Advanta), Draper, Utah. The State of Utah Department of Financial Institutions (UDFI) closed the institution on March 19, 2010, and named the FDIC as receiver. On April 1, 2010, the FDIC notified the OIG that Advanta's total assets at closing were $1.1 billion and that the estimated loss to the Deposit Insurance Fund (DIF) was $635.6 million. The estimated loss of $635.6 million exceeds the $200 million MLR threshold for losses occurring between January 1, 2010 and December 31, 2011, as established by the Financial Reform Act. As of September 3, 2010, the estimated loss to the DIF had decreased to $459.1 million.

When the DIF incurs a material loss with respect to an insured depository institution for which the FDIC is appointed receiver, the FDI Act states that the Inspector General of the appropriate federal banking agency shall make a written report to that agency. The report is to consist of a review of the agency's supervision of the institution, including the agency's implementation of FDI Act section 38, *Prompt Corrective Action* (PCA); a determination as to why the institution's problems resulted in a material loss to the DIF; and recommendations to prevent future losses.

The objectives of this material loss review were to (1) determine the causes of Advanta's failure and the resulting material loss to the DIF and (2) evaluate the FDIC's supervision of Advanta, including the FDIC's implementation of the PCA provisions of section 38 of the FDI Act. This report presents our analysis of Advanta's failure and the FDIC's efforts to ensure that Advanta's Board of Directors (Board) and management operated the institution in a safe and sound manner. The report does not contain formal recommendations. Instead, as major causes, trends, and common characteristics of institution failures are identified in our MLRs, we will communicate those to FDIC management for its consideration. As resources allow, we may also conduct more

comprehensive reviews of specific aspects of the FDIC's supervision program and make recommendations as warranted.[1]

Appendix 1 contains details on our objectives, scope, and methodology. We also include several other appendices to this report. Appendix 2 contains a glossary of key terms, including material loss, the FDIC's supervision program, and the Uniform Financial Institutions Rating System, otherwise known as the CAMELS ratings. Appendix 3 contains a list of acronyms and Appendix 4 contains the Corporation's comments on this report.

## Background

Advanta was a state-chartered non-member industrial bank that was insured in 1991 and was headquartered in Draper, Utah. Advanta had no branches, but conducted its operations on a national level. The bank marketed depository services though a corporate Web site; provided online banking services; and communicated with customers via the telephone, wire, and mail systems. Advanta was considered a monoline credit card bank. In that regard, its primary focus was on prime small business credit card customers,[2] and it did not have any other significant banking operations. Advanta was recognized as one of the largest issuers of credit cards to businesses and business professionals in the United States. Due to Advanta's relatively unique strategic focus, the FDIC stated that Advanta did not have a functional peer group for comparative analysis. As a result, the FDIC placed limited reliance on comparative analysis of the bank to its assigned peer group averages, and this report will also provide limited comparative analysis.

Advanta was wholly-owned by Advanta Corp., located in Spring House, Pennsylvania. As of December 2007, Advanta Corp.'s Chairman of the Board and Chief Executive Officer controlled 32 percent of the holding company Class A voting stock and was the largest individual shareholder. The parent holding company also wholly-owned Advanta Bank, Wilmington, Delaware. Advanta had one subsidiary, Advanta Business Receivables Corporation (ABRC). ABRC was involved in Advanta's credit card securitization activities, which, as discussed later in this report, were a contributing factor in the bank's failure. In order for readers to better understand how credit card securitizations played such an important role in Advanta's operations, and the complexity of such transactions, a discussion follows on how securitizations work, the benefits and risks, and what happens when the performance of the credit cards and associated securities begins to deteriorate.

---

[1] A further discussion of OIG-related coverage of financial institution failures can be found in the *Objectives, Scope, and Methodology* section of our report.
[2] The FDIC indicated that Advanta originated only a small percentage of accounts to customers with Fair Isaac Corporation (FICO) scores under 661 (the regulatory cut-off for a prime versus subprime designation).

**Basic Concepts Associated with Securitization and Early Amortization**

Generally defined, the securitization of credit card receivables is the process by which these financial assets are transformed into securities.  Simply stated, a securitization involves an institution selling its credit card receivables to a special purpose trust, which pays for the receivables by selling securities to investors.  The securities sold are backed by the cash flows generated from the credit cards.  The seller usually retains a subordinate interest or share in the trust as further protection to the owners of the securities.

The securities typically issued by the originators of the credit card securitizations offer investors alternative levels of protection against default risk by pooling the cash flows and paying them out to investors through a tiered, or tranched, priority structure.  Each tranche has an associated par value and yield and all, except perhaps the most junior tranches, will be rated by a credit rating agency.  The cash flows through a "waterfall" created by the terms of the different tranches.  The most senior investments (typically receiving the highest rating awarded by the various bond agencies) have the highest priority claim on the cash flows and are paid first.  The remaining cash flows are then allocated to fill the terms of the next highest priority tranche and so on through the priority structure.  When all the credit card loans in the pool are performing, each tranche will receive the promised cash flows.  As credit card loans default, the lowest priority tranche suffers losses first.  If the credit card losses are large enough, the claims of the lowest tranche could be wiped out completely, and the second-lowest priority tranche would begin to bear losses.  As losses grow, they are spread to sequentially higher priority tranches.

Securitizations, when used properly, provide financial institutions with a useful funding, capital, and risk management tool.  By using securitizations, a credit card issuer may be able to obtain lower cost funding, diversify its funding sources, improve financial indices, potentially lower regulatory costs, and increase its ability to manage interest rate risk.  Securitizations are the largest funding source for credit cards, representing over 50 percent of the industry's funding.

Securitization activities are susceptible, however, to economic influences and present other risks that need to be managed and controlled.  Weak underwriting standards, poor servicing, or inadequate liquidity and capital planning are examples of risks, which, if poorly managed, can damage a credit card issuer's reputation and cause serious financial problems.  The key to a bank's success with using securitizations lies in the quality of the underlying receivables, which is directly related to the underwriting and credit risk management techniques employed.  Banks that have an excessive dependence on securitizations for funding could experience significant liquidity issues if this funding source becomes unavailable.  Further, a significant reliance on securitizations may result in a bank outgrowing other alternatives, such as traditional borrowing facilities.

Performance and termination triggers are embedded in the structure of most credit card securitizations.  These triggers are intended to protect investors against deteriorating credit quality of the underlying pool of credit card receivables by returning principal to

3

the investors as quickly as possible. The most prominent credit card securitization protective trigger for investors is tied to the excess spread.[3] The triggering amount and calculation can vary, but most commonly it is based on the consecutive 3-month average excess spread falling to or below zero. Decisions regarding early amortization, or a wind-down event, are made by the trustee or, under certain circumstances, upon a vote by the investor certificate holders.

If a securitization goes into early amortization, there are immediate implications for the credit-card-issuing bank's capital and liquidity. The securitization vehicle's trustee stops buying replacement credit card receivables since it is now required to use the principal payments collected to begin paying off the investors. The credit-card-issuing bank now has to fund the new receivables without being able to subsequently sell them to the securitization vehicle. The bank has to either find a new funding source (internal and/or external) or start reducing the cardholders' line availability. The latter is not typically a viable option if the bank wants to stay in the credit card business. Longer term, the bank's reputation as a credit card originator or servicer is damaged and its revenue stream is impaired. Furthermore, longer-term liquidity and capital implications exist even if the bank can ride out the early amortization event.

**Advanta's Financial Condition in the Years Preceding Its Failure**

Table 1 summarizes selected financial information for Advanta for the year ending December 31, 2009 and for the 4 preceding calendar years.

**Table 1: Financial Condition of Advanta, 2005 to 2009**

| Financial Measure | Dec 2009 | Dec 2008 | Dec 2007 | Dec 2006 | Dec 2005 |
|---|---|---|---|---|---|
| Total Assets ($000s) | $1,525,931 | $3,106,694 | $2,217,247 | $1,958,239 | $1,662,359 |
| Total Loans ($000s) | $751,919 | $426,569 | $943,606 | $1,131,352 | $896,472 |
| Total Deposits ($000s) | $1,519,471 | $2,554,707 | $1,668,159 | $1,374,270 | $1,179,368 |
| Net Income (Loss) ($000s) | ($451,294) | $6,320 | $100,623 | $107,146 | $81,304 |
| Total Securitizations ($000s) | $1,599,319 | $4,511,651 | $5,315,421 | $4,073,128 | $2,880,401 |

Source: Uniform Bank Performance Reports (UBPR) and Reports of Condition and Income (Call Reports) for Advanta.

# Causes of Failure and Material Loss

Advanta failed due to insolvency brought on by the Board and management's failure to implement risk management practices commensurate with the risks associated with the bank (1) being a monoline small business credit card bank and (2) engaging in significant securitization activity. In particular, Advanta's Board and management failed to develop adequate contingency plans for responding to an early amortization of the bank's securitizations and failed to incorporate those plans into the bank's capital planning

---

[3] Excess spread is the difference between the gross yield on the pool of securitized receivables less the cost of financing those receivables (weighted average coupon paid on the investor certificates), charge-offs, servicing costs, and any other trust expenses. Excess spread is typically a source of credit enhancement for the certificates since it is commonly available to absorb losses on the assets.

model.  The bank's plan did not include an early amortization event because management believed it could avert an early amortization by supporting the securitization trust through various means.  However, when faced with such an event, those means did not materialize, and the Board and management's handling of the situation resulted in increased loan losses, which ultimately led to the bank's insolvency.

Overall, Advanta's Board and management created a high-risk business strategy that focused on credit card loans to small business customers.  These loans were unsecured, revolving lines-of-credit, with average credit lines greater than an average consumer credit card.  In the years preceding the bank's failure, the FDIC and the UDFI each expressed concern about Advanta's risk management practices and made recommendations for improvement.  However, the actions taken by Advanta's Board and management to address these concerns and recommendations were neither timely nor adequate.

**Advanta's Monoline Business Strategy**

Advanta's monoline business strategy created a concentration of assets within a portfolio of small business credit card loans,[4] without sufficient mitigating controls in the form of robust contingency plans for responding to an early amortization of the bank's securitizations and incorporation of those plans into the bank's capital and liquidity planning models.  Such loans were both owned by the bank and, to a significant extent, sold to investors through securitizations.  Management's actions to counteract increasing delinquencies as the economy deteriorated resulted in further deterioration of the bank's condition.  As of December 2007, the bank's credit card loans equaled 211 percent of total capital, and unfunded loan commitments equaled 3,047 percent of total capital.  Advanta's management permitted these loan concentrations to exist without adequately planning for the possibility that the securitizations would go into early amortization.

Figure 1 illustrates the growth of Advanta's credit card loan portfolio (funded and unfunded) and credit card securitizations in the years preceding the bank's failure.  Although the bank's overall credit card loan portfolio growth appears moderate, the bank began to significantly grow its credit card accounts from 2004 to 2007, and began to significantly increase its credit card securitization activities from 2005 to 2007.  As a result, the bank's credit card operations and the associated risk increased significantly over this 3-year period.

---

[4] For regulatory reporting purposes, small business credit card loans are included in the Commercial and Industrial (C&I) loan portfolio.

**Figure 1: Advanta's Growth of Loans, Securitizations, and Commitments**



Source:  OIG analysis of Call Reports for Advanta.

Figure 1 also reflects the impact of management's actions to cancel charging privileges on all accounts, the early amortization of the securitization trust, and the placement of the bank in a self-liquidation mode in 2009.

<u>Net Losses Through Charge-Offs</u>

Advanta began to experience a rapid and significant increase in credit card delinquencies and charge-offs in 2008 and 2009, as borrowers were impacted by rapidly deteriorating economic conditions, brought on, in part, by economic disruptions in the mortgage, securitization, and job markets.  Specifically, from January 2006 to December 2009, the bank recognized net charge-offs of $384 million in its credit card loan portfolio.  Such delinquencies and charge-offs also negatively impacted Advanta's securitizations, which, during the same time period, incurred net charge-offs of $1.9 billion.  Although Advanta did not incur the securitizations' net charge-offs directly, the bank's profitability was significantly impacted by the deterioration of the securitizations' excess spread provided to the bank.

Figure 2 illustrates the growing rate of net charge-offs and delinquencies within Advanta's credit card loan portfolio and securitizations.  The charge-off and delinquency rates began to significantly increase in March 2008 and continued to increase each quarter thereafter, showing a second significant increase in December 2008.  According to FDIC management, the continued increases in charge-offs and delinquencies were attributable, in part, to Advanta's aggressive re-pricing increases on the credit cards, particularly in September and October 2008.  These re-pricing increases are discussed in more detail later in our report.

**Figure 2:  Net Charge-Offs and Delinquencies Related to Advanta's Credit Card Portfolio and Securitizations**



Source:  OIG analysis of UBPRs for Advanta.

The rising level of charge-offs not only resulted in losses in the bank-owned portion of the credit card portfolio but also caused a decrease in the excess spread of the securitized portion of the portfolio.  Such a decrease in the excess spread is significant because the drop in the 3-month average excess spread to below zero resulted in an early amortization of the securitization trust in June 2009.  In response to rising loan losses and early amortization of the securitization trust, the bank also cancelled credit card charging privileges for all cardholders in order to prevent a rapid increase in on-book receivables.

The early amortization event and cancellation of charging privileges led to increased losses on the bank's assets related to the securitization.  According to industry experts, an institution's excess spread is the most important and comparable analytical factor in analyzing credit card securitizations.  Additionally, as discussed previously, the excess spread percentage acts as one of the triggers for initiating an early amortization event.

As indicated in Figure 3, the excess spread steadily decreased from 9.5 percent in March 2006 to 4.9 percent in June 2008.  During roughly the same time period, the industry's average excess spread ranged from 7 percent to 9 percent.

7

**Figure 3:  Advanta Business Card Master Trust's Quarterly Excess Spread**



Source:  OIG analysis of monthly statements filed by ABRC with the Securities and Exchange Commission.
* According to Citigroup Global Markets Ltd.'s *Credit Card ABS Primer*, dated October 31, 2008, the industry's average excess spread from December 2001 to December 2005 ranged roughly from 6 percent to 7 percent, from March 2006 to July 2008 ranged from 7 percent to 9 percent, and was projected to remain in the range of 6 percent to 7 percent in the future (short-term), with a worst case projected average of 3 percent.

Figure 3 also shows an increase in the excess spread in the latter half of 2008.  This increase is related to bank management's decision to significantly increase interest rates on outstanding credit card balances.  However, such increases turned out to be temporary. Ultimately, a rapidly rising level of charge-offs led to a sharp decline in the excess spread percentages and the early amortization of the trust in June 2009.

<u>Credit Administration and Risk Analysis and Recognition Practices</u>

As the economy began to negatively impact the bank's small business credit card customers, Advanta's credit administration practices exacerbated the problem and its risk analysis and recognition practices failed to keep pace with the resulting changes in portfolio behavior.  Additionally, Advanta's Board and management failed to adequately plan for a scenario involving early amortization of the securitizations.  In the November 2008 report of examination, the FDIC identified weaknesses in the following areas.

**Credit Administration.**  FDIC examiners found that Advanta:

- Engaged in aggressive re-pricing of customer finance charges, involving both the re-priced interest rates and the frequency of successive re-pricing events.  Of particular note, approximately 68 percent of the credit card loan portfolio was re-priced in 2008 to encourage potentially higher-risk borrowers to pay off their accounts.  However, these price increases resulted in much higher minimum payments for customers and made it very difficult for customers already struggling to make their minimum payments to cure any outstanding delinquency. The FDIC reported in its December 2008 compliance examination report that a

large number of accountholders received substantial rate increases that raised their annual percentage rates, in some cases, to as high as 37 percent.  Within the November 2008 examination report (issued in September 2009), the FDIC reported that the effect of rapidly increasing finance charge rates on minimum payments contributed to the acceleration of charge-offs in the latter half of 2008 and early 2009.

- Had substantive violations of Section 5 of the Federal Trade Commission (FTC) Act regarding Unfair[5] or Deceptive Acts or Practices (UDAP), which are considered to be illegal credit practices, and of Regulation B, which implements the Equal Credit Opportunity Act.[6]  The FDIC attributed the violations to management's inadequate oversight, unfamiliarity with the requirements (of the statutes and regulations), and lack of monitoring and audit procedures relative to these statutes and regulations.  In particular, Advanta engaged in over 1 million re-pricing actions on existing credit card accounts.  Based on these practices, from June 2007 through November 2008, the FDIC cited the following substantive violations:

  o  Section 5 of the FTC Act – Advanta engaged in unfair practices related to its aggressive re-pricing of customer finance charges, involving both the re-priced interest rates and the frequency of successive re-pricing events.  In particular, the bank engaged in unfair acts or practices when it imposed credit card rate increases based on criteria that were neither known nor communicated to customers.  In addition, the bank did not adequately notify the customers that their applicable interest rate had been increased, did not disclose the amount of the increased rate, did not effectively disclose the customers' right to opt-out of the rate increase, and did not provide customers with sufficient time to exercise their right to opt-out.

  o  Regulation B – Advanta did not provide complete and/or sufficient notification letters to its accountholders.  In particular, the notification letters did not provide customers with specific reasons for the adverse actions, disclose the customer's right to receive a statement of specific reasons, and/or provide the name and address of the FDIC's Consumer Response Center.

- Cancelled all card utilization privileges without fully considering the possible outcomes.  According to the FDIC, Advanta management relied upon optimistic assumptions in a stress scenario where little historical data existed to determine whether the bank could remain viable.

---

[5] Section 5 of the Federal Trade Commission Act prohibits unfair acts or practices.  An act or practice is unfair where it (1) causes or is likely to cause substantial injury to consumers, (2) cannot be reasonably avoided by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition.  Public policy may also be considered in the analysis of whether a particular act or practice is unfair.

[6] The Equal Credit Opportunity Act and Regulation B require disclosure by creditors of the specific reasons for adverse action taken against the customer, including the small business borrower.  This disclosure allows customers to identify and remedy credit issues, as well as correct inaccurate credit information.

**Risk Analysis and Recognition Practices.**  According to examination reports, Advanta:

- Failed to incorporate into its allowance for loan and lease loss methodology (1) the impact of the early amortization of the bank's securitization trust; (2) anticipated and actual changes in portfolio behavior associated with the continued economic downturn, the aggressive re-pricing strategy, and the cut-off in credit card account utility; and (3) the impact of management's change to a 120-day charge-off period.

- Failed to maintain an adequate allowance for loan and lease losses.

- Failed to consider the impact of early amortization in the bank's capital allocation model and liquidity contingency funding plan.

## Advanta's Securitization Activity

Advanta's significant involvement in securitization activities contributed to the failure of the bank when the securitizations went into early amortization due to rising loan losses, increasing delinquencies, and a deteriorating economy.  According to the Division of Supervision and Consumer Protection's (DSC) *Risk Management Manual of Examination Policies* (Examination Manual), securitizations can be an effective funding method for banks.  However, there are risks associated with using securitization as a funding source, including early amortization clauses to protect investors if the performance of the underlying assets does not meet pre-specified criteria.  If an early amortization clause is triggered, the issuing institution must begin paying principal to bondholders earlier than originally anticipated and will have to fund new receivables that would have otherwise been transferred to the trust.  The issuing institution must monitor the performance of the securitization to anticipate cash flow and funding ramifications due to early amortization clauses.

Advanta first noted signs of "economic disruptions" in August of 2007.  According to a 2009 Federal Reserve Bank of Dallas economic study, due to the financial crisis that began in August 2007, securitization market activity virtually halted and interest rate spreads on securitizations reached unprecedented low levels, as investors demanded higher risk premiums.  According to the FDIC, the securitization market for small issuers collapsed in August 2007 and for all other issuers in November 2007.

In November 2007, Advanta began to provide more favorable terms (for example, return on investment and time to final principal payment) to third-party investors.  Such terms reflected the level of perceived market risk.  Advanta also began to experience significant declining sales/issuance volume as of September 2007, and increasing delinquencies and loan losses in its own credit card portfolio and securitizations in March 2008.  Advanta's last securitization sold to an outside investor was in May 2008.  A year later, in May 2009, bank management publicly announced that it intended to let the securitizations go into early amortization in June 2009.

Ultimately, according to the November 2008 examination report (issued in September 2009 as noted earlier), the bank's poor cardholder performance caused cash flows from the securitized notes to fall below the bank's excess spread requirements in May 2009, leading management to announce that the securitized notes (Advanta Business Card Master Trust) would go into early amortization.  This action would require the bank to fund all newly generated credit card receivables (i.e., credit card charges by customers), which would cause an increase in on-book receivables, a decline in capital ratios, and a dissipation of liquidity.  However, the bank did not have sufficient financial resources, support, or contingency funding to fund its credit card customers on an ongoing basis.

The bank's contingency funding plans did not adequately take into consideration the potential impact to operations that could be caused by the bank's securitizations going into early amortization, or the bank's access to the securitization markets being limited.  According to Financial Institution Letter (FIL) 84-2008, entitled, *Liquidity Risk Management*, dated August 26, 2008, liquidity risk measurement and management systems should reflect an institution's complexity, risk profile, and scope of operations.  The August 2008 FIL states, in part, that banks that use securitizations should ensure that their contingency funding plans address relevant stress events.  In particular, contingency funding plans should incorporate events that could rapidly affect an institution's liquidity, including a sudden inability to securitize assets.  In addition, the guidance states that securitizing institutions should also have plans in place to address early amortization events.

Advanta Corp. management recognized, within their 2006 and 2007 Annual Reports, that any substantial reduction in its ability to complete securitizations could negatively impact its results of operations and financial condition.  However, according to the FDIC, prior to, and early on in the economic crisis, the possibility of the bank's securitizations going into early amortization never occurred to the bank.  Despite the heightened risk structure of the bank's loan activities, bank management failed to ensure that the risk associated with this activity was adequately identified, measured, monitored, and controlled.  According to the November 2008 examination report, bank management first added/considered the potential lack of access to the securitization markets into the bank's stress test scenarios and models to provide for its contingency funding plans in December 2008 – 6 months after the bank's last securitization issuance.  As a result, bank management did not effectively plan for and react to the securitization's early amortization and market disruptions that rendered further securitizations economically unfeasible.

## The FDIC's Supervision of Advanta

The FDIC provided supervisory oversight of Advanta in the form of risk management and compliance examinations, a visitation, and off-site monitoring.  The FDIC's supervision addressed both consumer protection and risk management issues and, overall, was quite extensive.  However, in hindsight, earlier and greater supervisory emphasis and/or concern could have been expressed regarding the failure of the bank's capital allocation model and contingency funding plans to incorporate more extreme stress

scenarios to ensure adequate capitalization and liquidity to support an unwinding of the securitization through early amortization.

**Supervisory History**

The FDIC, in conjunction with the UDFI, provided ongoing supervision of Advanta through regular on-site risk management examinations and a visitation.  The FDIC also prepared semiannual capital market reviews of the bank intended to identify key risks and assist with supervision.  Further, from the start of the November 2008 examination to the bank's closing on March 19, 2010, examiners were frequently onsite conducting examinations or monitoring the institution's liquidity position.  During this time period, the FDIC was involved in discussions with the bank, the bank's parent holding company, and UDFI, regarding bank proposals to improve its financial condition.  Most notably, in a May 2009 New York Regional Office letter, the FDIC informed Advanta's Board that a proposal by the Board to close accounts to new activity and to simultaneously purchase a large portion of Class A securitization notes was unusual and could pose a considerable risk.  Ultimately, the FDIC stated that

> In view of the winding down of deposit taking activities and credit card operations, we [the FDIC] request that management either submit a new business strategy for our [the FDIC's] review and comment or, if applicable, a plan for the voluntary termination of deposit insurance.

Advanta was also identified for off-site review due to the increased probability of a rating downgrade; however, the institution had already been downgraded through the onsite activities.

Table 2 summarizes key information pertaining to the on-site risk management examinations and visitation that the FDIC and UDFI conducted of Advanta from September 2006 until the institution failed in March 2010.

**Table 2:  Advanta's Examination History from 2006 to 2010**

| Examination/Visitation Start Date (Issuance Date) | On-Site Supervisory Effort | Supervisory Ratings | Supervisory Action |
|---|---|---|---|
| January 11, 2010 (March 1, 2010) | Joint Examination | 555555/5 | The bank was closed on March 19, 2010. |
| October 26, 2009 | Visitation | No Rating | None |
| November 17, 2008 (September 9, 2009) | Joint Examination | 555544/5 | None |
| May 20, 2009 | | 344422/4 | Interim Rating Change. Cease and Desist Order (C&D) issued on June 30, 2009. |
| October 15, 2007 (February 5, 2008) | Joint Examination | 122111/2 | None |
| September 25, 2006 (January 5, 2007) | Joint Examination | 121112/2 | None |

Source:  Examination reports, problem bank memoranda, and formal enforcement actions for Advanta.

As indicated in Table 2, during the initial period covered by our review, Advanta was considered a well-performing institution that consistently received composite "2" supervisory ratings.  At the 2006 and 2007 examinations, examiners identified and reported the unique business plan of the bank and conducted comprehensive reviews of the bank's securitization activities.  According to FDIC management, examiners also reflected the risk associated with the plan in the bank's ratings by assigning a composite "2" rating despite performance metrics that otherwise were generally indicative of a composite "1" rating, including capital ratios in excess of 20 percent, returns on average assets in excess of 5.50 percent, and maintenance of cash and Federal funds sold ranging from 22 to 32 percent of total assets.  From September 2006 to the bank's closing in March 2010, the FDIC and the UDFI performed four joint risk management examinations and a visitation.  The FDIC first expressed a heightened level of supervisory concern during the November 2008 examination, and that concern was initially reflected in interim rating downgrades in May 2009.

Enforcement Actions

The FDIC and UDFI separately issued two sets of formal enforcement actions between 2006 and the bank's failure.  A brief description of these enforcement actions follows.

- **June 2009 C&D (FDIC).**  Advanta stipulated to the FDIC's risk management C&D based on the May 2009 Interim Rating Change Memorandum that downgraded the bank's ratings.  The interim rating change was based, in part, on the pending results of the November 2008 risk management examination, and the January 2007 and December 2008 compliance examinations.  In addition, bank management notified the FDIC that the charge-off rate in the credit card portfolio was continuing to escalate and had reached a point that could cause early amortization of the securitizations and bank management intended to allow that to occur.  Further, charging privileges for all active accounts would be terminated, and financial support to the securitization trust funding the credit card receivables would no longer be provided.

  The June 2009 C&D contained 21 provisions addressing such areas as maintaining qualified management; ensuring adequate staffing and accounts receivable servicing; increasing Board supervision; developing strategic plans that provided for the orderly discontinuance of deposit-taking operations; developing an executive compensation plan; developing a written capital plan; restricting dividends; maintaining a "*Well Capitalized*" capital position; developing plans to address possible liquidity events; restricting transactions with and on the behalf of the parent holding company and affiliates; restricting cash transactions, contract authority, material balance sheet transactions, and brokered deposits; correcting violations; and providing progress reports.

- **October 2009 C&D Order (UDFI).**  Advanta also stipulated to the UDFI's risk management C&D, which contained 21 provisions similar to the FDIC's June 2009 C&D.  Based on our discussions with the UDFI, UDFI senior management

officials stated that the issuance of their enforcement action was delayed due to the timing of the November 2008 examination report issuance.

- **November 2009 Consent Order (FDIC).** Advanta stipulated to the FDIC's risk management Consent Order based on the parent holding company's filing for protection under Chapter 11 of the U.S. Bankruptcy Code on November 8, 2009. The consent order contained four provisions that superseded certain provisions of the June 2009 C&D, and replaced them with tighter restrictions on affiliate transactions and contractual agreements.

- **November 2009 Consent Order (UDFI).** Advanta stipulated to the UDFI's risk management Consent Order, which contained identical requirements to the FDIC's November 2009 Consent Order.

<u>The FDIC's Coordination of Supervisory Functions</u>

The FDIC's supervisory functions (risk management and consumer protection) coordinated effectively when inter-disciplinary concerns emerged. In particular, the FDIC's consumer protection function identified, reported on, and coordinated a unified supervisory response with the FDIC's risk management function. As discussed elsewhere in this report, substantive violations associated with Advanta's credit card re-pricing campaign were identified and corrective actions and penalties were pursued, based on the coordinated efforts of the following FDIC offices:

- The Consumer Response Center (CRC) identified an increasing volume of consumer complaints and notified the New York Regional Office's senior compliance personnel of CRC concerns in the summer of 2008.

- The New York Regional Office's senior compliance personnel scheduled a targeted visitation to review the identified concerns for the 4th quarter of 2008 and coordinated with DSC risk management personnel.

- The Salt Lake City Field Office's compliance examination team initiated the visitation and, based on their findings, subsequently expanded the review into a full-scope examination in December 2008. The December 2008 Compliance Examination resulted in a rating downgrade and the citation of substantive UDAP and Regulation B violations. During the compliance and risk management examinations, the respective Field Office Supervisors held periodic meetings and the respective examiners-in-charge communicated daily.

- The New York Regional Office's senior compliance personnel pursued an enforcement order (coordinated with risk management), civil money penalties, and restitution for consumers harmed by Advanta's practices.

- The New York Regional and Salt Lake City Field Office's risk management team also effectively incorporated the compliance examination team's findings and

concerns into the risk management assessment of the bank and in the pursuit of corrective actions.

FDIC senior compliance management stated that the identification and citation of Advanta's UDAP and Regulation B violations were among the first consumer compliance matters that had a substantial and direct impact on the assessment of the bank's safety and soundness.  As a result, the FDIC included Advanta in a case study in DSC's forward-looking supervision training program.

Off-site Reviews

The FDIC's off-site review program is designed to identify emerging supervisory concerns and potential problems so that supervisory strategies, such as examination schedules, can be adjusted appropriately.  The FDIC electronically generates an Off-site Review List (ORL) each quarter and performs off-site reviews for each 1- and 2- rated bank that appears on the list.  The system-generated ORL includes institutions that are identified by:

- The Statistical CAMELS Off-site Rating (SCOR) system as having a 35 percent or higher probability of downgrade to 3 or worse,[7] or
- The Growth Monitoring System (GMS) as having a growth percentile of 98 or 99.[8]

The FDIC's off-site review program did not detect any significant emerging risks early enough to impact the FDIC's supervisory strategy.  The FDIC ORL flagged Advanta for off-site review one time between January 2005 and July 2009.  Specifically, the FDIC's off-site review system identified Advanta for review in May 2009 based on the FDIC's automated review criteria established for the SCOR system.  Based on Advanta's March 2009 financial data, the SCOR system reported that the bank had a 45 percent chance of being downgraded to a 3 or worse – which was driven by the bank's earnings performance, asset quality, and management.  The review was completed in July 2009 and identified a high and increasing risk profile.  However, by this time, the bank's credit card securitization had already entered into early amortization, and the FDIC had downgraded the bank on an interim basis to a composite "4" rating and obtained the Board's stipulation to a June 24, 2009 C&D to guide corrective action.  Also of note, the FDIC's GMS did not identify Advanta for an off-site review, despite the bank's significant level of growth (through securitization) and reliance on securitization markets for funding.  Based on the GMS's established criteria, unique risk factors such as a bank's rapid and significant securitization growth and reliance on certain non-traditional funding sources are not considered in the system's computations.

---

[7] SCOR is a financial model that uses statistical techniques, off-site data, and historical examination results to measure the likelihood that an institution will receive a CAMELS downgrade at the next examination.
[8] GMS is an off-site rating tool that identifies institutions experiencing rapid growth or having a funding structure highly dependent on non-core funding sources.

In addition to the off-site review conducted by the New York Regional Office, the FDIC's Salt Lake City Field Office prepared semiannual capital market reviews on certain banks, including Advanta. According to FDIC management, these semiannual capital market reviews were conducted under a national program, and Advanta had been covered by the program since 1999. These reviews included, in part, an overview of Advanta's business strategy, growth, profitability, delinquency and loss rates, securitization activities, and recent examination findings. In particular, the December 2007 review identified certain key risks facing the bank and recommended that a capital markets specialist participate on subsequent examinations to enhance the FDIC's supervision of Advanta.

**Supervisory Response to Advanta's Monoline Business Strategy**

The FDIC routinely recognized the existence of Advanta's monoline operational structure and the bank's unique and potentially increased risk profile due to its operational strategies. In addition, the FDIC identified and reported on the bank's significant loan growth as early as the September 2006 examination. The FDIC considered the bank's structure and growth to be largely mitigated by the bank's maintenance of Tier 1 Leverage and Total Risk-Based capital ratios in excess of 20 percent and growing levels of on-balance sheet liquidity in the form of cash and Federal funds sold. However, in hindsight, earlier and greater supervisory emphasis or concern could have been expressed regarding the failure of the bank's capital allocation model and contingency funding plans to incorporate more extreme stress scenarios. Such action would have helped ensure adequate capitalization and liquidity to support an unwinding of the securitizations through early amortization, a significant risk associated with Advanta's monoline business strategy.

Supervisory Analysis of Asset Quality

The FDIC regularly assessed Advanta's asset quality in its examination reports, and examination work papers for the September 2006 and October 2007 examinations indicated that the FDIC had performed a comprehensive review of the bank's securitizations. However, consistent with the FDIC's examination policy, the respective examination reports presented limited, if any, commentary on the quality of the bank's outstanding securitizations until quality became a concern. For example, although documented in the examination work papers, the September 2006 and October 2007 examination reports did not discuss the structure and performance of the securitization trust in terms of its overall size, the balances invested in each tranche, and the quality and investment rating of the each tranche structure. Further, the FDIC did not fully discuss the quality and continuing reliance on the performance of the outstanding securitizations until the November 2008 examination report. In addition, key asset quality performance ratios presented in these examination reports were limited to the bank-owned credit cards, and did not address the securitizations.

Supervisory Analysis of the Economy and Securitization Markets

The October 2007 examination report provided a detailed discussion of the deteriorating national economy.  In particular, the FDIC reported on the downturn in the subprime mortgage markets and on Advanta's concerns over the "credit crunch's" potential impact to the bank's unsecured lending operations.  In the report's confidential section, the examiners reported the following observations:

> Over the past several months, and especially during the examination, the subprime mortgage crisis has begun to impact other areas of the market, including Alt-A lending, portions of the prime lending market, general mortgage lending, the mortgage backed securities market, and to a certain extent corporate bonds. The overall real estate market both nationally and in the specific . . . regions of the bank appear to be showing signs of weakness.  Housing prices are dropping, foreclosures are rising, and as more hybrid mortgages start to re-price, consumers will likely be impacted.

> After the examination ended, examiners noted that the parent company's stock price dropped dramatically . . . due to the market's concerns over the effects of the subprime market and the fact that management held an unscheduled conference call with investors to essentially withdraw their earnings projections for 2008.

The examination report also noted that Advanta increased industry exposure monitoring (tracking the bank's exposure to real estate-related businesses), and examiners encouraged Advanta to emphasize conservative practices as the economy continued to show signs of weakening.  In particular, the October 2007 examination report primarily focused on how the downturn in the housing market could impact the bank's small business cardholder performance as opposed to how a disruption in the mortgage-backed securitization market might expand into the credit card securitization market.  In addition, the October 2007 examination report identified securitizations as the bank's primary funding source but did not discuss the outlook for the credit card securitization market or the future viability of that market as a funding source for the bank.  Supervisory concern was not expressed, and recommendations were not formulated, to address the various economic and market risk factors faced by the bank due to its securitization activities. According to the FDIC, examiners believed that they had addressed the risk that was apparent at the time, by encouraging Advanta to emphasize conservative underwriting and account management practices as the economy continued to show signs of weakening.

Supervisory Analysis of Parent Holding Company Support

The FDIC routinely analyzed issues related to the ownership and control of Advanta by Advanta Corp.  The FDIC first reported that the parent holding company was not a source of financial strength within the November 2008 examination report.  In particular, the FDIC concluded that Advanta Corp. had limited ability to provide support in the form of liquidity and capital injections into the bank.  Subsequently, the FDIC sought to obtain

additional holding company support for Advanta.  However, in the January 2010 examination report, examiners reported that:

- Advanta Corp. filed for Chapter 11 Bankruptcy protection in November 2009.

- Advanta Corp.'s executive management stated that they refused to comply with the UDFI and FDIC C&Ds and Consent Agreements.

- Advanta Corp.'s executive management stated that their intention was not to provide any capital support to the bank and that their priority was to protect the parent company's assets and resources for the creditors of Advanta Corp.

The FDIC also reported that Advanta Corp. had sufficient cash and cash equivalents, of almost $100 million, to fund operations for the short-term; however, the parent holding company did not have sufficient resources to fund operations and debt obligations over an extended time period.  Overall, the FDIC concluded that the bank's parent company did not have the willingness or capacity to support the bank.

UDFI's senior management stated that Advanta was a unique industrial bank, in that its parent holding company did not engage in any commercial (mercantile) operations, did not generate a diverse revenue stream, and relied heavily on the success of the bank to support its own profitability.  In particular, as of December 2007, Advanta represented roughly 80 percent of the consolidated holding company's total assets and 140 percent of net income.  Of particular note, UDFI senior management stated that a significant weakness existed due to the lack of Capital and Liquidity Maintenance Agreements between the bank, the holding company, and the regulatory agencies.  The UDFI officials stated that had these agreements been in place, Advanta Corp. could not have refused to provide additional support to Advanta, which could have mitigated the loss to the DIF. The UDFI stated that these agreements are currently formulated and placed on all new charters; however, this practice was not in place when Advanta was established.

**Supervisory Response to Advanta's Securitization Activity**

The FDIC routinely assessed the bank's available liquidity and noted that the bank's assets were primarily funded through securitization activities.  In addition, the FDIC reported in the September 2006 examination report that the bank's securitization activities were well managed and that favorable pricing of recent issues indicated adequate market acceptance.  Examination reports and off-site reviews documented that bank management was maintaining increasing levels of cash and Federal funds sold, with the amount as a percentage of total assets growing from 22 percent at June 30, 2006 to 32 percent at June 30, 2007, and to 44 percent by year-end 2007.  However, the FDIC did not require the bank's contingency funding plans to incorporate scenarios that contemplated early amortization until after the securitization markets collapsed, and just before the bank's securitizations went into early amortization, during the November 2008 examination.

18

According to the *Credit Card Securitization Manual*, dated March 2007, examiners should review the liquidity implications of the bank's securitization activities in relation to the bank's normal liquidity management process, including contingency planning. Contingency plans should also provide for funding alternatives in the event of a complete withdrawal from the securitization market or in the event of a reduction in credit availability. The manual also states that early warning mechanisms related to early amortization triggers should be in place.

Both the September 2006 and October 2007 examination reports discussed the bank's sources of contingency funding and assessed the adequacy of such funding based on the funding sources' abilities to meet the bank's short-term (available liquidity) needs. The FDIC did not assess the bank's contingency funding plans in case of a significant downturn in the economy or restricted access to the securitization markets. However, the Salt Lake City Field Office's December 2007 off-site review (performed by a Capital Markets Subject Matter Expert just after the October 2007 examination) included the following observation:

> While liquidity is considered satisfactory, with cash and Federal funds sold accounting for nearly 45 percent of year-end assets, the bank is highly dependent on securitizations for funding. Furthermore, all deposits are potentially volatile liabilities. Whether brokered or originated from other sources, the institution pays high interest rates that are well above the average rates paid by banks. Consequently, the need for sound asset quality, backup liquidity, and an effective contingency funding plan is magnified.

Even though the bank maintained increasing levels of liquidity and high levels of capital, earlier and greater supervisory analysis and/or concern could have been expressed regarding the failure of the bank's contingency liquidity funding plan to incorporate the possibility of early amortization.

**Implementation of PCA**

The purpose of PCA is to resolve problems of insured depository institutions at the least possible long-term cost to the DIF. Part 325 of the FDIC Rules and Regulations implements PCA requirements by establishing a framework for taking prompt corrective action against insured state-chartered nonmember banks that are not adequately capitalized. The FDIC is required to closely monitor the institution's compliance with its capital restoration plan, mandatory restrictions defined under section 38(e), and discretionary safeguards imposed by the FDIC (if any) to determine if the purposes of PCA are being achieved. Based on the supervisory actions taken with respect to Advanta, we determined that the FDIC properly implemented applicable PCA provisions of section 38.

The FDIC issued timely notices related to the institution's capital category, reviewed and monitored the institution's Call Reports and UBPRs, obtained and reviewed progress reports on enforcement actions, conducted onsite reviews and monitoring of PCA

restrictions, and conducted periodic discussions with the institution's management regarding compliance with the restrictions imposed under each PCA capital category.

Advanta was considered *Well Capitalized* for PCA purposes until June 30, 2009, when the FDIC issued a C&D on Advanta that contained a capital provision. The C&D directed the bank to maintain a level of capital that corresponded to the PCA capital standards for *Well Capitalized* institutions. As a result, when Advanta was subject to this enforcement action, the bank was considered *Adequately Capitalized* for PCA purposes. Subsequent to the issuance of the June 2009 C&D, Advanta's capital ratios quickly fell below the levels required for *Well Capitalized* institutions. As a result, in September 2009 the bank became *Undercapitalized*, and in December 2009 the bank became *Critically Undercapitalized*. Table 3 illustrates Advanta's capital levels relative to the PCA thresholds for *Well Capitalized* institutions, and the significant decline in Advanta's capital levels from June 2007 to December 2009.

**Table 3:  Advanta's Capital Levels Relative to PCA Thresholds for Well Capitalized Institutions**

| Capital Ratio | Well Capitalized Threshold | Oct-2007 Examination (As of Jun-2007) | Nov-2008 Examination (As of Mar-2009) | As of Sep-2009 | As of Dec-2009 |
|---|---|---|---|---|---|
| Tier 1 Leverage Capital | 5% or more | 20.86% | 5.77% | 3.73% | (2.00%) |
| Tier 1 Risk-Based Capital | 6% or more | 21.18% | 11.24% | 8.93% | (4.07%) |
| Total Risk Based Capital | 10% or more | 22.44% | 12.55% | 10.28% | (4.07%) |

Source:  OIG analysis of UBPRs, and the October 2007, November 2008, and January 2010 examination reports for Advanta, as well as section 38 of the FDI Act and 57 Federal Register 44866-1.

The FDIC's key actions in implementing PCA and monitoring Advanta's adherence to PCA included the following:

- **June 30, 2009.** Although a PCA Notification Letter was not issued that informed Advanta that it was considered to be *Adequately Capitalized*, the June 2009 C&D contained provisions that were similar to and/or more stringent than the restrictions imposed on *Adequately Capitalized* banks. In particular, Advanta was restricted from further use of brokered deposits and was required to submit a Capital Restoration Plan.

- **October 27, 2009.** Based on Advanta's September 2009 Call Reports, the FDIC issued a PCA Notification Letter informing the bank that it was *Undercapitalized* based on PCA capital standards. As a result of this capital designation, the bank was subject to various restrictions, including limitations on asset growth, payments to insiders, and the issuance and renewal of any brokered deposits. In addition, the bank was again required to submit a Capital Restoration Plan by November 26, 2009.

- **March 2, 2010.** Based on the January 2010 examination, completed February 2010, the FDIC provided the bank with a second PCA notification letter that informed

Advanta that it was *Critically Undercapitalized*[9] for PCA purposes, the lowest PCA capital designation.  As a result, the bank was subject to further restrictions, including, but not limited to, the following:  entering into material transactions, extending highly leveraged credit, engaging in covered transaction, and paying excessive compensation.

In response to the June 2009 C&D and PCA Notification Letters, Advanta submitted three Capital Restoration Plans in July 2009, December 2009, and March 2010.  The FDIC rejected all three plans due, in part, to the plans' high-risk nature, failure to provide for new contributions of permanent capital, and/or lack of a performance guarantee from the parent holding company.  Ultimately, on March 19, 2010, the UDFI closed the institution and named the FDIC as receiver, due the bank's insolvency resulting, in part, from eroding/deteriorating capital.

## Corporation Comments

On October 1, 2010, the Director, DSC, provided a written response to a draft of this report.  That response is provided in its entirety as Appendix 4 of this report.  In its response, DSC reiterated the OIG's conclusions regarding the causes of Advanta's failure, pointing out that Advanta failed due to insolvency brought on by the Board and management's failure to implement risk management practices commensurate with the unique nature of Advanta's business model.  With regard to our assessment of the FDIC's supervision of Advanta, DSC summarized the supervisory history described in our report and recognized that it could have required Advanta to incorporate an early amortization scenario in its capital allocation model and contingency funding plans.  DSC also pointed out that beginning in January 2010, institutions engaged in securitization activity, in the manner followed by Advanta, have been required to consolidate securitized assets for financial reporting purposes as a result of the implementation of Statement of Financial Accounting Standards (FAS) 166 and FAS 167.  This accounting change will minimize the capital and liquidity risks associated with early amortization events for institutions following a business model similar to Advanta.

---

[9] According to Part 325 *Subpart B – Prompt Corrective Action,* an insured depository institution is deemed to be *Critically Undercapitalized* if it has a ratio of tangible equity to total assets that is equal to or less than 2.0 percent.

# Objectives, Scope, and Methodology

## Objectives

We performed this audit in accordance with section 38(k) of the FDI Act, which provides, in general, that if the Deposit Insurance Fund incurs a material loss with respect to an insured depository institution, the Inspector General of the appropriate federal banking agency shall prepare a report to that agency reviewing the agency's supervision of the institution. The FDI Act requires that the report be completed within 6 months after it becomes apparent that a material loss has been incurred.

Our audit objectives were to (1) determine the causes of Advanta's failure and resulting material loss to the DIF and (2) evaluate the FDIC's supervision of the institution, including implementation of the PCA provisions of section 38.

We conducted this performance audit from May 2010 to September 2010 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Scope and Methodology

The scope of this audit included an analysis of Advanta's operations from December 2004 until its failure on March 19, 2010. Our review also entailed an evaluation of the regulatory supervision of the institution from September 2006 to the bank's closing.

To achieve the objectives, we performed the following procedures and techniques:

- Analyzed examination reports prepared by the FDIC and the UDFI examiners from September 2006 to January 2010. These included risk management, compliance, and industrial bank holding company inspection reports.

- Reviewed the following:

  - UBPR and Call Report data from December 2004 to December 2009.

  - Examination work papers for the November 2008 and January 2010 examinations, as provided by DSC. In addition, subsequent to our examiner interviews, the FDIC provided work papers for the September 2006 and October 2007 examinations documenting the examiners' analysis of the bank's securitizations.

  - Correspondence maintained at DSC's New York Regional Office and Salt Lake City Field Office, as provided by DSC, from 2006 to 2010.

## Objectives, Scope, and Methodology

- Reports prepared by the Division of Resolutions and Receiverships (DRR) and DSC relating to the bank's closure.

- External audit reports and other public records of the parent holding company from 2006 to 2008.

- Pertinent DSC policies and procedures, and various banking laws and regulations.

- Various economic data and market studies related to the contraction of the securitization markets.

- Interviewed the following FDIC officials:

  - DSC management (for both risk management and compliance disciplines) in Washington, D.C., the New York Regional Office, and Salt Lake City Field Office.

  - FDIC examiners (for both risk management and compliance disciplines) from the Salt Lake City Field Office, who participated in the examinations or reviews of examinations of Advanta.

  - A DSC subject matter expert on credit card securitizations (not involved in the FDIC's supervisory history of Advanta).

- Met with officials from the UDFI to discuss their historical perspective of the institution, its examinations, and other activities regarding the state's supervision of the bank.

We performed the audit work at the OIG's offices in Arlington, Virginia and Dallas, Texas.

**Internal Control, Reliance on Computer-processed Information, Performance Measurement, and Compliance with Laws and Regulations**

Consistent with the audit objectives, we did not assess DSC's overall internal control or management control structure.  We relied on information in DSC systems, reports, examination reports, and interviews of examiners to understand Advanta's management controls pertaining to causes of failure and material loss as discussed in the body of this report.

## Objectives, Scope, and Methodology

We obtained data from various FDIC systems but determined that information system controls were not significant to the audit objectives and, therefore, did not evaluate the effectiveness of information system controls. We relied on our analysis of information from various sources, including examination reports, correspondence files, public information and testimonial evidence to corroborate data obtained from systems that was used to support our audit conclusions.

The Government Performance and Results Act of 1993 (the Results Act) directs Executive Branch agencies to develop a customer-focused strategic plan, align agency programs and activities with concrete missions and goals, and prepare and report on annual performance plans. For this material loss review, we did not assess the strengths and weaknesses of DSC's annual performance plan in meeting the requirements of the Results Act because such an assessment is not part of the audit objectives. DSC's compliance with the Results Act is reviewed in program audits of DSC operations.

Regarding compliance with laws and regulations, we performed tests to determine whether the FDIC had complied with provisions of PCA and limited tests to determine compliance with certain aspects of the FDI Act. The results of our tests were discussed, where appropriate, in the report. Additionally, we assessed the risk of fraud and abuse related to our objectives in the course of evaluating audit evidence.

### Related Coverage of Financial Institution Failures

On May 1, 2009, the OIG issued an internal memorandum that outlined major causes, trends, and common characteristics of FDIC-supervised financial institution failures that had resulted in a material loss to the DIF. The memorandum also indicated that the OIG planned to provide more in-depth coverage of those issues and make related recommendations, when appropriate. Since May 1, 2009, the OIG has issued additional MLR reports related to failures of FDIC-supervised institutions and these reports can be found at www.fdicig.gov. In June 2010, the OIG initiated an audit, the objectives of which are to (1) determine the actions that the FDIC has taken to enhance its supervision program since May 2009, including those specifically in response to the May 2009 memorandum, and (2) identify trends and issues that have emerged from subsequent MLRs.

In addition, with respect to more in-depth coverage of specific issues, in May 2010, the OIG initiated an evaluation of the role and federal regulators' use of the Prompt Regulatory Action provisions of the FDI Act (section 38, *PCA* and section 39, *Standards for Safety and Soundness*) in the banking crisis.

# Glossary of Terms

| Term | Definition |
|---|---|
| **Affiliate** | Under section 23A of the Federal Reserve Act (12 U.S.C. section 371c), an affiliate generally includes, among other things, a bank subsidiary, or a company that (1) controls the bank and any other company that is controlled by the company that controls the bank, (2) is sponsored and advised on a contractual basis by the bank, or (3) is controlled by or for the benefit of shareholders who control the bank or in which a majority of directors hold similar positions in the bank. |
| **Allowance for Loan and Lease Losses (ALLL)** | The ALLL is an estimate of uncollectible amounts that is used to reduce the book value of loans and leases to the amount that is expected to be collected.  It is established in recognition that some loans in the institution's overall loan and lease portfolio will not be repaid.  Boards of directors are responsible for ensuring that their institutions have controls in place to consistently determine the allowance in accordance with the institution's stated policies and procedures, generally accepted accounting principles, and supervisory guidance. |
| **Call Report** | Reports of Condition and Income, often referred to as Call Reports, include basic financial data for insured commercial banks in the form of a balance sheet, an income statement, and supporting schedules.  According to the Federal Financial Institutions Examination Council's (FFIEC) instructions for preparing Call Reports, national banks, state member banks, and insured nonmember banks are required to submit a Call Report to the FFIEC's Central Data Repository (an Internet-based system used for data collection) as of the close of business on the last day of each calendar quarter. |
| **Cease and Desist Order (C&D)** | A C&D is a formal enforcement action issued by a financial institution regulator pursuant to 12 U.S.C. section 1818 to a bank or affiliated party to stop an unsafe or unsound practice or a violation of laws and regulations.  A C&D may be terminated when the bank's condition has significantly improved and the action is no longer needed or the bank has materially complied with its terms. |
| **Concentration** | A concentration is a significantly large volume of economically related assets that an institution has advanced or committed to a certain industry, person, entity, or affiliated group.  These assets may, in the aggregate, present a substantial risk to the safety and soundness of the institution. |
| **Contingency Funding (or Liquidity) Plan** | A written plan that defines strategies for addressing liquidity shortfalls in emergency situations.  Such plans delineate policies to manage a range of stress environments, establish clear lines of responsibility, and articulate clear implementation and escalation procedures.  Contingency funding plans should be regularly tested and updated to ensure that they are operationally sound.  DSC uses the term contingency funding plan and contingency liquidity plan interchangeably. |

Appendix 2

# Glossary of Terms

| | |
|---|---|
| **FDIC's Supervision Program** | The FDIC's supervision program promotes the safety and soundness of FDIC-supervised institutions, protects consumers' rights, and promotes community investment initiatives by FDIC-supervised institutions. The FDIC's Division of Supervision and Consumer Protection (DSC) (1) performs examinations of FDIC-supervised institutions to assess their overall financial condition, management policies and practices (including internal control systems), and compliance with applicable laws and regulations and (2) issues related guidance to institutions and examiners. |
| **Financial Holding Company** | A financial entity engaged in a broad range of banking-related activities, created by the Gramm-Leach-Bliley Act of 1999. These activities include: insurance underwriting, securities dealing and underwriting, financial and investment advisory services, merchant banking, issuing or selling securitized interests in bank-eligible assets, and generally engaging in any non-banking activity authorized by the Bank Holding Company Act. The Federal Reserve Board is responsible for supervising the financial condition and activities of financial holding companies. |
| **Growth Monitoring System (GMS)** | GMS is an off-site rating tool that identifies institutions experiencing rapid growth or having a funding structure highly dependent on non-core funding sources. |
| **Material Loss** | As defined by section 38(k)(2)(B) of the FDI Act, and as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, for the period beginning January 1, 2010 and ending December 31, 2011, a material loss is defined as any estimated loss in excess of $200 million. |
| **Off-site Review Program** | The FDIC's Off-site Review Program is designed to identify emerging supervisory concerns and potential problems so that supervisory strategies can be adjusted appropriately. Off-site reviews are performed quarterly for each bank that appears on the Off-site Review List. Regional management is responsible for implementing procedures to ensure that Off-site Review findings are factored into examination schedules and other supervisory activities. |
| **Peer Group** | Institutions are assigned to 1 of 15 peer groups based on asset size, number of branches, and whether the institution is located in a metropolitan or non-metropolitan area. |

# Glossary of Terms

| | |
|---|---|
| **Prompt Corrective Action (PCA)** | The purpose of PCA is to resolve the problems of insured depository institutions at the least possible long-term cost to the Deposit Insurance Fund.  Part 325, subpart B, of the FDIC Rules and Regulations, 12 Code of Federal Regulations, section 325.101, et. seq., implements section 38, *Prompt Corrective Action*, of the FDI Act, 12 United States Code section 1831(o), by establishing a framework for determining capital adequacy and taking supervisory actions against depository institutions that are in an unsafe or unsound condition.  The following terms are used to describe capital adequacy:  (1) Well Capitalized, (2) Adequately Capitalized, (3) Undercapitalized, (4) Significantly Undercapitalized, and (5) Critically Undercapitalized.<br><br>A PCA Directive is a formal enforcement action seeking corrective action or compliance with the PCA statute with respect to an institution that falls within any of the three categories of undercapitalized institutions. |
| **Risk-Based Capital** | A "supplemental" capital standard under Part 325 of the FDIC Rules and Regulations.  Under the risk-based framework, a bank's qualifying total capital base consists of two types of capital elements, "core capital" (Tier 1) and "supplementary capital" (Tier 2). |
| **Statistical CAMELS Off-site Rating (SCOR) System** | SCOR is a financial model that uses statistical techniques, off-site data, and historical examination results to measure the likelihood that an institution will receive a CAMELS downgrade at the next examination. |
| **Tier 1 (Core) Capital** | Defined in Part 325 of the FDIC Rules and Regulations, 12 C.F.R. section 325.2(v), as<br>**The sum of**:<br>• Common stockholder's equity (common stock and related surplus, undivided profits, disclosed capital reserves, foreign currency translation adjustments, less net unrealized losses on available-for-sale securities with readily determinable market values);<br>• Non-cumulative perpetual preferred stock; and<br>• Minority interest in consolidated subsidiaries;<br>**Minus**:<br>• Certain intangible assets;<br>• Identified losses;<br>• Investments in securities subsidiaries subject to section 337.4; and<br>• Deferred tax assets in excess of the limit set forth in section 325.5(g). |

# Glossary of Terms

| | |
|---|---|
| **Tier 2 (Supplemental) Capital** | Tier 2 capital is defined in Appendix A to Part 325 of the FDIC Rules and Regulations, and is generally the sum of:<br>• Allowances for loan and lease losses, up to a maximum of 1.25 percent of risk-weighted assets;<br>• Cumulative perpetual preferred stock, long-term preferred stock and related surplus;<br>• Perpetual preferred stock (dividend is reset periodically);<br>• Hybrid capital instruments; and<br>• Term subordinated debt and intermediate-term preferred stock. |
| **Tranches** | Multiple classes of equity and debt that are set in a senior or subordinate position to one another based upon seniority in bankruptcy and timing of repayment. The tranches are divided into three general categories: (1) Senior tranche; (2) Mezzanine tranche; and (3) Equity tranche. |
| **Uniform Bank Performance Report (UBPR)** | The UBPR is an individual analysis of financial institution financial data and ratios that includes extensive comparisons to peer group performance. The report is produced by the Federal Financial Institutions Examination Council for the use of banking supervisors, bankers, and the general public and is produced quarterly from Call Report data submitted by banks. |
| **Uniform Financial Institutions Rating System (UFIRS)** | Financial institution regulators and examiners use the Uniform Financial Institutions Rating System (UFIRS) to evaluate a bank's performance in six components represented by the CAMELS acronym: **C**apital adequacy, **A**sset quality, **M**anagement practices, **E**arnings performance, **L**iquidity position, and **S**ensitivity to market risk. Each component, and an overall composite score, is assigned a rating of 1 through 5, with 1 having the least regulatory concern and 5 having the greatest concern. |

## Acronyms

| | |
|---|---|
| ABCMT | Advanta Business Card Master Trust |
| ABRC | Advanta Business Receivables Corporation |
| ALLL | Allowance for Loan and Lease Losses |
| C&D | Cease and Desist Order |
| C&I | Commercial and Industrial |
| CAMELS | **C**apital, **A**sset Quality, **M**anagement, **E**arnings, **L**iquidity and **S**ensitivity to Market Risk |
| CLP | Contingency Liquidity Plan |
| CRC | Consumer Response Center |
| DIF | Deposit Insurance Fund |
| DRR | Division of Resolutions and Receiverships |
| DSC | Division of Supervision and Consumer Protection |
| FDI | Federal Deposit Insurance |
| FFIEC | Federal Financial Institutions Examination Council |
| FICO | Fair Isaac Corporation |
| FIL | Financial Institution Letter |
| FTC | Federal Trade Commission |
| GMS | Growth Monitoring System |
| OIG | Office of Inspector General |
| ORL | Off-site Review List |
| PCA | Prompt Corrective Action |

**Appendix 3**

## Acronyms

| | |
|---|---|
| UBPR | Uniform Bank Performance Report |
| UDAP | Unfair or Deceptive Acts or Practices |
| UDFI | Utah Department of Financial Institutions |
| UFIRS | Uniform Financial Institutions Rating System |

Appendix 4

## Corporation Comments



**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, D.C. 20429-9990                Division of Supervision and Consumer Protection

October 1, 2010

**TO:**        Stephen Beard
              Assistant Inspector General for Material Loss Reviews

**FROM:**      /**Signed**/
              Sandra L. Thompson
              Director

**SUBJECT**:   Draft Audit Report Entitled, Material Loss Review of Advanta Bank Corp.,
              Draper, Utah (Assignment No. 2010-037)

Pursuant to Section 38(k) of the Federal Deposit Insurance Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Federal Deposit Insurance Corporation's Office of Inspector General (OIG) conducted a material loss review of Advanta Bank Corp., Draper, Utah (Advanta), which failed on March 19, 2010. This memorandum is the response of the Division of Supervision and Consumer Protection (DSC) to the OIG's Draft Report received on September 10, 2010.

Advanta failed due to insolvency brought on by the Board of Directors' (Board) and management's failure to implement risk management practices commensurate with the unique nature of Advanta's business model. As the economy began to negatively impact Advanta's small business credit card customers, management enacted a series of decisions that ultimately affected viability. Most significantly, management increased the interest rates on the majority of the card holder accounts and later cancelled charging privileges for all cardholders. Advanta's Board and management failed to consider the potential impact of these decisions on portfolio performance and violated consumer protection laws by failing to give clear and timely notice to consumers before raising their interest rates. Further, despite FDIC warnings about the legal, credit and reputational risks associated with the cancellation of charging privileges, management relied upon optimistic assumptions to determine whether Advanta could remain viable. Management's decisions led to mounting loan losses, early amortization of the securitized receivables, and erosion of capital.

DSC and the Utah Department of Financial Institutions conducted comprehensive supervision of Advanta, and DSC maintained strong coordination between its two supervisory functions, risk management and consumer protection. While Advanta maintained high levels of liquidity and capital in recognition of the risks associated with its business model and contemplated actions to prevent an early amortization scenario, DSC could have also required Advanta to incorporate such a scenario in its capital allocation model and contingency funding plans. Beginning in January 2010, institutions engaged in securitization activity, in the manner followed by Advanta, have been required to consolidate securitized assets for financial reporting purposes as a result of the implementation of Statement of Financial Accounting Standards (FAS) 166 and FAS 167. This accounting change will minimize the capital and liquidity risks associated with early amortization events for institutions following a business model similar to Advanta.

Thank you for the opportunity to review and comment on the Report.

Exhibit I

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported) June 30, 2009

# Advanta Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 0-14120 | 23-1462070 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| Welsh & McKean Roads, P.O. Box 844, Spring House, Pennsylvania | 19477 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code <u>(215) 657-4000</u>

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

# TABLE OF CONTENTS

Item 1.01 Entry into a Material Definitive Agreement
Item 9.01 Financial Statements, Pro Forma Financial Information and Exhibits
SIGNATURES
EX-10.1
EX-10.2
EX-10.3
EX-10.4

Item 1.01 Entry into a Material Definitive Agreement.

Advanta Bank Corp. (the "Bank"), a wholly-owned subsidiary of Advanta Corp. (the "Company"), entered into two regulatory agreements with its primary federal banking regulator, the Federal Deposit Insurance Corporation ("FDIC") that became effective on June 30, 2009. The Bank did not admit any wrongdoing in entering into the agreements and entered into the agreements in the interest of expediency and to avoid litigation and the costs associated therewith. The agreements are described below.

**Regulatory Agreement Regarding Banking Practices**

The Bank entered into a Stipulation and Consent (the "First Consent Agreement") to the issuance of an Order to Cease and Desist (the "First Order") with the FDIC.

The First Order places restrictions on the Bank's use of its cash assets, payment of dividends, entering into transactions that would materially alter the Bank's balance sheet composition and taking of brokered deposits, and it requires the maintenance of minimum Tier 1 leverage capital and total risk-based capital ratios at well capitalized levels which the Bank has had in the past, including as of December 31, 2008 and March 31, 2009, and expects to have as of June 30, 2009. In compliance with the First Order, the Bank is to submit to the FDIC a strategic plan related to its deposit-taking operations and deposit insurance that provides for the termination of the Bank's deposit-taking operations and deposit insurance after the Bank's deposits are repaid in full, which is anticipated to take a few years. However, the First Order also provides that during this time period, the Bank may submit an additional plan that, if approved by the FDIC, would allow the Bank to continue its deposit–taking operations and deposit insurance. The Bank intends to submit such additional plan in the future.

The First Order does not in any way restrict the Bank from continuing to service its managed credit card accounts and receivables, including those that are owned by the Advanta Business Credit Card Master Trust. Specifically, under the First Order, the Bank must continue to perform its obligations as servicer for the credit card accounts and receivables of those credit card accounts. In addition, all customer bank deposits remain fully insured to the fullest extent permissible by law.

The descriptions of the First Consent Agreement and the Order in this Form 8-K are qualified in their entirety by reference to the First Consent Agreement and the Order, which are attached as Exhibits 10.1 and 10.2, respectively.

**Regulatory Agreement Regarding Compliance Matters**

The Bank also entered into a Stipulation and Consent (the "Second Consent Agreement") to the issuance of an Order to Cease and Desist, Order for Restitution and Order to Pay (the "Second Order") with the FDIC relating to alleged unsafe or unsound banking practices associated with alleged violations of consumer protection and banking laws.

The Second Order alleges, among other things, that some of the Bank's marketing of certain cash back reward programs for its business credit cards and practices related to the pricing strategies of certain of its business credit card accounts violated Section 5 of the Federal Trade Commission Act ("Section 5") and that the Bank also violated certain adverse action notification requirements in connection with the

pricing strategies of certain of its business credit card accounts. Under the Second Order the Bank must: pay restitution, as described below, to Eligible Customers (as defined in the Second Order); and pay a civil money penalty of $150,000. Total restitution for the alleged violations relating to marketing of the cash back reward programs will not exceed $14 million and total restitution for the alleged violations relating to the pricing strategies will not exceed $21 million. The Company previously took a $14 million pretax charge related to an estimate of cash back rewards program restitution in the third quarter of 2008. The Company expects to record an additional charge in the second quarter of 2009 related to the pricing strategies restitution.

The descriptions of the Second Consent Agreement and the Second Order in this Form 8-K are qualified in their entirety by reference to the Second Consent Agreement and the Second Order which are attached as Exhibits 10.3 and 10.4, respectively.

This Form 8-K contains forward-looking statements that are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected. The most significant among these risks and uncertainties are: the risk that the Bank will not maintain capital levels and ratios at the levels required by the FDIC; and the risk that the Bank will not submit a strategic plan to the FDIC for the continuation of its deposit-taking operations and deposit insurance that is acceptable to the FDIC. The cautionary statements provided above are being made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 (the "Act") and with the intention of obtaining the benefits of the "safe harbor" provisions of the Act for any such forward-looking information. Additional risks that may affect the Company's future performance are detailed in the Company's filings with the Securities and Exchange Commission, including its most recent Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q.

**Item 9.01 Financial Statements, Pro Forma Financial Information and Exhibits.**

(c) Exhibits.

10.1   Stipulation and Consent to the Issuance of an Order to Cease and Desist

10.2   Order to Cease and Desist

10.3   Stipulation and Consent to the Issuance of an Order to Cease and Desist, Order for Restitution, and Order to Pay

10.4   Order to Cease and Desist, Order for Restitution and Order to Pay

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Advanta Corp.

(Registrant)

Date: July 1, 2009

By:  /s/ Jay A. Dubow

Jay A. Dubow, Chief
Administrative Officer, Senior Vice
President, Secretary and
General Counsel

**Exhibit 10.1**

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|  |  |  |
|---|---|---|
| | ) | |
| In the Matter of | ) | STIPULATION AND CONSENT |
| | ) | TO THE ISSUANCE OF AN |
| | ) | ORDER TO CEASE AND DESIST |
| ADVANTA BANK CORP. | ) | |
| DRAPER, UTAH | ) | FDIC-09-266b |
| | ) | |
| (INSURED STATE NONMEMBER BANK) | ) | |

Subject to the acceptance of this STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST (CONSENT AGREEMENT) by the Federal Deposit Insurance Corporation (FDIC), it is hereby stipulated and agreed by and between a representative of the Legal Division of the FDIC and Advanta Bank Corp., Draper, Utah (Respondent) as follows:

1. The Respondent has been advised of its right to receive a Notice of Charges for an Order to Cease and Desist; Findings of Fact and Conclusions of Law; Order to Pay; and Notice of Hearing (collectively, NOTICE) detailing the unsafe or unsound banking practices alleged to have been committed by the Respondent for which an Order to Cease and Desist (ORDER) may issue against the Respondent pursuant to sections 8(b) of the Federal Deposit Insurance Act (Act), 12 U.S.C. §§ 1818(b).

2. The Respondent has been further advised of its right to a hearing on the charges under sections 8(b) of the Act, 12

U.S.C. §§ 1818(b) and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

3. The Respondent is represented by counsel.

4. The Respondent admits that the FDIC is the appropriate Federal banking agency to maintain this enforcement action pursuant to section 3(q) (3) of the Act, 12 U.S.C. § 1813(q)(3), and that the FDIC has jurisdiction over it and the subject matter of this proceeding.

5. In the interest of compromise and settlement, the Respondent, solely for the purpose of this proceeding pursuant to section 8(b) of the Act, 12 U.S.C. §§ 1818(b), and without admitting or denying any of charges of unsafe or unsound banking practices, hereby consents and agrees to the issuance of the ORDER by the FDIC.

6. The Respondent further stipulates and agrees that such ORDER will be deemed to be an order which has become final under the Act, and that such ORDER shall become effective upon its issuance by the FDIC and fully enforceable by the FDIC pursuant to the provisions of the Act subject only to the conditions of paragraphs 8 and 9 of this CONSENT AGREEMENT.

7. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, it is agreed that no action will be taken by the FDIC against the Respondent to enforce the ORDER

2

in the United States District Court unless the Respondent or any director, officer, employee, agent, successor or assign, or other institution-affiliated party (collectively, the Bank Parties) has violated or is about to violate any provision of such ORDER.

8. The FDIC and the Respondent agree that entering into this CONSENT AGREEMENT shall not constitute an admission of liability by the Respondent for the alleged unsafe or unsound banking practices that form the basis of the ORDER.

9. The Respondent hereby waives:

(a) all defenses and counterclaims of any kind to the NOTICE and in this proceeding;

(b) a public hearing for the purpose of taking evidence on such alleged charges;

(c) the filing of proposed findings of fact and conclusions of law;

(d) the issuance of a recommended decision by an administrative law judge;

(e) the filing of exceptions and briefs with respect to such recommended decision; and

(f) judicial review of the ORDER as provided by section 8(h) of the Act, 12 U.S.C. § 1818(h), or any other challenge to the validity of the ORDER.

3

Dated this 24 day of June, 2009.

FDIC
LEGAL DIVISION

BY:

_____
/s/ Carol G. Laakso
Carol G. Laakso
Counsel

ADVANTA BANK CORP.
DRAPER, UTAH

BY:

/s/ Dennis Alter
_____
Dennis Alter
Director

/s/ Calvin M. Boardman
_____
Calvin M. Boardman
Director

/s/ Philip M. Browne
_____
Philip M. Browne
Director

/s/ Fred W. Fairclough
_____
Fred W. Fairclough
Director

/s/ Fred P. Gonzales
_____
Fred P. Gonzales
Director

/s/ John F. Moore
_____
John F. Moore
Director

/s/ William Wirthlin
_____
William Wirthlin
Director

Comprising the Board of
Directors of Advanta Bank Corp.,
Draper, Utah

4

**Exhibit 10.2**

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

| | | |
|---|---|---|
| In the Matter of | ) | ORDER TO CEASE AND DESIST |
| | ) | |
| | ) | |
| ADVANTA BANK CORP. | ) | |
| DRAPER, UTAH | ) | FDIC-09-266b |
| | ) | |
| (Insured State Nonmember Bank) | ) | |
| | ) | |

Advanta Bank Corp., Draper, Utah ("Bank"), through its board of directors, having been advised of its right to the issuance and service of a NOTICE OF CHARGES AND OF HEARING detailing the unsafe or unsound banking practices alleged to have been committed by the Bank and of its right to a hearing on the alleged charges under section 8(b) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1818(b), and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC") dated June 24, 2009, whereby, solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices, the Bank consented to the issuance of an ORDER TO CEASE AND DESIST ("ORDER") by the FDIC.

The FDIC considered the matter and determined that they had reason to believe that the Bank may engage in unsafe or unsound banking practices. The FDIC, therefore, accepted the CONSENT AGREEMENT and issued the following:

1

### ORDER TO CEASE AND DESIST

**IT IS ORDERED**, that the Bank, institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), of the Bank and its successors and assigns, cease and desist from the following unsafe or unsound banking practices:

1. The Bank's Board of Directors and Management operating the Bank in a manner that causes the Bank's significant financial deterioration;

2. Operating with inadequate capital for the Bank's risk profile; and

3. Operating in a manner that does not sustain satisfactory earnings performance to maintain sufficient capital in relation to the Bank's risk profile.

**IT IS FURTHER ORDERED**, that the Bank, its institution-affiliated parties and its successors and assigns take affirmative action as follows:

### <u>MANAGEMENT</u>

1. (a) The Bank shall have and retain qualified management. Each member of management shall possess qualifications and experience commensurate with his or her duties and responsibilities at the Bank. The qualifications of management personnel shall be evaluated on their ability to:

(1) Comply with the requirements of the ORDER;

(2) Operate all aspects of the Bank in a safe and sound manner, giving due consideration to the Bank's asset quality, capital adequacy, earnings, management effectiveness, liquidity, and its sensitivity to market risk; and

(3) Comply with applicable laws and regulations.

2

(b) While this ORDER is in effect, the Bank shall notify the New York Regional Director ("Regional Director") in writing of any resignations and/or terminations of any members of its board of directors and/or any of its senior executive officer(s) within 15 days of the event. The Bank shall also establish procedures to ensure compliance with section 32 of the FDI Act, 12 U.S.C. § 1831i and Subpart F of Part 303 of the FDIC's Rules and Regulations, 12 C.F.R. §§ 303.100 through 303.103. In addition, the Bank shall notify the Regional Director in writing when it proposes to add any individual to the Bank's board of directors or employ any individual as a senior executive officer. The notification must be received at least 30 days before such addition or employment is intended to become effective and should include a description of the background and experience of the individual(s) to be added or employed.

## MANAGEMENT – BOARD SUPERVISION

2. Within 30 days after the effective date of this ORDER, the Bank's board of directors shall increase its participation in the affairs of the Bank by assuming full responsibility for the approval of the Bank's policies and objectives and for the supervision of the Bank's management, including all the Bank's activities. The board's participation in the Bank's affairs shall include, at a minimum, monthly meetings in which the following areas shall be reviewed and approved by the board: reports of income and expenses; insider, charged-off, delinquent, nonaccrual, and recovered loans; investment activities; material changes to policies; and individual committee actions impacting the aforementioned. The Bank's board of directors' minutes shall document the board's reviews and approvals, including the names of any dissenting directors.

**STRATEGIC PLAN AND BUDGET/EXECUTIVE COMPENSATION**

    3. (a) Within 30 days of this ORDER, the Bank shall submit to the Regional Director for review and approval a written strategic plan and budget providing for the orderly discontinuance of deposit-taking operations and the voluntary termination of deposit insurance after the repayment in full of all deposits. In connection therewith, the Bank shall provide the Regional Director with pro forma financial statements for the period necessary to complete the orderly liquidation of assets. This plan shall, at a minimum, provide for: (i) the responsibilities of the Bank's board of directors regarding the definition, approval, implementation, and monitoring of the strategic plan and budget, and the procedures designed to ensure that the board of directors fulfills such responsibilities; (ii) the repayment in full of all deposits; (iii) the operating assumptions that form the bases for major projected income and expense components; (iv) financial performance objectives, including plans for earnings, liquidity, and capital supported by detailed quarterly and annual pro forma financial statements, including projected budgets, balance sheets, and income statements; and (v) the establishment of a monthly review process to monitor the actual income and expenses of the Bank in comparison to budgetary projections. Notwithstanding the above, the Bank may submit a plan for future activities during the years in which the Bank is implementing the orderly discontinuation of deposit taking operations contemplated by this provision. The plan, subject to the prior approval of the FDIC, may permit the continuation of deposit taking activities.

    (b) Within 30 days from the effective date of this ORDER, the Bank shall submit to the Regional Director for review and approval an Executive Compensation Plan which incorporates qualitative as well as profitability performance standards. For purposes of this paragraph, "compensation" refers to any and all salaries, bonus and other benefits of every kind

4

and nature whatsoever, whether paid directly or indirectly. Executive officers are defined as any officer designated as chairman of the board, vice-chairman of the board, president, chief executive officer, executive vice president, senior vice president, or chief financial officer.

## CAPITAL ADEQUACY

4. (a) Within 30 days of the effective date this ORDER, the Bank shall submit to the Regional Director, for review and approval, an acceptable written plan to achieve and maintain sufficient capital at the Bank. The plan shall, at a minimum, address: (i) the Bank's current and future capital requirements; (ii) the Bank's level of concentrations of credit; (iii) the volume of the Bank's adversely classified assets; (iv) the Bank's anticipated level of retained earnings; (v) the collectability of on-book account receivables and other assets associated with securitized assets; and (vi) source and timing of additional funds to fulfill the future capital needs of the Bank.

(b) Notwithstanding the provisions of paragraph 4(a) the Bank shall at all times during the term of this ORDER, maintain its Tier 1 Leverage Capital ratio at a level of no less than 5 percent and Total Risk-Based Capital ratio equal to or greater than 10 percent, which during the term of this Order shall be calculated and reported in writing to the Regional Director within 15 days of the end of each month. For the purpose of reporting the Tier 1 Leverage Capital ratio at the end of months which do not represent the end of a quarter, the Tier 1 Leverage Capital ratio shall be calculated by substituting month-end Total Assets for quarterly Average Assets.

(c) After the Regional Director approves the capital plan, the Bank's board of directors shall adopt the capital plan, including any modifications or amendments requested by

5

the Regional Director. Thereafter, the Bank shall immediately initiate measures detailed in the capital plan, to the extent such measures have not previously been initiated, to effect compliance with the plan within thirty (30) days after the Regional Director responds to the capital plan.

(d) In addition, the Bank shall comply with the FDIC's Statement of Policy on Risk-Based Capital found in Appendix A to Part 325 of the FDIC's Rules and Regulations, 12 C.F.R. Part 325, App. A.

(e) For purposes of this ORDER, all terms in this Order relating to capital shall be calculated according to call report instructions, FIL-20-2009, and the methodology set forth in Part 325 of the FDIC's Rules and Regulations, 12 C.F.R. Part 325.

## FUNDS MANAGEMENT AND LIQUIDITY

5. Within 30 days of this Order, the Bank shall submit to the Regional Director an acceptable, comprehensive liquidity contingency plan. The written plan shall, at a minimum,

(a) assess possible liquidity events that the Bank may encounter and identify responses to the potential impact of such events on the Bank's short-term, intermediate-term, and long-term liquidity profile;

(b) provide for weekly review of the Bank's deposit structure, including volume and trend of total deposits, maturity distribution of all time deposits; and

(c) provide for weekly calculation and reporting of the Bank's liquidity posture in a format acceptable to the Regional Director.

## PARENT COMPANY/AFFILIATE RELATIONS

6. Without the prior written consent of the Regional Director, the Bank shall not directly or indirectly enter into, participate in, or otherwise engage in or allow any extension of

6

credit to Advanta Corp. (the "Parent Company") or to any other "affiliate" of the Bank and/or directly or indirectly enter into, participate in, or otherwise engage in or allow any "covered transaction" or "transaction covered" with the Parent Company or with any "affiliate" of the Bank regardless of whether such "extension of credit", "covered transaction" or "transaction covered" would be prohibited, limited or otherwise regulated by Sections 23A or 23B of the Federal Reserve Act ("Sections 23A and 23B"), 12 U.S.C. §§ 371c and 371c-1.

For purposes of this ORDER, "extension of credit" shall be defined as set forth at 12 C.F.R. § 215.3 and "affiliate," "covered transaction" and "transaction covered" shall have the meanings set forth in Sections 23A and 23B; provided, however, that the terms "covered transactions" and "transactions covered" shall not include the continued provision of and payments for operational services provided by affiliates under pre-existing contracts in the normal course of business, including the provision of technology platforms and dual employees. Additionally, for purposes of this ORDER, any transaction by the Bank with any person or entity shall be deemed to be a transaction with an "affiliate" of the Bank if any of the proceeds of the transaction are used for the benefit of, or transferred to any Bank affiliate.

7. (a) As of the effective date of this ORDER, the Bank shall not make any payment, directly or indirectly, to or for the benefit of the Parent Company or any other Bank affiliate, without the prior written consent of the Regional Director, except for the continued provision of and payments for operational services provided by affiliates under reasonable pre-existing contracts and arrangements in the normal course of business.

(b) As of the effective date of this ORDER, the Bank shall not enter into any contract or modification of an existing contract with its Parent Company or any other Bank affiliate, or increase the periodic payments under any existing contract with its Parent Company

7

or any other Bank affiliate without submitting the new contract, modification, or information concerning the proposed increase in any existing contract with its Parent Company or any other Bank affiliate to the Regional Director for review and comment.

## CASH TRANSACTIONS

   8. As of the effective date of this Order, all transactions for the withdrawal, transfer or other utilization of Bank cash assets must be approved in writing by a Bank officer.

## DIVIDEND RESTRICTION

   9. As of the effective date of this ORDER, the Bank shall not declare or pay any dividends without the prior written consent of the Regional Director. Requests for approval shall be received at least 30 days prior to the proposed date for the declaration of dividends and shall contain, but not be limited to, information on consolidated earnings for the most recent annual period and the last quarter.

## CONTINUED SERVICING OF CREDIT CARD ACCOUNTS

   10. (a) The Bank shall take all steps necessary to ensure that the Bank infrastructure, staffing, and contracts necessary to service the Bank credit card accounts and related Bank owned and Bank managed (owned by Advanta Business Card Master Trust or the Parent Company) account receivables (collectively, "account receivables") remain in place.

      (b) Any materially adverse changes to the servicing of the account receivables, including but not limited to new contracts with vendors, and amendments to or cancellation of existing contracts with vendors that materially adversely affect the servicing of the account receivables must receive prior written non-objection by the Regional Director.

8

(c) Any unavoidable changes to the servicing of the credit card accounts must be reported by the Bank to the Regional Director within 5 days of the Bank receiving notice of the changes.

## CHANGE IN BALANCE SHEET STRUCTURE OR OPERATIONS

11. Without prior written non-objection from the Regional Director, the Bank shall not engage in any transaction that would materially alter its balance sheet composition, including growth in total assets, significant changes in funding sources, or entering into or exiting existing contracts for services provided by the Bank or to the Bank.

## BROKERED DEPOSITS

12.    As of the effective date of this Order the Bank shall not renew, rollover, or accept "Brokered Deposits" (as such term is defined at 12 C.F.R. § 337.6).

## COMPLIANCE WITH LAWS AND REGULATIONS

13. Within 30 days from the effective date of this ORDER, the Bank shall take steps necessary, consistent with sound banking practices, to ensure future compliance with all applicable laws, rules, and regulations.

## PROGRESS REPORTS

14. Within thirty (30) days after the end of the calendar quarter following the effective date of this ORDER, and by the 30th day after the end of every calendar quarter thereafter, the Bank shall furnish written progress reports to the Regional Director detailing the

9

form, content, and manner of any actions taken to secure compliance with this ORDER, and the results thereof.

## NOTICE TO SHAREHOLDERS

15. Within thirty (30) days of the effective date of this ORDER, the Bank shall send to its shareholders or otherwise furnish a description of this ORDER. The description shall fully describe the ORDER in all material respects. The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Division of Supervision and Consumer Protection, Accounting and Securities Disclosure Section, 550 17th Street, N.W., Washington, D.C. 20429 for review at least 20 days prior to dissemination to shareholders. Any changes requested to be made by the FDIC shall be made prior to dissemination of the description, communication, notice or statement.

## OTHER ACTIONS

16. It is expressly and clearly understood that if, at any time, the Regional Director shall deem it appropriate in fulfilling the responsibilities placed upon the Regional Director under applicable law to undertake any further action affecting the Bank, nothing in this ORDER shall in any way inhibit, estop, bar or otherwise prevent the Regional Director from doing so, including, but not limited to, the imposition of civil money penalties.

17. It is expressly and clearly understood that nothing herein shall preclude any proceedings brought by the Regional Director to enforce the terms of this ORDER, and that nothing herein constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States, departments or agencies

10

thereof, Department of Justice or any other representatives of the State of Utah or any other departments or agencies thereof, including any prosecutorial agency, to bring other actions deemed appropriate.

## **REGIONAL DIRECTOR**

18. Whenever a provision of this ORDER shall require the Bank to submit a proposed letter, report, or other matter to the Regional Director for review, comment and/or non-objection, the Bank shall make such submission to the Regional Director at 20 Exchange Place, New York, New York 10005.

## **ORDER EFFECTIVE**

19. The effective date of this ORDER shall be the date of issuance.

20. The provisions of this ORDER shall be binding upon the Bank, its institution-affiliated parties, successors and assigns.

21. The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provision of this ORDER has been modified, terminated, or set aside in writing by the FDIC.

Pursuant to delegated authority.

Dated: June 30, 2009

/s/ James C. Watkins
James C. Watkins
Deputy Regional Director
Division of Supervision
and Consumer Protection

11

**Exhibit 10.3**

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | | |
|---|---|---|
| In the Matter of | ) ) ) ) | STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST, |
| ADVANTA BANK CORP. DRAPER, UTAH | ) ) ) | ORDER FOR RESTITUTION, and ORDER TO PAY |
| (INSURED STATE NONMEMBER BANK) | ) ) ) ) | FDIC-08-259b FDIC-08-403k |

Subject to the acceptance of this STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST AND ORDER FOR RESTITUTION (CONSENT AGREEMENT) by the Federal Deposit Insurance Corporation (FDIC), it is hereby stipulated and agreed by and between a representative of the Legal Division of the FDIC and Advanta Bank Corp., Draper, Utah (Respondent) as follows:

1. The Respondent has been advised of its right to receive a Notice of Charges for an Order to Cease and Desist and for Restitution; Notice of Assessment of Civil Money Penalties; Findings of Fact and Conclusions of Law; Order to Pay; and Notice of Hearing (collectively, NOTICE) detailing the violations of law and/or unsafe or unsound banking practices alleged to have been committed by the Respondent for which an Order to Cease and Desist, Order for Restitution, and

Order to Pay (ORDER) may issue against the Respondent pursuant to sections 8(b) and 8(i)(2)of the Federal Deposit Insurance Act (Act), 12 U.S.C. §§ 1818(b) and 1818(i)(2).

2. The Respondent has been further advised of its right to a hearing on the charges under sections 8(b)and 8(i)(2) of the Act, 12 U.S.C. §§ 1818 (b) and 1818(i)(2), and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

3. The Respondent is represented by counsel.

4. The Respondent admits that the FDIC is the appropriate Federal banking agency to maintain this enforcement action pursuant to section 3(q)(3) of the Act, 12 U.S.C. § 1813(q)(3), and that the FDIC has jurisdiction over it and the subject matter of this proceeding.

5. The FDIC has reason to believe that the Respondent engaged in unsafe and unsound banking practices and violations of law in connection with the marketing of the Cash Back Reward feature of Respondent's credit card products and acts or practices related to the Respondent's repricing of credit card accounts. Specifically, the FDIC has reason to believe the Respondent engaged in violations of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (Section 5) and the adverse action notification requirements of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* ("ECOA"), set forth at 15 U.S.C. § 1691(d), and Regulation B of the

2

Board of Governors of the Federal Reserve System, 12 C.F.R. Part 202 *et seq*. ("Regulation B"), set forth at 12 C.F.R. § 202.9 (collectively "Adverse Action Notification Requirements").

   6. In the interest of compromise and settlement, the Respondent, solely for the purpose of this proceeding pursuant to sections 8(b)and 8(i)(2) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i)(2), and without admitting or denying any of the unsafe or unsound banking practices or violations of law or regulation as set forth in paragraph 5 of this CONSENT AGREEMENT, hereby consents and agrees to the issuance of the ORDER by the FDIC, and further consents and agrees to pay a civil money penalty in the amount of $150,000 to the Treasury of the United States pursuant to the provisions of section 8(i)(2)of the Act, 12 U.S.C. § 1818(i)(2), and to pay restitution to certain customers as set forth in the Order pursuant to the provisions of section 8(b)(6) of the Act, 12 U.S.C § 1818(b)(6).

   7. The Respondent further agrees to pay the civil money penalty assessed by delivering to the FDIC a certified check payable to the Treasury of the United States in the amount of $150,000 within five (5) days of the execution of the CONSENT AGREEMENT. Upon issuance of the ORDER by the FDIC, the FDIC shall remit the certified check to the Treasury of the United

3

States.

8. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, Respondent agrees not to seek or accept indemnification for the civil money penalty assessed and paid in this matter.

9. The Respondent further stipulates and agrees that such ORDER will be deemed to be an order which has become final under the Act, and that such ORDER shall become effective upon its issuance by the FDIC and fully enforceable by the FDIC pursuant to the provisions of the Act subject only to the conditions of paragraphs 10 and 11 of this CONSENT AGREEMENT.

10. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, it is agreed that no action will be taken by the FDIC against the Respondent to enforce the ORDER in the United States District Court unless the Respondent or any director, officer, employee, agent, successor or assign, or other institution-affiliated party (collectively, the Bank Parties) has violated or is about to violate any provision of such ORDER.

11. (a) In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, this will be a release by the FDIC of the Respondent and Bank Parties with respect to the alleged violations of Section 5 identified by the FDIC arising

4

---

out of the Respondent's marketing of the Cash Back Reward feature of its credit card products and acts or practices relating to the Respondent's repricing of credit card accounts, the Adverse Action Notification Requirements, and any other allegations relating in any manner to the FDIC's Compliance Report of Examination dated January 16, 2007 (Release Violations). In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, it is agreed that the FDIC shall not initiate any further legal action, except an action to enforce the terms of the ORDER, against any of the Bank Parties based on the Release Violations.

(b) Except as provided herein, the Respondent agrees and acknowledges that the terms and provisions of this CONSENT AGREEMENT and the acceptance by the FDIC of this CONSENT AGREEMENT and the issuance of the ORDER shall not in any way bar, estop or otherwise prevent the FDIC from taking any other action against any of the Bank Parties, or any of the Respondent's current or former institution-affiliated parties.

12. The Bank disagrees with FDIC's assertion that Section 5 (including implementing rules, regulations, regulatory guidance, and statements of policy) applies to business-purpose credit cards issued to owners of small businesses and other professionals. The FDIC and the

5

Respondent agree that entering into this CONSENT AGREEMENT shall not constitute an admission of liability by the Respondent for the transactions and practices that form the basis of the ORDER; nor shall it constitute a waiver of any substantive or procedural rights of the Respondent or Bank Parties to refute any alleged violations of Section 5 or the Adverse Action Notification Requirements not mentioned in the Compliance Report or the ORDER.

13. The Respondent hereby waives:

(a) all defenses and counterclaims of any kind to the NOTICE and in this proceeding;

(b) a public hearing for the purpose of taking evidence on such alleged charges;

(c) the filing of proposed findings of fact and conclusions of law;

(d) the issuance of a recommended decision by an administrative law judge;

(e) the filing of exceptions and briefs with respect to such recommended decision; and

(f) judicial review of the ORDER as provided by section 8(h) of the Act, 12 U.S.C. § 1818(h), or any other challenge to the validity of the ORDER.

6

Dated this 24 day of June, 2009.

| FDIC | ADVANTA BANK CORP. |
|---|---|
| LEGAL DIVISION | DRAPER, UTAH |

BY:                                              BY:

/s/ Carol G. Laakso                        /s/ Dennis Alter

Carol G. Laakso                           Dennis Alter

Counsel                                  Director

/s/ Calvin M. Boardman

Calvin M. Boardman
Director

/s/ Philip M. Browne

Philip M. Browne
Director

/s/ Fred W. Fairclough

Fred W. Fairclough
Director

/s/ Fred P. Gonzales

Fred P. Gonzales
Director

/s/ John F. Moore

John F. Moore
Director

/s/ William Wirthlin

William Wirthlin
Director

Comprising the Board of
Directors of Advanta Bank
Corp., Draper, Utah

7

**Exhibit 10.4**

V26 06-15-2009
FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|                                          |     |                              |
|------------------------------------------|-----|------------------------------|
| In the Matter of                         | )   |                              |
|                                          | )   |                              |
|                                          | )   | ORDER TO CEASE AND DESIST,   |
| ADVANTA BANK CORP.                       | )   | ORDER FOR RESTITUTION        |
| DRAPER, UTAH                             | )   | and                          |
|                                          | )   | ORDER TO PAY                 |
|                                          | )   |                              |
| (INSURED STATE NONMEMBER BANK)           | )   | FDIC-08-259b                 |
|                                          | )   | FDIC-08-403k                 |
|                                          | )   |                              |

   ADVANTA BANK CORP., Draper, Utah ("Bank"), having been advised of its right to a Notice of Charges and of Hearing under section 8(b) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1818(b), detailing the violations of law and/or regulations and unsafe or unsound banking practices alleged to have been committed by the Bank prior to the Bank's closure of credit card accounts to new transactions in May 2009, and of its right to a hearing with respect to the foregoing, and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, and ORDER TO PAY ("CONSENT AGREEMENT") with a representative of the Legal Division of the Federal Deposit Insurance Corporation ("FDIC"), dated June 24, 2009, whereby, solely for the purpose of this proceeding and without admitting or denying the alleged violations of law and/or regulations and

unsafe or unsound banking practices, the Bank consented to the issuance of an ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, and ORDER TO PAY ("ORDER") by the FDIC.

   The FDIC considered the matter and determined that it has reason to believe that the Bank committed violations of law and/or regulations and engaged in unsafe or unsound banking practices, including, but not limited to, violations of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) ("Section 5") in connection with the marketing of the Cash Back Reward feature of the Bank's credit card products and acts or practices related to the repricing of credit card accounts; the adverse action notification requirements of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* ("ECOA"), set forth at 15 U.S.C. § 1691(d), and Regulation B of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 202 *et seq.* ("Regulation B"), set forth at 12 C.F.R. § 202.9 (collectively "Adverse Action Notification Requirements"); and operating the Bank without effective oversight and supervision of the Bank's credit card products; that the Bank was unjustly enriched in connection with such violations or practices; and that the Bank should be required to make restitution to remedy the injuries resulting from such violations or practices.

Page 2 of 17

The FDIC, therefore, accepts the CONSENT AGREEMENT and issues the following:

**ORDER TO CEASE AND DESIST**

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns, cease and desist from the following violations of law and/or regulations and from engaging in the following unsafe or unsound banking practices:

     (a) operating in violation of Section 5; and

     (b) operating in violation of the Adverse Action Notification Requirements.

**ORDER FOR RESTITUTION AND OTHER RELIEF**

IT IS FURTHER ORDERED THAT:

     1. Within sixty (60) days of the effective date of this ORDER, the Bank shall commence the restitution and other relief described below and complete such restitution within one hundred and twenty (120) days of the effective date of this ORDER. For purposes of this ORDER, the following definitions will apply:

Page 3 of 17

(a) *Customer* includes any individual, group, unincorporated association, corporation, limited liability corporation, limited or general partnership or other business entity.

(b) *Cash Back Reward* means the payment by the Bank to a customer of a specified percentage of the purchase price charged to a Bank credit card account.

(c) *Stated Cash Back Reward* means the Cash Back Reward most frequently and prominently advertised in a solicitation for the Bank's credit card products.

(d) *Cash Back Reward Account* means a Bank credit card account on which Cash Back Rewards are or were earned.

(e) *Cash Back Accountholder* means each customer who opens or opened a Cash Back Reward Account.

(f) *Bonus Category Purchase* means a qualifying purchase charged to a Bank credit card for which the credit card solicitation states that the Cash Back Accountholder will earn the Stated Cash Back.

(g) *Ascending Tier Account* means a Cash Back Reward Account in which the Cash Back Accountholder earns or earned less than the Stated Cash Back Reward until the aggregate Bonus Category Purchases reaches or reached a level established by the Bank.

Page 4 of 17

(h) *Cap Account* means a Cash Back Reward Account in which the Cash Back Accountholder earns or earned the Stated Cash Back Reward on Bonus Category Purchases until the aggregate Cash Back Rewards earned on Bonus Category Purchases and other purchases reaches or reached an amount established by the Bank, after which the Cash Back Accountholder earns or earned 0% Cash Back Rewards on Bonus Category Purchases.

(i) *Descending Tier Account* means a Cash Back Reward Account in which the Cash Back Accountholder earns or earned the Stated Cash Back Reward until the aggregate Bonus Category Purchases reaches or reached the amount established by the Bank.

(j) *Threshold* means the minimum amount of unpaid, earned Cash Back Rewards that the Cash Back Accountholder must accrue by the end of a billing cycle in order for the Bank to issue a check to the Cash Back Accountholder for the earned Cash Back Reward.

(k) *Reprice* means the upward adjustment of an Annual Percentage Rate ("APR") applicable to a Bank Credit Card Account except for the upward adjustment of an APR due to (i) a Default Event; (ii) the operation of an index for variable rate APRs; (iii) a reset of the variable rate floor (*e.g.*, an adjustment to the margin or change in the underlying index); (iv) loss or expiration of a promotional rate; or (v) termination or

Page 5 of 17

completion of a workout arrangement.

(l) *Default Event* means (i) not making payment on the Customer's credit card account so that it is received by the Bank by its due date, (ii) paying less than the minimum amount due on the Customer's credit card account, (iii) exceeding the credit limit of the Customer's credit card account, and/or (iv) making a payment on the credit card account that is not honored by the Customer's bank.

(m) *Eligible Customer* means:

(i) any Cash Back Accountholder who, during the period from January 17, 2004 to the effective date of this ORDER, applied for and received a Bank credit card in response to a written, web-based, or alternative media solicitation or advertisement for a Bank credit card that provided Cash Back Rewards, that did not contain the words "up to" preceding the Stated Cash Back Reward. This includes existing Cash Back Reward Accountholders; former Cash Back Reward Accountholders of a Cash Back Reward Account that is now closed, charged off, or has been sold to a third party; and Cash Back Accountholders who, after opening a Cash Back Reward Account, transferred or migrated from the initial Cash Back Reward program to another Cash Back Reward program, business reward program, travel reward program, or any other type of Bank credit card product, unless Eligible Customer

Page 6 of 17

already is provided Restitution with respect to one of the Cash Back Reward programs.

(ii) any Bank credit card accountholder whose credit card account was repriced (as defined in subparagraph 1(k)) from June 1, 2007 through 2008 unless an accountholder exercised the opt-out right pursuant to the Bank's notice of change in terms. This includes existing Bank credit card accountholders and former Bank credit card accountholders of a credit card account that is now closed, charged off, or has been transferred by the Bank.

(iii) It is agreed that the file containing the customer list submitted by the Bank and approved by the FDIC constitutes compliance with the Order in terms of the scope of Eligible Customers awarded restitution under paragraph 3.

2. <u>Restitution — Cash Back Reward Account</u>: Except as provided in subparagraph (e) of this paragraph and paragraph 4, the Bank shall pay each Eligible Customer the full amount of the applicable Stated Cash Back Reward for each Bonus Category Purchase, regardless of any Threshold established by the Bank, from the date the Cash Back Reward Account was opened through and including the end of the billing cycles indicated below, less the amount of Cash Back Rewards attributable to the Bonus Category Purchases that occurred during the billing cycles

Page 7 of 17

referenced below and that were actually paid by the Bank to the Eligible Customer:

(a) Ascending Tier Account – From opening of Cash Back Reward Account through three (3) billing cycles following the billing cycle in which the first Bonus Category Purchase occurs.

(b) Descending Tier Account – From opening of Cash Back Reward Account through three (3) billing cycles following the billing cycle in which the aggregate Bonus Category Purchases reach/reached the limit applicable to the Cash Back Reward Account.

(c) Cap Account with Billing Cycle Cap – From opening of Cash Back Reward Account through three (3) billing cycles following the billing cycle in which the Cash Back Accountholder reaches/reached the Billing Cycle Cap.

(d) Cap Account without Billing Cycle Cap – From opening of Cash Back Reward Account through three (3) billing cycles after the Cash Back Accountholder reaches/reached the Annual Cap.

(e) If on the effective date of this Order an Eligible Customer is more than 30 days delinquent in making payment on the Customer's credit card account, the amount of restitution to which the Eligible Customer is entitled will be

Page 8 of 17

credited to the Customer's account.

    (f) Excluding restitution credited to accountholders' credit card accounts in accordance with paragraph 4, total restitution under this paragraph shall not exceed $14 million.

    3. <u>Restitution, Repriced Account</u>: Except as provided in subparagraphs (a), (b), and (c) of this paragraph and paragraph 4, the Bank shall pay each Eligible Customer the difference between the full amount of the interest that accrued on the Customer's credit card account from the effective date of the repricing (as defined in paragraph 1(k)) through the immediately succeeding two billing cycles ("Restitution Period") and the amount of interest that would have accrued using the APR(s) that would have applied if the account had not been repriced. If an Eligible Customer's credit card account was repriced (as defined herein) more than once, the Bank will pay the Customer restitution with respect to each repricing. Restitution will be reduced by any interest credited to the Customers' accounts in the form of an interest waiver for the Restitution Period.

    (a) If a credit card accountholder whose account was repriced from June 1, 2007 through December, 2008 subsequently received a downward rate adjustment for the applicable Restitution Period (for example as a result of enrollment in a workout program, a retention offer or a decrease in the index

Page 9 of 17

for a variable APR ("Lowered Rate"), restitution shall be calculated as the difference between either (i) the full amount of the interest that accrued on the Customer's credit card account from the effective date of the repricing (as defined in paragraph 1(k)) or (ii) the Lowered Rate, whichever was applied through the Restitution Period, and the amount of interest that would have accrued using the APR(s) that would have been applied if the account had not been repriced.

(b) If on the effective date of this Order an Eligible Customer is more than 30 days delinquent in making payment on the Customer's credit card account, the amount of restitution to which the Eligible Customer is entitled will be credited to the Customer's account.

(c) Excluding restitution credited to accountholders' credit card accounts in accordance with paragraph 4, total restitution under this paragraph shall not exceed $21 million.

(d) It is agreed that the restitution calculations submitted by the Bank and approved by the FDIC constitute compliance with the restitution calculations prescribed in this paragraph.

4. <u>Restitution, Charged Off Account</u>: For Cash Back Reward and repriced accounts that have been charged off, the amount of

Page 10 of 17

restitution to which the Eligible Customer is entitled will be credited to the Customer's account. The Bank will report the reduced outstanding balance to the credit reporting agencies.

**NOTIFICATIONS TO CUSTOMERS**

    5. <u>Written Notification, Restitution</u>: (a) Prior to the effective date of this ORDER, the Bank shall submit the proposed text of the letters that will accompany the restitution checks to Eligible Customers (except customers receiving a credit under paragraphs 2(e), 3(b), and 4 above) under the terms of this ORDER to the Regional Director of the FDIC's New York Regional Office ("Regional Director") for review and non-objection. Such letters shall include satisfactory language explaining the reason the Bank is sending a restitution check together with an explanation of the manner in which the amount of restitution was calculated.

    (b) The Regional Director shall notify the Bank in writing of any comments or non-objection. The Bank shall then address any comments of the Regional Director, making such changes as may be required to the proposed letter(s).

    (c) The letters, incorporating any changes that may be required in response to comments by the Regional Director, shall be sent to all Eligible Customers receiving a check for

Page 11 of 17

restitution.

(d) The letters described above and the restitution checks described in paragraph 6 below shall be mailed no later than one hundred twenty (120) days from the effective date of this ORDER.

(e) All mailings pursuant to this paragraph shall be sent by United States Postal Service first-class mail, address correction service requested. The envelope shall contain no materials other than those reviewed and not objected to by the Regional Director.

(f) The Bank shall make reasonable attempts to locate Eligible Customers, including a standard address search using the National Change of Address System, whose notification letter and/or restitution check is returned for any reason.

(g) The Bank shall promptly re-mail all returned letters and/or restitution checks to corrected addresses, if any.

6. <u>Restitution Check</u>: The face of each restitution check shall clearly and conspicuously state "Please cash or deposit this check within 180 days or it will no longer be valid." After one hundred eighty-seven (187) days from the date the restitution checks were originally mailed, the Bank may void all checks that were returned or have not been negotiated.

7. <u>Restitution Funds</u>: (a) In order to allow Eligible Customers who did not receive their restitution check or failed to negotiate it within the original period to receive restitution, the Bank shall retain, in a separate account, the money owed for restitution for a period of five hundred forty (540) days from the effective date of this ORDER.

(b) The Bank shall determine the disposition of any unclaimed funds in accordance with all applicable laws and regulations.

8. <u>Restitution Compliance Report</u>: (a) Within ninety (90) days from the effective date of this Order, and then every thirty (30) days thereafter until completion of the restitution required by this ORDER, the Bank shall prepare and send to the Regional Director a detailed written report that explains the processes and procedures by which the Bank identified the Eligible Customers and determined the applicable restitution amounts described above. The report shall also include the following: (i) total number of Eligible Customers, (ii) names, contact, and account information of the Eligible Customers, (iii) amount of restitution to which each Eligible Customer is entitled, (iv) number of Eligible Customers who received restitution, (v) total amount of restitution paid, (vi) the Bank's procedures to contact Eligible Customers who did not

Page 13 of 17

receive restitution, and (vii) the amount of undistributed restitution funds.

(b) The Bank shall hire an independent auditor, acceptable to the Regional Director, who may be a certified public accountant who shall verify that the Bank accurately identified Eligible Customers and issued restitution checks as required by this ORDER.

(c) The independent auditor shall prepare a detailed written report of the processes and procedures by which the Bank determined the restitution described in paragraphs 2 and 3 above.

(d) The report described above in paragraph 8(c) shall be submitted to the Regional Director for review, comment, and non-objection sixty (60) days after the Bank has completed all required Restitution.

9. <u>Record Retention</u>: For three (3) years from the effective date of this Order, the Bank shall retain all records pertaining to the Restitution including, but not limited to: documentation of the processes and procedures used to determine the Eligible Customers, the names, contact and account information of the Eligible Customers, any mailing records, and documentation that the appropriate restitution was made.

Page 14 of 17

**ORDER TO PAY**

IT IS FURTHER ORDERED THAT, by reason of the alleged violations of law and/or regulations, and after taking into account the CONSENT AGREEMENT, the appropriateness of the penalty with respect to the financial resources and good faith of the Bank, the gravity of the conduct by the Bank, the history of previous conduct by Bank, and such other matters as justice may require, pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2):

10. The Bank shall pay a civil money penalty of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000). The Bank shall pay the civil money penalty to the Treasury of the United States. The Bank shall pay such civil money penalty itself, and is prohibited from seeking or accepting indemnification for such payment from any third party.

11. Notice to Shareholders: Within sixty (60) days of the effective date of this ORDER, the Bank shall send or otherwise furnish a description of this ORDER to its shareholders. The description shall fully describe the ORDER in all material respects. The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Division of Supervision and Customer Protection, Accounting and

Page 15 of 17

Securities Disclosure Section, 550 17th Street, N.W., Washington, D.C. 20429 and to the Regional Director for review at least 20 days prior to dissemination to shareholders. Any changes requested to be made by the FDIC shall be made prior to dissemination of the description, communication, notice or statement, with a copy provided to the Regional Director.

12. Regional Director: Whenever a provision of this ORDER shall require the Bank to submit a proposed letter, report, or other matter to the Regional Director for review, comment and/or non-objection, the Bank shall make such submission to the Regional Director at 20 Exchange Place, New York, New York 10005.

13. Effective Date: This ORDER shall be effective on the date of issuance.

14. Responsible Persons: The provisions of this ORDER shall be binding on the Bank, its institution-affiliated parties, successors and assigns.

15. Enforceability: The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provisions of this ORDER shall have been modified, suspended or terminated in writing by the FDIC.

Page 16 of 17

Pursuant to delegated authority.

Dated at Washington, D.C., this 30th day of June, 2009.

/s/ Sandra L. Thompson
_____
Sandra L. Thompson
Director
Division of Supervision and
Consumer Protection

Page 17 of 17

# Exhibit J

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2008 OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE
TRANSITION PERIOD FROM TO

Commission File Number: 0-14120

# Advanta Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 23-1462070 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| Welsh & McKean Roads, P.O. Box 844 | |
| Spring House, Pennsylvania | 19477 |
| (Address of principal executive offices) | (Zip Code) |

(215) 657-4000 (Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report) None

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on whic |
|---|---|
| Class A Common Stock, $.01 par value per share | The NASDAQ Stock Market LLC |
| Class B Common Stock, $.01 par value per share | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:

Class A Right
Class B Right

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definition of "Large Accelerated Filer", "Accelerated Filer" and "Smaller Reporting Company" in Rule 12b-2 of the Exchange Act. (check one):

Large Accelerated Filer ☐          Accelerated Filer ☑          Non-Accelerated Filer ☐          Smaller Reporting Company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of June 30, 2008, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $244,692,638 based on the closing sale price as reported on The NASDAQ Stock Market LLC.

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at March 6, 2009 |
|---|---|
| Class A Common Stock, $.01 par value per share | 14,410,133 shares |
| Class B Common Stock, $.01 par value per share | 30,898,060 shares |

DOCUMENTS INCORPORATED BY REFERENCE

| Document | F |
|---|---|
| Proxy Statement for the Annual Meeting of Stockholders to be held on June 11, 2009 (Proxy Statement) | Part III |

**CAUTIONARY STATEMENT PURSUANT TO THE PRIVATE SECURITIES LITIGATION
REFORM ACT OF 1995**

We have included or incorporated by reference in this Annual Report on Form 10-K statements that may constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 (the "Act"). In addition, other written or oral communications provided by Advanta from time to time may contain "forward-looking statements." Forward-looking statements are not historical facts but instead are based on certain assumptions by management and represent only our belief regarding future events, many of which, by their nature, are inherently uncertain and outside our control. These statements include statements other than historical information or statements of current condition and among other things may relate to: anticipated earnings (loss) per share; anticipated delinquencies and charge-offs; anticipated level of receivables outstanding and credit card accounts; anticipated interest yields; expected cost of funds; projected levels of excess spread in our securitization transactions and whether an early amortization event is expected to occur; the expected level of new account acquisitions, customer spending and account attrition; anticipated payment rates of outstanding loans; anticipated operating expenses; estimated values of and anticipated cash flows from our retained interests in securitizations; industry trends; our need and ability to replace existing credit facilities and securitization financing when they expire or terminate with appropriate levels of funding; the value of the investments that we hold; income tax uncertainties; realizability of net deferred tax asset; expected levels of liquidity and capital; anticipated outcome and effects of litigation and contingencies; and other future expectations of Advanta. Forward-looking statements are often identified by words or phrases such as "is anticipated," "are expected to," "are estimated to be," "intend to," "believe," "will likely result," "projected," "may," or other similar words or phrases. The cautionary statements provided below are being made pursuant to the provisions of the Act and with the intention of obtaining the benefits of the "safe harbor" provisions of the Act for any such forward-looking information.

Forward-looking statements are subject to various assumptions, risks and uncertainties which change over time, and speak only as of the date they are made. We undertake no obligation to update any forward-looking information. However, any further disclosures made on related subjects in our subsequent reports filed with the SEC, including our Reports on Forms 10-K, 10-Q and 8-K, should be consulted. We caution readers that any forward-looking statement provided by us is not a guarantee of future performance and that actual results may be materially different from those in the forward-looking information. In addition, future results could be materially different from historical performance. See "Item 1A. Risk Factors" for further discussion of important factors that could cause actual results to differ from those in the forward-looking statements.

**Item 1A.    *Risk Factors***

**Negative trends and developments in economic conditions and the financial markets may continue to adversely impact our business, results of operations, financial condition, access to various funding sources and the trading price of our common stock.** Deterioration of the U.S. economy beginning in the latter half of 2007 and the continuing negative trends in economic conditions and disruption in the capital markets have adversely affected our business. Many small business credit card issuers, including Advanta, have experienced increased delinquencies and charge-offs due to the impact of the general economic downturn on small businesses. It is more difficult to predict the credit performance of our customers and the losses inherent in our portfolio in this challenging economic environment. If the economic downturn continues, the ability and willingness of our small business customers to pay amounts owed to us could continue to be adversely affected, resulting in further increases in delinquencies and charge-offs. In addition, continued deterioration in the economy could lead to further reductions in the number of customers and the volume of transactions and have a negative impact on our business, results of operations and financial condition.

The disruption in the credit and financial markets has negatively impacted the securitization markets, the value of certain of our investments and the value of our retained interests in securitizations, which has impacted our funding decisions and our ability to realize expected levels of return on certain of our assets. Although we have high levels of capital and liquidity, if the current economic situation continues or worsens it could adversely affect our business, results of operations and financial condition.

13

customer pays the balance in full each month. Therefore, an increase in market interest rates could reduce our net interest income and/or our securitization income. Changes in interest rates and credit spreads can also affect the value of our assets and liabilities.

**Social, economic, environmental and geographic factors can affect levels of customer spending, credit card payments and other customer behaviors, as well as our ability to predict customer behaviors, in ways that could negatively impact our asset quality and profitability.** A variety of social, economic, environmental and geographic factors can adversely affect customer behaviors, such as levels of credit card use, payment patterns, delinquencies, charge-offs and the number of customers filing under bankruptcy laws. Social factors include changes in confidence levels and attitudes toward incurring debt, the public's perception of the use of credit cards and the stigma of bankruptcy. Economic factors include the rates of inflation, the unemployment rates and the relative interest rates offered for various types of loans. In addition, acts of terrorism in the United States and the political and military response to any such events may have an adverse effect on general economic or environmental conditions, business confidence and spending, and general market liquidity. Geographic factors may include adverse changes in economic and environmental conditions in states where customers are located which could have a direct impact on the customers' use of our credit cards as well as on the timing and amount of payments on the accounts. Any of these factors could negatively impact our small business customers and could have an adverse affect on the performance of our business credit card portfolio and our profitability through, among other things, lower new account originations, lower credit card use, increases in delinquencies, increases in the number of customers seeking protection under the bankruptcy laws, increases in charge-offs and credit losses and changes in payment patterns. In addition, any of these factors could negatively impact our ability to accurately predict or anticipate customer behavior. This could cause our business models, including our proprietary credit scoring and other models used to predict and forecast customer behavior and financial results, to produce less accurate and reliable results.

**Market conditions and other factors beyond our control could negatively impact the availability and cost of funding for our operations.** We fund our operations through a number of sources, including securitizations, deposits at our bank subsidiaries and sales of unsecured debt securities. Currently our unsecured debt is rated below investment grade. Non-investment grade ratings of our unsecured debt from rating agencies could make it more difficult and more costly for us to sell debt or equity securities in the capital markets. Continuation of our below investment grade ratings or a down-grade of any of the ratings of our unsecured debt may negatively affect, among other things, our ability to borrow or raise funds on terms that we consider reasonable to us. If we are unable to obtain funding on reasonable terms, it may negatively impact our ability to fund our operations.

To generate cash for the funding of our operations we have historically relied on our ability to combine and sell business credit card receivables as asset-backed securities through transactions known as securitizations. At December 31, 2008, off-balance sheet securitized receivables represented 55% of our funding. Our ability to complete securitizations depends upon:

- general conditions in the securities markets;

- specific conditions in the asset-backed securities markets;

- the quality of our business credit card portfolio; and

- the ratings on the asset-backed securities sold in the securitizations.

The disruption in the credit and financial markets has negatively impacted the securitization markets, the value of certain of our investments and the value of our retained interests in securitizations, which has impacted our funding decisions and our ability to realize expected levels of return on certain of our assets. In February 2009, Standard and Poor's and Moody's Investor Service both downgraded their ratings on certain of the AdvantaSeries notes issued by our securitization trust. Due to the disruption in the capital markets, since the second quarter of 2008 we have not accessed the securitization markets which have historically been a significant source of our funding. It is uncertain whether or on what terms we will have access to the securitization markets as a source of funding in the future. Although securitizations are not our only source of cash to fund our operations, if our access to securitization funding on terms that we consider reasonable to us continues to be disrupted, it could negatively impact our results of operations and financial condition.

18

**Item 7.**     *Management's Discussion and Analysis of Financial Condition and Results of Operations*

In April 2007, the Board of Directors of Advanta Corp. approved a three-for-two stock split, in the form of a 50% stock dividend payable June 15, 2007, on both Class A and Class B Common Stock. We have adjusted all share amounts and per share data in Management's Discussion and Analysis of Financial Condition and Results of Operations to reflect the stock split for all periods presented.

## Overview

Our Advanta Business Cards segment issues (through Advanta Bank Corp.) business purpose credit cards to small businesses and business professionals in the United States. Our business credit card accounts provide approved customers with unsecured revolving business credit lines. Advanta Business Cards revenue is generated through interest earned on outstanding balances, interchange income, balance transfer fees, cash usage fees and other fees. Through the first quarter of 2001, we had two additional lending businesses, Advanta Mortgage and Advanta Leasing Services. In the first quarter of 2001, we completed our exit from the mortgage business, announced the discontinuance of our leasing business, and restructured our corporate functions to a size commensurate with our ongoing businesses. Changes in estimate related to our exit from the mortgage business and discontinuance of the leasing business are reported as discontinued operations for all periods presented.

The current market and economic environments present us with inherent and specific challenges. The general economic environment in the United States has had and is expected to continue to have a significant impact on our results. Deterioration in the U.S. economy has negatively impacted the credit quality of our receivables and decreased rates of growth in customer merchandise sales volume. We expect the increases in delinquency rates and lower merchandise sales volume growth rates may continue through at least some portion of 2009 based on current economic forecasts and actual results experienced in early 2009. Additional deterioration in the U.S. economy could cause these trends to continue or worsen. We anticipate that the negative effects of the economic downturn will be partially offset by higher net interest margin resulting from decreases in market interest rates and planned pricing strategies. The intense competition in the credit card industry may also affect our ability to retain customers and to deepen our customer relationships. We believe that an improvement in the U.S. economy could favorably impact the credit quality of our receivables, increase customer activity and improve profitability.

We believe that we have helped position ourselves for the current challenging economic environment by increasing our levels of cash and liquid assets throughout 2008 and maintaining strong capital levels. In addition, we intentionally acquired fewer new customers in 2008 and reduced certain promotional activities. In 2009, we intend to build value from our existing customer base, focusing strategically on customers that are more profitable for us. Our Board of Directors has approved a significant reduction in our dividend rate for both Class A and Class B Common Stock effective in the first quarter of 2009. We will also reduce our operating expenses in 2009 through further reductions in acquisition marketing efforts and reduced staffing levels more commensurate with our anticipated portfolio size and the anticipated scale of business activities.

Our primary competitors are among the largest issuers of credit cards in the United States. As a small business credit card issuer we compete for, among other things, customers, card utilization and payments on outstanding balances. We believe our exclusive focus on the small business market and related community, as well as our experience in serving this market, provide us with a competitive advantage as compared to these larger competitors. Small business credit cards generally represent a less significant portion of our competitors' businesses as compared to their consumer credit card portfolios. We believe that our focus and size enable us to quickly respond to the market environment.

27

our mortgage and leasing businesses of $1.0 million, or $0.02 per combined diluted common share, and an after-tax gain of $738 thousand, or $0.02 per combined diluted common share, for the year ended December 31, 2006. See "Discontinued Operations" section of Management's Discussion and Analysis of Financial Condition and Results of Operations for further discussion.

In June 2008, FASB issued FASB Staff Position ("FSP") No. EITF 03-6-1, *Determining Whether Instruments Granted in Share-Based Payment Transactions Are Participating Securities*. The FSP concludes that unvested share-based payment awards that contain nonforfeitable rights to dividends are participating securities under Statement of Financial Accounting Standards ("SFAS") No. 128, *Earnings Per Share*, and should be included in the computation of earnings per share under the two-class method. The two-class method is an earnings allocation formula that we currently use to determine earnings per share for our Class A and Class B Common Stock according to dividends declared and participation rights in undistributed earnings. The nonvested shares of Class B Common Stock issued under our stock-based incentive plan are participating securities with nonforfeitable rights to dividends. Therefore, upon adoption of FSP No. EITF 03-6-1 effective January 1, 2009, our nonvested Class B Common Stock will be a third class of stock for purposes of earnings per share computations. This will result in lower proportionate income or loss allocations to our Class A and Class B Common Stock and will impact our reported earnings per Class A and Class B share. We will adjust all prior period earnings per share data presented to conform to the provisions of this FSP. The adoption of this FSP will not impact our financial position or net income.

## Critical Accounting Policies and Estimates

Our significant accounting policies are described in Note 2 to the consolidated financial statements. The preparation of financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates. Estimates are inherently subjective and are susceptible to significant revision as more information becomes available. Changes in estimates could have a material impact on our financial position or results of operations. We have identified the following as our most critical accounting policies and estimates because they require management's most difficult, subjective or complex judgments as a result of the need to make estimates about the effect of matters that are inherently uncertain. We have discussed the development, selection and disclosure of the critical accounting policies and estimates with the Audit Committee of the Board of Directors. Where management has provided sensitivities below, they depict only certain possibilities out of a large set of possible scenarios. These sensitivities do not reflect management's expectations of changes and are for demonstrative purposes only.

### Allowance for Receivable Losses

Receivables on the consolidated balance sheets are presented net of an allowance for receivable losses. The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio. We establish the allowance for receivable losses through provisions charged to earnings. We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectibility of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions. Since our business credit card receivable portfolio is comprised of smaller balance homogeneous receivables, we generally evaluate the receivables collectively for impairment through the use of a migration analysis as well as the consideration of other factors that may indicate increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts that have been re-aged or entered a workout program. A migration analysis is a technique used to estimate the likelihood that a receivable or pool of receivables will progress through various delinquency stages and charge off. The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. Changes in economic conditions, the composition and risk characteristics of the receivables portfolio, bankruptcy laws or regulatory policies could impact our credit losses. A 10% change in the

allowance for business credit card receivable losses at December 31, 2008 would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $10.3 million. See Note 5 to the consolidated financial statements for a rollforward of the allowance for receivable losses including provisions and charge-offs in each reporting period.

### Securitization Income

Off-balance sheet securitized receivables represent a significant portion of our funding at December 31, 2008. Retained interests in securitizations are included in accounts receivable from securitizations on the consolidated balance sheets. These assets are carried at estimated fair value and the resulting unrealized gain or loss from the valuation is included in securitization income on the consolidated income statements. We estimate the fair value of retained interests in securitizations based on a discounted cash flow analysis if quoted market prices are not available. We estimate the cash flows of the retained interest-only strip as the excess of the interest yield on the pool of the receivables sold over the sum of the interest rate earned by noteholders, the servicing fee and future credit losses over the life of the existing receivables. We discount cash flows from the date the cash is expected to become available to us using an interest rate that management believes a third party purchaser would demand. The discounted cash flow analysis is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. Changes in economic conditions, market interest rates, changes in the level of payments on securitized receivables, the composition and risk characteristics of the securitized receivables, bankruptcy laws or regulatory policies could cause actual cash flows from the securitized receivables to vary from management's estimates.

Note 6 to the consolidated financial statements summarizes the key assumptions used to estimate the fair value of retained interests in securitizations during each of the reporting periods and at December 31, 2008 and 2007. Note 6 also includes a sensitivity analysis of the valuations of retained interests in securitizations, assuming two changes in each of those assumptions at December 31, 2008. See "Securitization Income (Loss)" section of Management's Discussion and Analysis of Financial Condition and Results of Operations for a discussion of valuation adjustments to retained interests in securitizations in each of the reporting periods.

### Rewards Programs

We offer rewards programs with most of our business purpose credit cards. Under our rewards programs, customers may earn cash back rewards and/or business rewards that can be redeemed for travel, gift certificates or merchandise. We estimate the costs of future rewards redemptions and record a liability at the time rewards are earned by the customer. These costs of future rewards redemptions are recorded as a reduction of other revenues on the consolidated income statements. Estimates of the costs of future rewards redemptions require management to make predictions about future customer behavior, including assumptions regarding the percentage of earned rewards that customers will ultimately redeem and the cost of business rewards. We base the assumptions on historical experience, consideration of changes in portfolio composition and changes in the rewards programs, including redemption terms. It is reasonably possible that actual results will differ from our estimates or that our estimated liability for these programs may change. If either the estimated percentage of earned rewards that customers will ultimately redeem for each program or the estimated cost per redeemed reward point increased by 10% at December 31, 2008, other revenues of the Advanta Business Cards segment would decrease $3.7 million and other liabilities would increase by the same amount.

We revised our estimated costs of future rewards redemptions in each of the three years ended December 31, 2008 based on changes in experience in redemption rates and the costs of business rewards redeemed, and/or changes in the rewards programs. The changes in estimated costs of future rewards redemptions increased other revenues $1.1 million for the year ended December 31, 2008, $2.2 million for 2007 and $500 thousand for 2006.

### Income Taxes

Our effective tax rate is based on expected income, statutory tax rates, current tax law, changes in uncertain tax positions and tax planning opportunities available to us in the various jurisdictions in which we operate. Management judgment is required in determining our effective tax rate and in evaluating our tax positions. While

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**($ in thousands except per share amounts, unless otherwise noted)**

In these notes to consolidated financial statements, "Advanta", "we", "us", and "our" refer to Advanta Corp. and its subsidiaries, unless the context otherwise requires.

**Note 1.**       **Nature of Operations, Current Operating Environment and Basis of Presentation**

Our Advanta Business Cards segment is one of the nation's largest credit card issuers (through Advanta Bank Corp.) in the small business market. Our exclusive focus on this market, as well as our size, experience in the small business market and commitment to developing meaningful product offerings and a high level of service tailored to the needs of small businesses, differentiate us from other credit card issuers. Founded in 1951, Advanta has long been an innovator in developing and introducing many of the marketing techniques that are common in the financial services industry today. We own two depository institutions, Advanta Bank Corp. and Advanta Bank. Advanta Business Cards is primarily funded and operated through Advanta Bank Corp., which offers a variety of deposit products, such as retail and large denomination certificates of deposits and money market savings accounts that are insured by the Federal Deposit Insurance Corporation. At December 31, 2008, we had 1.0 million business credit card accounts and had owned business credit card receivables of $506 million and securitized business credit card receivables of $4.5 billion. Certain administrative functions associated with the servicing of our business credit card accounts are performed by a single third party vendor.

Through the first quarter of 2001, we had two additional lending businesses, Advanta Mortgage and Advanta Leasing Services. In the first quarter of 2001, we completed our exit from the mortgage business, Advanta Mortgage, through a purchase and sale agreement with Chase Manhattan Mortgage Corporation as buyer (the "Mortgage Transaction"), announced the discontinuance of our leasing business, and restructured our corporate functions to a size commensurate with our ongoing businesses. Changes in estimate related to our exit from the mortgage business and discontinuance of the leasing business are reported as discontinued operations for all periods presented.

The recent deterioration of the economic environment has negatively impacted our small business customers and has adversely affected our business results. Our delinquency and net charge-off trends have deteriorated throughout 2008 and those trends have continued into 2009. In addition, the economic crisis has impacted our access to funding and our liquidity decisions. Historically, we have funded our operations through a number of sources including securitizations, deposits at our bank subsidiaries and sales of unsecured debt securities. We have approximately $1.8 billion of securitizations that are expected to have noteholder payment dates in 2009, but we expect our replacement funding needs to be significantly less than that total since receivable balances are expected to decline in 2009 as result of reduced acquisition marketing efforts. The disruption in the credit and financial markets has negatively impacted the securitization markets, the value of certain of our investments, the value of our retained interests in securitizations and our ability to realize expected levels of return on certain of our assets. As further discussed in Note 6, the occurrence of certain events could result in the early amortization of our outstanding business credit card securitization transactions. If an early amortization occurred, it could have a negative impact on the value of certain of our assets and negatively affect our results of operations and financial condition. However, we have securitization structuring alternatives and other tools available to us to increase the trust's cash-based revenues, if we choose to do so, that we believe will avoid an early amortization for the trust or any individual securitization.

In response to the current economic environment and conditions, we have reduced and expect to further reduce new account originations and we are developing strategies and programs designed to build value from our more profitable customers and to manage our exposure to our higher risk customers. We have reduced our exposure to certain of our customers and increased the yield earned on certain customers through pricing strategies we implemented. Through this challenging economic environment, we have increased our level of liquidity in response to continued turmoil in the economy and capital markets by increasing our level of deposit funding. We have access to other sources of liquidity as well, including the Federal Reserve Discount window.

We operate our business in a highly regulated environment and we are subject to oversight, regulation and examination by a number of state and federal regulatory agencies and authorities. We conduct our business credit card business through Advanta Bank Corp., a Utah chartered industrial bank that is subject to regulatory oversight

65