**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM E. UNDERLAND and MARK SCHALLER,** *on behalf of themselves and all others similarly situated,*          **Plaintiffs,**        **v.** | **CIVIL ACTION NO. 10-3621** |
| **DENNIS ALTER, WILLIAM ROSOFF, PHILIP BROWNE, DAVID WEINSTOCK, ROBERT BLANK, MAX BOTEL, THOMAS COSTELLO, DANA BECKER DUNN, RONALD LUBNER, OLAF OLAFSSON, MICHAEL STOPLER, and KPMG LLP;**          **Defendants.** | |

<u>**MEMORANDUM OPINION & ORDER**</u>

**RUFE, J.**                                                                    **September 9, 2011**

In this action, Plaintiffs assert claims against the directors and officers of Advanta Corporation ("the Advanta Defendants") and their outside auditor, KPMG LLP, under the Securities Exchange Act of 1933.[1]  Plaintiffs allege that the Advanta Defendants sold $500 million worth of notes using registration statements containing material misstatements and omissions in violation of the Act.  They further allege that KPMG LLP certified the misstated financial records.

The Advanta Defendants and KPMG each move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all counts of the Plaintiffs' Amended Complaint for failure to state a claim. After oral argument on this matter on August 15, 2011, and upon consideration of the Parties' papers, KPMG's motion is granted and the Advanta Defendants' motion is granted in part.

---

[1] 15 U.S.C. §§ 77k, 77l(a)(2).

# I. Background[2]

Named Plaintiffs bring this action on behalf of a putative class of individuals who purchased Advanta securities between June 24, 2007 and November 28, 2009.  The Advanta Defendants[3] are directors and senior officers of Advanta who signed the allegedly untrue registration statement used to sell the securities.[4]  Defendant KPMG LLP is an international accounting and auditing firm that reviewed the accuracy of and certified Advanta's financial statement.[5]  Advanta Corporation is not a defendant in this action.

## A.   Advanta's Business Model and Collapse

Prior to its collapse, Advanta was one of the largest issuers of credit cards to businesses in the United States.[6]  It operated its business primarily through its wholly-owned subsidiary, Advanta

---

[2] The following facts are drawn largely from the amended complaint and various undisputedly authentic documents attached to defendants' motions to dismiss.  "Because plaintiffs' claims are based upon these documents, they were properly considered as part of defendants' motions to dismiss."  In re Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir. 1996).

[3] Advanta Corporation is not a defendant in this action.

[4] There are eleven individual defendants: Dennis Alter, Chairman of the Board and Advanta's CEO; William A. Rosoff, Vice Chairman of the Board and Advanta's President; Philip M. Browne, Advanta's Senior Vice President and Chief Financial Officer; David Weinstock, Advanta's Vice President and Chief Accounting Officer; and directors Robert Blank, Max Botel, Thomas Costello, Dana Dunn, Ronald Lubner, Olaf Olafsson, and Michael Stopler.

Defendants argue that the claims against Defendant Blank should be dismissed because he signed only the 2007 Amendment.  Advanta Defs.' Mot. to Dismiss at 29.  The Court agrees.  The only challenged statement in the 2007 Amendment is Advanta's description of its methodology for assessing and monitoring consumer's creditworthiness.  Because the Court concludes, below,  that those statements are inactionable, Plaintiffs have failed to allege that Defendant Blank violated the Securities Laws.

[5] Am. Compl. ¶ 28.

[6] Advanta Defs.' Mot. to Dismiss, Ex. H at 2 (Federal Deposit Insurance Corporation, Officer of Inspector General, Material Loss Review of Advanta Bank Corp., MLR-11-002, October 2010 ("Material

Bank Corporation.[7]  Advanta was a "monoline" (specialized) credit-card bank: it focused primarily

on small business credit-card customers, and it did not have any other significant banking

operations.[8]  Its business strategy was considered "risky" because the loans it made were unsecured,

revolving lines of credit, with credit lines greater than those for consumer credit cards.[9]

Consequently, Advanta's credit rating was "below investment grade."

      Advanta's primary source of funding was derived from the securitization[10] of its credit card

receivables.  Credit card securitization allows banks and other issuers of credit cards to convert their

receivables into cash.  To securitize its receivables, Advanta sold them to a wholly-owned special-

purpose trust ("the Trust").  The Trust pooled the receivables together, packaged them, and sold

them as RediReserve variable rate certificates and investment notes ("RediReserve Notes").

On August 18, 2006, Advanta filed a shelf registration statement[11] and prospectus with the

---

Loss Review")).

    [7] Advanta Defs.' Mot. to Dismiss, Ex. A at 2 (Advanta Corp. 2007 10-k) ("2007 Amendment").

    [8] Am. Compl. ¶ 2; Material Loss Review at 2.

    [9] Material Loss Review at 3; Am. Compl. ¶ 2.

    [10] "Securitization of a loan is a form of structured finance in which pools of loans are packaged and sold to an independent entity that raises money to finance such purchase by issuing notes or other securities backed by the pool of loans."  Lori J. Parker, Annotation, Liability Under Federal Securities Laws of Sellers of Subprime Mortgage Loans, 43 A.L.R. Fed. 2d 47, § 2 (2010).

    [11] "A 'shelf registration' is an indication of an issuer's intent to offer a specified number of securities in the future, frequently through a series of incremental offerings.  A shelf registration . . . is accompanied by a 'shelf registration statement' which, like any registration statement, provides certain required information to the market about the issuer. . . .  When an issuer is then ready to offer some or all of the securities authorized by the shelf to market, it 'pulls down' the shelf registration statement from the shelf and updates it by filing a supplemental prospectus.  The 'registration statement' for that sale and offering thus constitutes both the initial shelf registration statement and the supplement, along with any SEC filings incorporated by either document."  In re Citigroup Inc. Bond Litig., 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010).

Securities and Exchange Commission ("SEC"), which indicated its intent to offer $500 million worth of RediReserve notes. By the terms of the shelf registration, and pursuant to federal law, each of Advanta's subsequent annual reports amended the Registration Statement.[12]

Advanta issued $350 million worth of notes on August 18, 2006; on February 9, 2009, it issued another $150 million of notes.[13] Advanta capped investment in the notes at $500,000.[14] The notes were not sold in traditional debt markets, but instead were marketed directly to investors through newspaper advertisements.[15] The notes paid varying rates depending on the amount of the initial investment and the duration of the note.[16] Advanta received cash upon the sale of the receivables to the Trust, but retained an interest in the receivables.[17] Advanta relied on the proceeds from the receivables' securitization as its primary source of funding. The RediReserve notes gave investors the right to a certain return on their investment; as customers paid their Advanta credit card payments, the Trust would make payouts to noteholders. Thus, noteholders were dependent upon Advanta's revenues for periodic interest payments and the eventual repayment of principal

---

[12] Am. Compl. ¶¶ 31, 32.

[13] Am. Compl. ¶¶ 30, 31.

[14] Am. Compl. ¶ 40.

[15] Am. Compl. ¶ 4.

[16] Am. Compl. ¶ 39.

[17] Advanta's subordinated financial interest is known as the "residual interest." See Chase Manhattan Mortg. Corp. v. Advanta Corp., No. 01-507, 2004 WL 422681, *1 n.2 (D. Del. Mar. 4, 2004). "The residual interest holder is entitled to receive the overcollateralization in the trust (the principal balance of the loans in the trust that exceeds the principal amount of the certificates issued by the trust) and the excess spread (the difference between the average interest rate of the loans in the trust and the average interest rate of the certificates offered by the trust) in the securitization, to the extent those amounts are not required to pay the expenses of the trust and the certificateholders the amounts they are due." Id.

upon their note's maturity.[18]

The RediReserve Notes were not insured or guaranteed by the FDIC,[19] and Advanta did not

establish a "sinking fund"[20] as a precaution in the event that Advanta was unable to repay

noteholders.[21]   To protect investors, however, the RediReserve Notes contained an "early

amortization clause,"[22] which, once triggered,[23] required Advanta to immediately repay noteholders'

principal.  The RediReserve notes were designed to amortize early if the monthly excess spread fell

to zero or below for three consecutive months.

Beginning in August 2007, due to serious economic disruptions, securitization market

activity virtually halted, and the market for small issuers—like Advanta—collapsed.[24]

---

[18] Am. Compl. ¶ 40.

[19] Although Advanta was not insured or guaranteed by the FDIC, the FDIC exercised supervisory oversight of Advanta in the form of risk management, compliance examinations, visitations, and off-site monitoring.  See Material Loss Review at 12.

[20]  A sinking fund is "[a] fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt."  Black's Law Dictionary 697 (8th ed. 2004).

[21] Am. Compl. ¶ 40.

[22] See 2009 Amendment at 48.  Once hit, an early amortization trigger causes the payments to investors to be defined as principal, so that the Trust's liabilities are paid off early (before the scheduled date of maturity).  See Gary B. Gorton & Nicholas S. Souleles, Special Purpose Vehicles and Securitization  46 (FRB Philadelphia Working Paper, No. 05-21, Sept. 2005), available at http://ssrn.com/abstract=713782.

[23] Advanta derived its profit primarily from the "excess spread of the securitized portion of the portfolio."  The excess spread is cash flow remaining in any given month after payment of all the trust expenses, including losses.  See Saloman Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities (Hayre, Lakhbir, ed. 2002) 85.  Thus, it is a profit ratio consisting of "the difference between the average interest rate of the loans in the trust and the average interest rate of the certificates offered by the trust."  Id.  Here, Advanta was entitled to receive the excess spread as profit, to the extent that the excess spread was not used to pay the expenses of the trust and the certificate holders the amount they were due.  See Chase Manhattan Mortg. Corp., 2004 WL 422681 at *1 n.2.

[24] Material Loss Review at 10.

Consequently, Advanta's securities sales significantly decreased.[25]  Then, in March 2008, credit-card delinquencies and charge-offs began to rapidly increase.  As more of Advanta's credit-card customers defaulted, profits generated by its securitized receivables dropped dramatically.

In June 2009, after the excess spread dropped to below zero for three consecutive months, the early amortization clause was triggered.  Because the early amortization required Advanta to direct all funds from the securitization pool to repay principle due to noteholders, Advanta was obligated to fund its credit card customers from a different source.  But since the securitization fund was the *only* source of funding for its primary business, once the early amortization occurred, Advanta was no longer able to fund its credit card customers.[26]  Unable to fund its credit cards, and in the face of still-rising loan losses, Advanta cancelled all charging privileges for its cardholders.[27] A few months later, in November 2009, Advanta filed for Chapter 11 bankruptcy.

B.    THE PENDING LITIGATION

On June 24, 2010, Plaintiffs commenced this action in the Court of Common Pleas of Montgomery County, Pennsylvania.[28]  Defendants timely removed the action to this Court; Plaintiffs did not move to remand.  After the Court granted Plaintiffs' motion to appoint class counsel and lead plaintiffs,[29] Plaintiffs filed the pending amended complaint.[30]

---

[25] Advanta sold its last securitization to an outsider in May 2008.

[26] Material Loss Review at 11.

[27] Material Loss Review at 7.

[28] Notice of Removal ¶ 1 [doc. no. 1].

[29] Doc. no. 30.

[30] Doc. no. 33.

Plaintiffs claims arise from the 2006 Shelf Registration Statement and its Amendments.[31] According to Plaintiffs, those documents misrepresented Advanta as a "prudent company with a 'very strong' financial condition," when in fact Advanta was engaging in "unsafe and unsound banking practices" that ultimately led to its collapse.[32]

Plaintiffs pinpoint three documents issued by the FDIC as proof that the registration statement and its amendments included material misstatements and omissions.[33]  The first, a 2010 Material Loss Review, allegedly "makes clear that Advanta was engaged in numerous unsound and illegal activities that were misrepresented and not adequately disclosed in the Registration Statement."[34]  The two other documents, FDIC cease and desist orders, allegedly corroborate the Material Loss Review.[35]

In its Material Loss Review, the FDIC reviewed Advanta's business practices between December 2004 and December 2009 in order to determine, among other things, the cause of Advanta's failure.  Based on the audit, the FDIC concluded that "Advanta failed due to insolvency brought on by the Board of Directors' and management's failure to implement risk management practices commensurate with the risks associated with its business model."[36]  In particular, the FDIC

---

[31] The Registration Statement was amended by four documents: the 10-K for 2006 filed February 28, 2007 ("2007 Amendment"); the 10-K for 2007 filed on February 28, 2008 ("2008 Amendment"); a post-effective amendment registering an additional $150 million in new RediReserve notes and re-registering $60 million in unsold notes (February 2009 Amendment); and the 10-K for 2008 filed March 13, 2009 ("March 2009 Amendment").  See Am. Compl. ¶¶ 35, 36, 37.

[32] Am. Compl. ¶ 5.

[33] Am. Compl. ¶ 5.

[34] Pls.' Resp. to Advanta Defs.' Mot. to Dismiss at 11.

[35] Id. at 11.

[36] Material Loss Review at 4.

faulted Advanta's board and management for failing to develop adequate contingency plans for responding to an early amortization event, and its failure to incorporate those plans into its capital adequacy model.[37]

The FDIC also concluded that although a rapid increase in customer defaults was partially caused by economic conditions, they were also attributable to an "aggressive repricing campaign" that Advanta began in late 2007.  During that campaign, Advanta repriced 68 percent of its credit card loan portfolio by increasing customer finance charges and raising interest rates.[38]  The price hikes resulted in higher minimum payments for customers, and made it difficult for struggling customers to cure any delinquencies.  The FDIC found that Advanta's aggressive repricing practices were illegal:[39]  Advanta imposed the rate hikes on customers without disclosing the basis and reasons for the increase, the amount of the increase, or the customers' right to opt-out.[40]  Nor did it notify its customers of the specific reasons for the adverse actions.

On June 30, 2009, two FDIC cease-and-desist orders took effect against Advanta, and were disclosed by Advanta in an 8-K filing with the SEC.[41]  In the first order, the FDIC directed Advanta to cease and desist certain "unsafe and unsound" banking practices, including: "The Bank's Board of Directors and Management operating the Bank in a manner that causes the Bank's significant

---

[37] Material Loss Review at 5.

[38] Material Loss Review at 8.  In some cases, Advanta raised customer APR rates to as high as 37 percent.

[39] Specifically, the FDIC found that the repricing campaign violated Section 5 of the Federal Trade Commission (FTC) Act regarding Unfair or Deceptive Acts or Practices, and Regulation B, which implements the Equal Credit Opportunity Act.

[40] Material Loss Review at 9.

[41] See Advanta Defs.' Mot. to Dismiss, Ex. I.

deterioration;" "operating with inadequate capital for the Bank's risk profile;" and "[o]perating in a manner that does not sustain satisfactory earnings performance to maintain sufficient capital in relation to the Bank's risk profile."[42]  In the second cease and desist order, the FDIC alleged that Advanta had raised the interest rates on certain customer accounts and marketed its Cash Back Rewards program in violation of consumer protection laws.  Based on those findings, the FDIC ordered Advanta to pay restitution to customers "substantially injured" by those practices.

Plaintiffs' amended complaint includes three counts:  Count One alleges violations of § 11 of the 1933 Securities Act[43] against the Advanta Defendants and KPMG; and Counts Two and Three allege that the Advanta Defendants violated §§ 12(a)(2) and 15 of the 1933 Act.


## II. STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court must accept a plaintiff's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.[44]  Courts are not, however, bound to accept as true legal conclusions couched as factual allegations,[45] or "accept as true unsupported conclusions and unwarranted inferences."[46]  The Complaint must set forth "direct or inferential allegations [for]

---

[42] Advanta Defs.' Mot. to Dismiss, Ex. F. (Advanta Corp. Form 8-K (Current Report) filed June 10, 2009) (June 2009 8-K)).

[43] 15 U.S.C. § 77k.

[44]  Phillips v. Cnty. of Allegheny,  515 F.3d 224, 233 (3d Cir. 2008).

[45] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).

[46] Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir.), cert. denied, 522 U.S. 977 (1997).

all the material elements necessary to sustain recovery under some viable legal theory."[47]  And it must allege "enough facts to state a claim to relief that is plausible on its face."[48]  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[49]

## III.  DISCUSSION

A.    SECURITIES ACT OF 1933

Sections 11, 12 and 15 of the Securities Act of 1933, on which Plaintiffs' claims are founded, protect investors by imposing liability on certain participants in a registered security offering when the publicly filed documents used during the offering contain material misstatements or omissions.[50]  Sections 11[51] and 12(a)(2)[52] allow purchasers to sue certain parties in a registered

---

[47] See Twombly, 550 U.S. at 562 (citations and quotations omitted).

[48] Id. at 570.

[49] Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

[50] In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 273 (3d Cir. 2004).

[51] Section 11 provides a right of action to purchasers:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading

15 U.S.C. §77k(a).

[52] Section 12(a)(2) provides that any defendant who:

> [O]ffers or sells a security. . . by . . . means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not

offering when materially false or misleading statements are included in registration statements and prospectuses.[53]  Section 15, a form of derivative liability, imposes liability on one who "controls any person liable" under sections 11 or 12.

"Section 11 and 12(a)(2) are 'Securities Act siblings' with 'roughly parallel elements.'"[54]  A section 11 action can only be brought against the issuer, its directors or partners, and accountants who are named as having prepared or certified the registration statement.[55]  For those parties, "[l]iability . . . is virtually absolute, even for innocent misstatements."[56]  Thus, to state a prima facie case under section 11, Plaintiffs need only allege that they purchased securities pursuant to a registration statement that contained a material misstatement or omission.[57]  Similarly, to state a claim under section 12(a)(2), plaintiffs need only allege that they purchased securities pursuant to a

---

misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him.

See  15 U.S.C. 77l(a)(2).

[53] See 15 U.S.C. §§ 77k, 77l(a)(2).

[54] In re Citigroup Inc. Bond Litig., 723 F. Supp. 2d at 583.

[55] 15 U.S.C. § 77k(a).

[56]  Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

[57]  In re Adams Golf, Inc., 381 F.3d at 273; see also Herman & MacLean, 459 U.S. at 381–82. Plaintiffs' relatively light burden to show a section 11 violation stands in sharp contrast to the requirements imposed by the anti-fraud  Securities Exchange Act of 1934 (the "1934 Act"), which require a showing of reasonable reliance and scienter.  Pleadings alleging violations of the 1934 Act must conform to the "stringent" pleading requirements imposed by the Private Securities Litigation Reform Act of 1995.  In re Adams Golf, 381 F.3d at 274 n.5.  Because Plaintiffs have explicitly disclaimed  any allegation of fraud, their allegations need not meet the heavy burden imposed by the 1934 Act.

materially false or misleading "prospectus or oral communication."[58]   Alternatively, plaintiffs may

establish a prima facie violation of sections 11 or 12(a)(2) by alleging that "an omitted material fact

was required to be included by the securities laws or that its absence rendered statements in the

prospectus misleading."[59]

Here, Plaintiffs properly alleged that they acquired securities pursuant to a registration

statement, and that the Advanta Defendants and KPMG are among those liable under the Securities

Act of 1933.[60]   As such, the only issue presented by the pending motions to dismiss is whether

plaintiffs have sufficiently alleged that the challenged registration statement, as amended, contained

material misstatements or omissions.

---

[58] 15 U.S.C. § 77l(a)(2).  Unlike section 11, which limits liability to certain parties, liability under section 12 is broader, and applies to any defendant who offers or sells a security, through a written prospectus or oral communication related to a prospectus, by use of some means of interstate commerce or the mails.

[59] In re Adams Golf, Inc., 381 F.3d at 277.

[60] 15 U.S.C.A. § 77k(a) imposes liability upon:

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

B.    MATERIALITY

A misstatement or omission is material "if there is a substantial likelihood that a reasonable

shareholder would consider it important" in making an investment decision.[61]   Thus, for a

misrepresentation or omission to be material, "there must be a substantial likelihood that the

disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available."[62]   "To be

actionable, a statement or omission must have been misleading at the time it was made; liability

cannot be imposed on the basis of subsequent events."[63]

"Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter

for Rule 12(b)(6) dismissal."[64]   However, certain categories of "soft information" are "so obviously

unimportant to an investor that reasonable minds cannot differ on the question of materiality,"[65] and

"it is appropriate for the district court to rule that the allegations are inactionable as a matter of

law."[66]   Soft information includes "statements of subjective analysis or extrapolation, such as

---

[61] In re Constar Int'l Inc. Sec. Litig. 585 F.3d 774, 783 (3d Cir. 2009) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  Although TSC Industries involved a proxy solicitation dispute (under § 14(a) of the Securities Exchange Act of 1934), the Third Circuit has made the TSC standard applicable under sections 11 and 12(a)(2) of the 1933 Act.  See In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993).

[62] Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988).

[63] In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).

[64] In re Adams Golf, Inc., 381 F.3d at 274; see also Weiner v. Quaker Oats Co., 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings.").

[65] Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n. 11  (3d Cir. 1992), cert. denied, 506 US. 934 (1992).

[66] Id.

opinions, motives, and intentions . . . forward-looking statements, such as projections, estimates, and forecasts,"[67] or "general statements of optimism [which] constitute no more than 'puffery' and are understood by reasonable investors as such."[68] The courts have adopted various doctrines to evaluate the materiality of misstated or omitted soft information, two of which are relevant to the Court's analysis.

Generally, an alleged misrepresentation or omission must concern an objective fact.[69]  Under Virginia Bankshares v. Sandberg,[70] statements of reasons, opinions, or beliefs may be "factual" if they are "a []statement of the psychological fact of the speaker's belief in what he says."[71]  In Virginia Bankshares, the Court explained that opinions contain two components: the opinion itself and the factual basis for the opinion.  Assuming that the undergirding facts are neither false nor misleading, a statement of belief might be objectionable "solely as a misstatement of the psychological fact of the speaker's belief in what he says."[72]  Thus, to allege a material misstatement of reason, opinion or belief, plaintiffs must allege either that the defendant did not actually believe her stated opinion or that she had no reasonable basis for her belief.  "Defendants are not liable

---

[67] Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989).

[68] In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999).  "Puffery" is immaterial as a matter of law because there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1428 n.14 (3d Cir. 1997); TSC Indus., Inc., 426 U.S. at 449.  Thus, claims that "vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts."  See Burlington Coat Factory, 114 F. 3d at 1427–28.

[69] In re Craftmatic, 890 F.2d at 642.

[70] 501 U.S. 1083 (1991).

[71] Id. at 1095.

[72] Id.

under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because they could have formed 'better' opinions."[73]

A second doctrine useful to this Court's analysis is the "bespeaks caution" doctrine, under which cautionary language in a offering statement may negate the materiality of an otherwise misleading forward-looking statement.[74]  The bespeaks caution doctrine is subject to limitations: First, not just any cautionary language will render accompanying forward-looking statements immaterial; to suffice, the language "must be substantive and tailored to the specific future projections, estimates or opinions" in the challenged communication.[75]  Second, a blanket warning that an investment is risky is likely to be insufficient to ward off a securities fraud claim.[76]  And finally, the bespeaks caution doctrine does not apply to facts: "[f]raud is still fraud, and all the cautionary language in the world will not replace a true material omission or misstatement of a fact which would matter to a reasonable investor."[77]

C.    THE ALLEGED MISSTATEMENTS AND OMISSIONS

---

[73] Plumbers' Union Local No. 12 Pens. Fund v. Nomura Asset Acceptance Corp., 632  F.3d 762, 775 (1st Cir. 2011).

[74] In re Donald J. Trump, 7 F.3d at 372.

[75] Id. at 373.

[76] See, e.g., Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994).

[77] In re Integrated Res. Real Estate Ltd. P'ship Sec. Litig., 815 F. Supp. 620, 674 (S.D.N.Y. 1993).  The 1995 Private Securities Litigation Reform Act codified the "bespeaks caution defense" by amending the 1933 Act to include Section 27A.  Section 27A generally provides safe harbor from liability in private actions for certain *forward-looking statements* if: (1) the statement is identified as a forward-looking statement and is accompanied by meaningful cautionary language; (2) the statement is immaterial; or (3) the plaintiff fails to prove that the statement was made with actual knowledge of its falsity (irrespective of whether cautionary language is included).

As to the Advanta Defendants, Plaintiffs attack six categories of alleged misstatements and omissions contained in Registration Statement and its subsequent amendments: (1) Advanta's predictions about the likelihood of an early amortization event; (2) its representations about the calculation and adequacy of its loan loss reserves; (3) its espoused belief that it was in compliance with capital adequacy requirements; (4) its assessment of its capital levels as "strong;" (5) alleged misstatements and omissions about Advanta's commitment to maintaining and strengthening customer relationships; and, (6) descriptions of Advanta's methodology for accessing and monitoring customer creditworthiness.

Plaintiffs sole claim against Defendant KPMG is brought under Section 11 of the 1933 Act. KPMG allegedly certified that certain financial statements fairly presented Advanta's financial position and conformed to Generally Accepted Accounting Principals ("GAAP").[78]  Plaintiffs contend that KPMG is liable for misstatements contained in those financial statements, namely the overstating of Advanta's financial position due to its failure to maintain and calculate an adequate allowance for loan and lease losses.

*1.     Statements about the prospect and potential impact of early amortization*

Advanta addressed the prospect and potential impact of early amortization in three 2009 filings: a January 11, 2009 8-K filing;[79] the February 2009 Amendment (which incorporated the 8-

---

[78] Generally Accepted Accounting Principles are principles issued by the Financial Accounting Standards Board for use by accountants in preparing financial statements.  "The principles include not only broad guidelines of general application but also detailed practices and procedures."  See Black's Law Dictionary 705 (8th ed. 2004).

[79] 17 C.F.R. § 249.308 provides the Form 8-K, a "Current Report" which companies must file in order to notify investors of certain material events.

K); and the March 2009 Amendment.[80]   In the January 8-K, Advanta stated, "in response to recent

media," that:

> [E]arly amortization for our business credit card master trust is avoidable and the
> Company does not expect it to occur.  The Company has repricing conditions and other
> structuring alternatives available to it . . . .
>
> The financial condition of the Company is very strong, and our cash and short-term
> investment position has been increased in the fourth quarter from the $ 1.8 billion we
> reported as of September 30, 2008.[81]

Later, in the March 2009 Amendment, Advanta addressed the prospect of an early amortization

again:

> [W]e are under no obligation to fund new receivables on our balance sheet whether or
> not there is an early amortization.  We can do so for the accounts we choose and to the
> degree we choose.  Therefore, we do not expect an early amortization to cause a serious
> reduction of our strong levels of liquidity.  Our expectation is that we would use our tools
> to prevent an early amortization unless we conclude that it is to our advantage not to do
> so.[82]

Pointing to the FDIC Material Loss Review, which partially attributed Advanta's collapse to

its failure to develop an adequate contingency plan for dealing with an early amortization event,[83]

---

[80] Am. Compl. ¶¶ 59, 63.

[81] Am. Compl. ¶ 59; Advanta Defs.' Reply, Ex. D (Advanta Corp. Form 8-K (Current Report)
filed January 21, 2009).

[82] Am. Compl. ¶ 63, 2009 Amendment at 19.

[83] Material Loss Review at 4–5.  Specifically, the FDIC concluded that:

> Advanta's Board and management failed to develop adequate
> contingency plans for responding to an early amortization of the bank's
> securitizations and failed to incorporate those plans into the bank's
> capital planning model.  The bank's plan did not include an early
> amortization event because management believed it could avert an early
> amortization by supporting the securitization trust through various
> means.  However, when faced with such an event, those means did not
> materialize, and the Board and management's handling of the situation
> resulted in increased loan losses, which ultimately led to the bank's

Plaintiffs attack the statements about early amortization for containing both material misstatements and omissions.

Sections 11(a) and 12(a)(2) "impose upon defendants the duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading."[84]  When defendants "voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact."[85]  An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder."[86]  As noted above, "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law."[87]

Plaintiffs argue that by raising the issue of amortization, Advanta put the adequacy of its contingency plan "in play."  Thus, Plaintiffs reason, Advanta omitted a material fact by failing to disclose that it did not have an adequate contingency plan in place for an early amortization event.[88] Defendants argue that the challenged statements did not put the adequacy of Advanta's contingency plan "in play" because the statements "deal with Advanta's plans and expectations for *avoiding* early

insolvency.

[84] Craftmatic, 890 F.2d at 641.

[85] Id. at 641 n.17.

[86] Id. at 639.

[87] Id. at 641.

[88] Am. Compl. ¶ 69.

18

amortization, while any plan for *dealing with* early amortization once it had occurred simply is an entirely separate issue."[89]  The Court agrees.  There is a fundamental mismatch between the challenged statements and the topic they allegedly put in play.  Far from characterizing a contingency plan, the statements do not even indicate that such a plan existed.

Because Advanta did not put the adequacy of its contingency plan "in play," it had no duty to disclose that its plan for an early amortization was inadequate.  It is well established that neither allegations of mismanagement nor failure to disclose mismanagement are material, and accordingly are not actionable under federal laws.[90]  Thus, the securities laws do not obligate defendants to reveal the "culpability of their activities," "impure motives for entering a transaction," or a "breach of fiduciary duty."  Here, Advanta's failure to provide an adequate contingency plan reflects, at bottom, mismanagement and ineptitude.[91]  In <u>In re Craftmatic Securities Litigation</u>,[92] the Third Circuit dismissed similar allegations as stating claims for "mere mismanagement."  There, Plaintiffs claimed that defendant Craftmatic's failure to characterize its new product research as "meaningless," or its information systems as "wholly inadequate" implicated the Securities Act.  The alleged omission here is indistinguishable from those dismissed by the Third Circuit in <u>Craftmatic</u>.  Thus, Plaintiffs have not sufficiently alleged the existence of a material omission.

Plaintiffs also allege that Advanta's statements about early amortization contained two

---

[89] Advanta Defs.' Reply at 6.

[90] <u>Shapiro</u>, 964 F.2d at 280–81; <u>Craftmatic</u>, 890 F.2d at 639–40.

[91] <u>Compare</u> <u>In re Century Bus. Serv. Sec. Litig.</u>, No. 99-2200, 2002 WL 32254513, * 20 (N.D. Ohio June 27, 2002) (defendants were not obligated to disclose lack of an adequate financial reporting structure because statements as to that issue represented nothing more than inactionable allegations of corporate mismanagement).

[92] 890 F.2d 628 (3d Cir. 1989).

19

material misstatements.  First, Plaintiffs challenge Advanta's opinion that its economic condition was "very strong."  Plaintiffs generally aver that the company was "nearing collapse by early 2009;" but they do not allege that at the time this statement was published—January 11, 2009—the speakers either did not believe that their financial position was strong or that they had no reasonable basis for believing that to be true.  Indeed, the Material Loss Review, upon which Plaintiffs heavily rely, shows that the precipitous drop in profits that ultimately led to the early amortization (the direct cause of Advanta's collapse) did not begin until March 2009.[93]  Although in hindsight Advanta was certainly teetering on the edge of financial ruin in early 2009, Defendants cannot be liable for statements that simply failed to foresee the future.[94]

For similar reasons, Plaintiffs second challenge, to Advanta's statement that it "did not expect an early amortization to cause a serious reduction of our strong levels of liquidity," also fails. Under Virginia Bankshares v. Sandberg, for "misrepresentations in an opinion or [statement of ] belief to be actionable, Plaintiffs must show that the statement was issued without a genuine belief or reasonable basis."  Plaintiffs allege neither.

   2.    *Statements about Loan Loss Reserves*

The next category of challenged misstatements pertain to the Advanta Defendants'

---

[93] Material Loss Review at 8, Fig. 3 (showing a drop in quarterly excess spread from -2.2% to -17.0% between March 2009 and June 2009).

[94] See In re NAHC, Inc. Sec. Litig., 306 F.3d at 1330.  In any event, the statements are likely mere puffery.  Puffery, "even if arguably misleading, do[es] not give rise to a federal securities claim because [it is] not material: there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix of information made available."  In re Advanta Corp Sec. Litig., 180 F.3d at 539.  See also Asher v. Baxter Intern., Inc., 2003 WL 21825498 (N.D. Ill. Jul. 24, 2003) overruled on other grounds by 377 F.3d 727 (7th Cir. 2004)  (statement that "the overall financial dynamic . . . is very strong" was puffery).  A vague statement that capital levels are "very strong" simply is not the sort of "hard information" upon which a reasonable investor typically relies.

calculation of loan loss reserves.  A "loan loss" reserve is a current reserve against likely credit

losses in a company's portfolio.  "As losses occur, they are charged against this reserve.  That is, the

loan account is credited and the reserve account is debited.  The reserve is established by a debit to

an expense account called the loan loss provision, with a corresponding credit to the loan loss

reserve."[95]

The gravamen of Plaintiffs' claims is that the Advanta Defendants did not conform to their

disclosed methodology for calculating loan loss and consequently overstated their net income, and

that KPMG violated securities laws by certifying the false loan loss and net income statements.

a.   *The Advanta Defendants*

Plaintiffs allege that Advanta made two categories of misstatements about the loan loss

reserves:  First, Plaintiffs allege that although Advanta disclosed a methodology by which it claimed

loan loss reserves were calculated, it did not conform to that method, and consequently, understated

its loan loss reserves.  Second, Plaintiffs allege that by understating its loan loss reserves—which are

subtracted from gross income—Advanta misrepresented its net income.

In response, the Advanta Defendants argue that loan loss reserves are forward-looking

statements because they are predictions or estimates of future financial liabilities.[96]  As such, loan

reserves are statements of "opinion" that require an allegation of subjective knowledge to be

actionable.  Thus, Defendants contend that Plaintiffs' complaint is deficient because it fails to allege

that the Advanta Defendants knew the loan loss reserves were misstated.

The 2008 and March 2009 Amendments (which are duplicative in all material respects)

---

[95] Shapiro, 964 F. 2d at 281.

[96] Advanta Defs.' Mot. to Dismiss at 17.

represented Advanta's methodology for calculating loan loss reserves and included cautionary

language that the loan loss allowance was inherently subjective and susceptible to changing

economic conditions:

> Receivables on the consolidated balance sheets are presented net of the allowance for receivable losses. The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio. We establish the allowance for receivable losses through provisions charged to earnings. We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. ***The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectability of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions.*** Since our business credit card receivable portfolio is comprised of smaller balance homogeneous receivables, we generally evaluate the receivables collectively for impairment through the use of a migration analysis as well as the consideration of other factors that may indicate increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts that have been re-aged or entered a workout program. A migration analysis is a technique used to estimate the likelihood that a receivable or pool of receivables will progress through various delinquency stages and charge off. The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. Changes in economic conditions, the composition and risk characteristics of the receivables portfolio, bankruptcy laws or regulatory policies could impact our credit losses.[97]

Defendants contend that in <u>Shapiro v. UJB</u>,[98] the Third Circuit held that loan reserves are

always forward-looking statements of "opinion," only actionable as material misstatements upon a

showing of the speaker's subjective knowledge.[99]   But neither <u>Shapiro</u> nor any other case Defendants

---

[97] Am. Compl. ¶ 53.

[98] 964 F.2d 272 (3d Cir. 1992).

[99] <u>See generally</u> Advanta Defs.' Mot. to Dismiss, <u>citing</u> <u>Shapiro</u>, 964 F. 2d at 284 (allegation that defendants' total loan loss reserves were not maintained at an adequate level in light of the economic conditions was not actionable); <u>Fait v. Regions Fin. Corp.</u>, 712 F. Supp. 2d 117, 125 (S.D.N.Y. 2010) (allegations that loan loss reserves were "woefully inadequate" and did not comply with GAAP did not state a claim under the securities laws); <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d at 709 (plaintiffs

rely upon stands for the broad proposition that *all* statements pertaining to loan loss reserves are opinions.[100]  To the contrary, <u>Shapiro</u> made clear that "[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview . . . of the federal securities laws."

In <u>Shapiro</u>, the court held that "general labels" such as "strong," "very strong," and "maintained at adequate levels" might be actionable material misstatements under <u>Virginia Bankshares</u>, but concluded that plaintiff's claims were not sufficient because they did not allege the defendant *knew* the "general labels" were false.  Instead, the plaintiffs' allegations simply "charge[d] defendants with essentially failing to predict the future."

In contrast to <u>Shapiro</u>, the Advanta Defendants did not describe the quality of the loan loss reserves using a "general label."  Instead, they disclosed a *method* by which they claimed loan loss reserves were calculated.  And Plaintiffs allege that, as evidenced by the Material Loss Review, Advanta did not adhere to that methodology.  This allegation does not allege Advanta Defendants failed to protect the future, but instead alleges that Advanta refused to incorporate, among other things, *current* losses into its calculations:  Advanta claimed that its loan loss calculations were based, *inter alia*, on "historical experience by receivable type," "adverse situations that may affect the borrower's ability to repay," "prevailing economic conditions," and "factors that may indicate

---

sufficiently alleged that loan loss reserves were misstated where they argued that "defendants' statements regarding the adequacy of the loan loss reserves were materially false when made because defendants knew that the reserves were and would remain inadequate, even without any future or prolonged economic downturn); <u>Urbach v. Sayles</u>, 779 F. Supp. 351, 355 (D.N.J. 1991) ("A fraud action will lie where, while representing that loss reserves are adequate, a defendant knows that they are not or lacks any valid basis for her representation.").

[100] <u>Shapiro</u>, 964 F.2d at 282.

increased risk of loss."[101]   But that claim is contradicted by the FDIC Material Loss review,[102] which

concluded that "Advanta . . . failed to incorporate into its allowance for loan and lease methodology .

. . anticipated and actual changes in portfolio behavior."[103]   If Advanta did not, as the FDIC

concluded, incorporate anticipated and actual changes into its methodology, it is reasonable to infer

that Advanta was not considering "historical experience," "adverse situations," or "factors that may

indicate increased risk of loss."[104]   The FDIC's findings also support Plaintiffs' contentions that

"Advanta ignored the adverse credit effects caused by its aggressive repricing campaign and the

economic downturn and, consequently, took an inadequate allowance for loan losses."[105]   Because

Plaintiffs have sufficiently alleged that Defendants departed from their claimed methodology to

---

[101] Am. Compl. ¶¶ 55, 66.

[102] Defendants' secondary, fact-bound argument, is that the Material Loss Review "does not establish that Advanta did not follow its stated [loan allowance calculation] policy, only that apparently the FDIC *in hindsight* disagreed with [loan loss calculation] policy." Advanta Defs.' Reply at 10.  This argument is premised on the Material Review's failure to state *when* Advanta's methodology failed to incorporate certain factors and became inadequate.  Advanta Defs.' Reply at 10. Defendants also claim that because Advanta increased its loan reserves in 2007 and 2008, the evidence shows that Advanta was taking actual portfolio behavior into account.  This argument is inappropriate at this stage of the litigation, and mischaracterizes the FDIC's findings in the Material Loss Review.  Although the Material Loss Review does not pinpoint exactly when Advanta stopped incorporating certain factors into its methodology, such specificity is not required at this pleading stage.  The FDIC's statements about the loan loss reserves were the result of an examination that commenced on November 17, 2008.  The challenged statements were included in the February 28, 2008 amendment, and in the March 13, 2009 Amendment.  While undisputable that the FDIC did not begin their 2008 visit until well after the 2008 Amendment was issued, that is not dispositive to the truth or falsity of the 2008 loan loss reserve statements.  Instead, the FDIC's findings indicate that at some point—potentially in late 2008 or 2009, but also potentially earlier—Advanta stopped adhering to its stated loan loss methodology.  The purpose of discovery is to elucidate evidence demonstrating when that shift occurred.  See Phillips, 515 F.3d at 234 ("The Supreme Court's Twombly formulation . . . 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element.") (quoting Twombly, 127 S.Ct. at 1965).

[103] FDIC Material Loss Review at 10.

[104] Am. Compl. ¶ 6F.

[105] Am. Compl. ¶ 54.

calculate the loan loss reserve, they have sufficiently alleged that Advanta's net income and loan loss reserves were misstated.[106]  Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact.[107]  If, as Plaintiffs allege, Advanta omitted factors from its calculation, the sum of that calculation is necessarily misstated.

To the extent that Defendants challenge the materiality of the statements about the loan loss reserves, they rely on the "bespeaks caution" doctrine, under which "an offering statement [or other disclosure document], such as a prospectus, accompanies statements of future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud."[108]  In their statements, the Defendants noted that the calculation of loan loss reserves was "inherently subjective."  But the bespeaks caution doctrine does not apply to facts,[109] and, as Plaintiffs have challenged a statement of fact, not opinion, Advanta's cautionary language does not cure the misstatement.[110]  Accordingly, the Court cannot conclude that the alleged misrepresentation

---

[106] Am. Compl. ¶¶ 52, 64.

[107] See also Urbach, 779 F. Supp. at 360–61.

[108] In re Donald J. Trump Casinos Sec. Litig., 793 F. Supp. 543, 549 (D.N.J. 1991), aff'd 7 F.3d 357 (3d Cir. 1993).

[109] In re Integrated Res. Real Estate Ltd. P'ship Sec. Litig., 815 F. Supp. 620 at 674; see also EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 874 (3d Cir. 2000) ("By its terms, the 'bespeaks caution' doctrine . . . is directed only to forward-looking statements.");  Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997) (holding that the bespeaks caution doctrine applies only to forward-looking information).

[110] See also Clairdale Enters. v C.I. Realty Investors, 423 F. Supp. 257, 259 (S.D.N.Y. 1976) (plaintiffs fraud claim that a quarterly reported firm's assets were overstated survived a Rule 9(b) challenge where plaintiff alleged "facts from which it has been inferred that specific properties held by [defendant] generate negative cash flow"); Fox v. Equimark Corp., 782 F. Supp. 295, 300, 301 (W.D. Pa. 1991) (rejecting a claim based on alleged fraudulent misrepresentations about loan loss reserves on the grounds that the complaint failed to explain "the manner in which reserves were improperly

would have been so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.[111]

    *b.*      *Loan Loss Reserves and KPMG*

Plaintiff s allege that KPMG violated securities laws by certifying false financial statements in the Registration statement.[112]  Under 15 U.S.C. § 77k(a)(4), accountants are only liable for the parts of a registration statement that they have prepared or certified.[113]  Thus, while "liability against the issuer of a security is virtually absolute, even for innocent misstatements," accountant liability under Section 11 is limited to "those matters which purport to have been prepared or certified by them."[114]

Plaintiffs allege that KPMG certified Advanta's loan loss provision and net income as correct by stating, in both the 2008 and 2009 report, that:

> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in the Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 21, 2007 and 2006, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.[115]

―――――――――――――――

established.").

[111] In re Adams Golf, 381 F.3d at 275.

[112] Am. Compl. ¶¶ 55, 66.

[113] Herman & MacLean, 459 U.S. at 387 n.22.

[114] Id. at 381 n.11.

[115] Am. Compl. ¶ 55, 66.

By their terms, the challenged statements are only "false" if Advanta's financial statements did not, as KPMG stated, conform to GAAP.  Thus, Plaintiffs' vague allegation that KPMG's statements "were not correct for the reasons set forth in the various FDIC orders and reports" is insufficient. The FDIC reports do not conclude that Advanta's financial results were not prepared in conformity with GAAP or that its internal controls did not adhere to the criteria established in the Internal Control Integrated Framework.  Plaintiffs have neither alleged what GAAP standards KPMG violated nor how the statements in the audit report were false or misleading at the time they were made.[116]  Indeed, Plaintiffs have not even alleged that the statements did not conform to GAAP.[117]  In sum, Plaintiffs' allegations are entirely conclusory and do not contain factual matter sufficient to support a plausible claim for relief.

3.      *Statements about Advanta's Compliance with Capital Adequacy Requirements*

The 2008 Amendment stated that "[m]anagement believes that at December 31, 2007, Advanta Bank Corp. was in compliance with the capital adequacy requirements to which it was subject."[118]  Plaintiffs allege that the 2008 statement was false because the FDIC found in its material loss review that Advanta was "in need of capital."[119]  In addition, Plaintiffs highlight the first FDIC Cease and Desist Report, which found that Advanta was operating with insufficient capital.  Further,

---

[116] See Dutton v. Harris Stratex Networks, Inc., 270 F.R.D. 171, 178 (D. Del. 2010) (dismissing plaintiffs' allegations against an accountant as "threadbare recitals of the elements of a cause of action.").

[117] Although Plaintiffs have sufficiently alleged that Advanta did not conform to its disclosed methodology for computing loan loss reserves, that allegation is insufficient to show that KPMG's audit report contained misstatements.  Plaintiffs have not alleged that Advanta's methodology was equivalent to GAAP.  And there is "no single method of evaluating and setting loan loss reserves."  Shapiro, 964 F.2d at 281.  Thus the Court cannot assume that KPMG's statement is false simply because Advanta deviated from its internal accounting method.

[118] Am. Compl. ¶ 51; see also 2008 Amendment.

[119] Am. Compl. ¶ 70.

Plaintiffs argue that because Advanta was overstating its financial position by maintaining inadequate loan and lease losses, the capital levels reported in the 2008 report were overstated. The 2008 Amendment explains that Advanta was subject to capital adequacy guidelines issued by the Federal Financial Institutions Examination Council (the "FFIEC"):

> Under the rules and regulations of the FFIEC, at least half of a bank's total capital is required to be "Tier I capital," comprised of common equity, retained earnings and a limited amount of non-cumulative perpetual preferred stock. The remaining capital, "Tier II capital," may consist of other preferred stock, a limited amount of term subordinated debt or a limited amount of the reserve for possible credit losses.

Plaintiffs allegations about compliance with capital adequacy requirements sufficiently state a claim. Defendants attempt to characterize this statement as "forward-looking" is unpersuasive. Whether or not Advanta was in compliance with its capital adequacy reserves as of December 31, 2007 is a historical fact, verifiable by discovery. A statement is not mere "puffery" when it provides specific facts that may be relied on.[120]

4.    *Statements Characterizing Advanta's Capital Reserves*

In the March 2009 Amendment, Advanta stated that "We believe we have helped position ourselves for the current challenging economic environment by increasing our levels of cash and liquid assets throughout 2008 and maintaining strong capital levels." Plaintiffs do not challenge the statement on the basis that Advanta did not raise its capital levels throughout 2008, nor do they identify Advanta's actual capital levels.[121] Thus, the sole inquiry here is whether Advanta's statement that it had "strong" capital levels was a material misstatement.

---

[120] Newman v. Rothschild, 662 F. Supp. 957, 959 (S.D.N.Y. 1987).

[121] Advanta Defs.' Mot. to Dismiss at 23.

Advanta's description of its capital levels is a statement of opinion that is couched as

Advanta's "belief."  Thus, to be actionable, Plaintiffs must allege that the Advanta Defendants

either knew the capital levels were not strong, or that they had no reasonable basis for their opinion.

Because they have alleged neither, this allegation fails.

5.      *Statements about Evaluating Customer Creditworthiness*

In the 2007, 2008, and 2009 Amendments, Advanta explained that it had developed models

for assessing the creditworthiness of applicants:

> Using a proprietary credit scoring system, we evaluate common applicant
> characteristics and their correlation to credit risk.  We regularly validate and update
> our scoring models to maintain and enhance their predictive power.[122]

According to Plaintiffs, these statements were false because "Advanta was being operated in an

unsafe and unsound manner, was not updating its credit portfolios to account for changes in

portfolio behavior associated with the economic downturn, and was using an aggressive re-pricing

strategy."  In addition, Plaintiffs note that the FDIC failed to incorporate anticipated and actual

changes in portfolio behavior into its loan loss methodology.

Defendants contend that these allegations fail because the plaintiffs do not contend that the

methodology was actually misstated.  Defendants also note that "plaintiffs do not even attempt to

allege a connection between the Company's creditworthiness methodology and the Company's loan

loss methodology."

Plaintiffs' allegations are deficient and do not state a claim.  Plaintiffs do not connect their

allegations that Advanta was operated in an "unsafe and unsound manner," or that it "failed to

incorporate anticipated and actual changes in portfolio behavior" to Advanta's creditworthiness

---

[122] Am. Compl. ¶¶ 47, 50, 61.

scoring model.  At best, Plaintiffs' allegations might raise an inference that because Advanta failed

to incorporate anticipated and actual changes into its loan loss calculations, it also failed to account

for those changes in its creditworthiness models.  Or perhaps the Court might infer that because

Advanta was not updating its credit portfolio, it was also not "regularly validat[ing] and updat[ing]

its scoring models."  But speculating about potential claims is not the Court's task; it is the

Plaintiff's responsibility to set forth "direct or inferential allegations for all the material elements

necessary to sustain recovery."  Plaintiffs have failed to do so here; their allegations do not explain

why the statements about creditworthiness were false or misleading.

6.      *Statements about Maintaining Strong Relationships with Customers*

        Plaintiffs also challenge Advanta's statements regarding its relationships with customers.  In

the 2008 and 2009 Amendments, Advanta stated that it sought to strengthen and improve its

relationships with customers and maximize long-term profits by attracting and retaining high-credit

quality customers and deepening customer relationships.[123]  In reality, Plaintiffs allege, Advanta was

---

[123] The challenged statements were:

| | |
|---|---|
| 2008 Amendments: | "We continually seek new ways to develop and strengthen our relationships with our customers and the small business community."  See Am. Compl. ¶ 49. |
| February 2009 Amendment: | "Using our direct marketing and information-based expertise, [Advanta] identif[ies] potential customers and provide[s] a high level of service tailored to the needs of small businesses." |
| | "Our strategy in Advanta Business Cards is to maximize long-term profits by attracting and retaining high credit quality customers and deepening our customer relationships."  See Am. Compl. ¶ 57. |
| March 2009 Amendment | "We use an information-based strategy to prudently operate our business" |
| | "We continually seek new ways to develop and strengthen our |

damaging its relationships by: (1) beginning in at least June 2007, engaging in "an aggressive" repricing campaign that "according to the FDIC, violated Section 5 of the Federal Trade Commission Act" and "substantial[ly] injur[ed]" its customers; (2) failing to send sufficient notice letters providing customers with explanations for the adverse actions, in violation of Regulation B; and (3) imposing severe price increases on customers that, according to the FDIC, made it "very difficult for customers already struggling to make their minimum payments to cure any outstanding delinquency."[124]

These alleged misrepresentations are vague statements of "opinion or expectation" that courts have uniformly held not actionable.  The statement claiming that Advanta intended to strengthen relationships with customers is not the type of information the ordinary investor would be likely to find important to his or her investment decision.[125]  This type of puffery cannot serve as the basis for liability under Federal securities laws.[126]

---

relationships with our customers and the small business community."  See Am. Compl. ¶ 60.

[124] Am. Compl. ¶ 49.

[125] See In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 938 (D.N.J. 1998) (dismissing defendant's statement that it would "continue to provide the best in customer service [as] the type of puffery that has been found to be immaterial as a matter of law"); Roth v. OfficeMax, Inc., No. 05-C-236, 2006 WL 2661009, at * 4 (N.D. Ill. Sept. 13, 2006) ("combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments" deemed puffery); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996) ("[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace-loosely optimistic statements that are so vague . . . that no reasonable investor could find them important in the total mix of information available.").

[126] See In re Burlington Coat Factory, 114 F.3d at 1427.

**V. Conclusion**

For the foregoing reasons, the Court will grant KPMG's Motion to Dismiss and grant in part the Advanta Defendants' Motion to Dismiss.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ : | | |
| **WILLIAM E. UNDERLAND** and | : | |
| **MARK SCHALLER,** *on behalf of* | : | |
| *themselves and all others similarly* | : | |
| *situated,* | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| v. | : | **NO. 10-3621** |
| | : | |
| **DENNIS ALTER, WILLIAM ROSOFF,** | : | |
| **PHILIP BROWNE, DAVID** | : | |
| **WEINSTOCK, ROBERT BLANK,** | : | |
| **MAX BOTEL, THOMAS COSTELLO,** | : | |
| **DANA BECKER DUNN, RONALD** | : | |
| **LUBNER, OLAF OLAFSSON,** | : | |
| **MICHAEL STOPLER, and KPMG LLP;** | : | |
| **Defendants.** | : | |
| _____: | | |

## ORDER

**AND NOW,** this 9th day of September 2011, in accordance with the foregoing reasons, it is

hereby **ORDERED** that:

1)    The Advanta Defendants' Motion to Dismiss is **GRANTED IN PART**.  For the

reasons set forth in the accompanying opinion, Plaintiffs have not sufficiently alleged

that the following misstatements are actionable: (1) Advanta's predictions about the

likelihood of an early amortization event; (2) its assessment of its capital levels as

"strong;" (3) alleged misstatements and omissions about Advanta's commitment to

maintaining and strengthening customer relationships, and; (4) descriptions of

Advanta's methodology for accessing and monitoring customer creditworthiness;

and,

2)    KPMG LLP's Motion to Dismiss is **GRANTED**; and,

3)      Plaintiffs are granted leave to amend their Complaint on or before **October 9, 2011.**

**It is so ORDERED.**

**BY THE COURT:**

_____
**HON. CYNTHIA M. RUFE**