UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------- X
                                                           :
WILLIAM E. UNDERLAND and MARK                              :
SCHALLER, *on behalf of themselves and all*               :
*others similarly situated,*                               :
                                                           :
                        Plaintiffs,                        :
                                                           :
        - against-                                         :
                                                           :   10-Civ.-3621 (CMR)
                                                           :
DENNIS ALTER, WILLIAM A. ROSOFF,                          :
PHILIP M. BROWNE, DAVID B.                                 :
WEINSTOCK, MAX BOTEL, THOMAS                               :
COSTELLO, DANA BECKER DUNN,                                :
ROBERT LUBNER, OLAF OLAFSSON,                             :   **JURY DEMANDED**
MICHAEL STOLPER and KPMG LLP,                             :
                                                           :
                        Defendants.                        :
                                                           :
-------------------------------------------------------- X


**SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE SECURITIES ACT OF 1933**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 5

PARTIES .............................................................................................................................. 6

SUBSTANTIVE ALLEGATIONS ..................................................................................... 8

I.    Defendants Caused Advanta to File the Untrue Registration Statement
      and Amendments Thereto in Connection with the Shelf Registration of
      Advanta Notes to Individual Investors ................................................................... 8

      A.    The Registration Statements and Amendments Thereto ............................... 8

      B.    The RediReserve Notes ................................................................................ 10

      C.    Defendants Caused Advanta to Target Individual Investors ....................... 11

II.   The Registration Statement, as Amended, Contained Numerous Untrue
      Statements of Material Fact and Omitted Material Facts ..................................... 11

      A.    Untrue Statements and Omissions of Material Fact in the 2008 Amendment ............. 12

      B.    Untrue Statements and Omissions of Material Fact in the February 2009
            Amendment .................................................................................................. 13

      C.    Untrue Statements and Omissions of Material Fact in the March 2009
            Amendment .................................................................................................. 14

      D.    The 2008 Amendment, February 2009 Amendment and March 2009
            Amendment Violated The Duty to Disclose Material Trends Imposed
            by 17 C.F.R. §229.303(a)(3)(ii) and Thereby Violated Section 11 of
            the Securities Act ........................................................................................ 15

      E.    KPMG's Statements in the March 2009 Amendment Were False and
            Misleading and Lacked a Reasonable Basis ............................................... 18

III.  The Truth Emerges ............................................................................................... 23

RELIANCE PRESUMED ................................................................................................. 24

CLASS ACTION ALLEGATIONS ................................................................................. 24

FIRST CAUSE OF ACTION ........................................................................................... 26
      Violations of §11 of the 1933 Act Against All Defendants ................................. 26

SECOND CAUSE OF ACTION ........................................................................................... 27
 Violations of §12(a)(2) of the 1933 Act Against the Individual Defendants ................... 27

THIRD CAUSE OF ACTION ............................................................................................. 28
 Violations of §15 of the 1933 Act Against the Individual Defendants............................ 28

PRAYER FOR RELIEF ...................................................................................................... 29

JURY DEMANDED............................................................................................................. 30

## INTRODUCTION

1.      This is a securities class action alleging that the defendants caused the Advanta Corporation ("Advanta" or the "Company") to sell hundreds of millions of dollars worth of RediReserve variable rate certificates and investment notes (referred to collectively as the "RediReserve notes") through registration statements and prospectuses that contained untrue statements of material fact and omitted material facts in violation of the Securities Act of 1933 (the "1933 Act").

2.      Advanta was a risky mono-line credit card issuer that primarily marketed its cards to small businesses. By the start of the Class Period, defined as February 28, 2008 through November 8, 2009, Advanta was in the midst of a catastrophic business downturn, largely as a result of what were later revealed to be a plethora of unsafe, unsound and illegal business practices.

3.      Seeking to stave off Advanta's looming collapse, the defendants caused Advanta to raise money through the sale of the RediReserve notes, which were unsecured debt securities.

4.      Defendants sold the RediReserve notes through an unorthodox manner. Companies typically accomplish large debt offerings by hiring an investment bank that organizes the sale of the debt securities to sophisticated institutional investors such as pension funds. However, throughout the Class Period, Advanta's credit rating was "below investment grade," limiting Advanta's "access to unsecured, institutional debt." Accordingly, Advanta eschewed the formal debt markets and targeted the RediReserve notes directly at "mom-and-pop" investors. Advanta advertised the RediReserve notes in newspapers around the country and capped the maximum investment in these notes at $500,000, an amount too small for most institutional investors. As these distribution methods indicate, the RediReserve notes were

1

intended for individual investors who would hold the RediReserve notes to maturity and collect the interest paid on the notes. Indeed, Advanta's public filings stated: "We do not expect there will be a trading market for the investment notes or the RediReserve certificates."

5. Despite the fact that Advanta marketed RediReserve notes directly to individual investors, defendants failed to accurately describe Advanta's business practices and the state of Advanta's business in the registration statement and prospectuses used to sell the RediReserve notes. For instance, according to the RediReserve registration statement, Advanta was a prudent company with a "very strong" financial condition that was competently managing the risks involved in offering credit cards to small businesses amidst an economic downturn. In fact, as was later revealed by two cease and desist orders from the Federal Deposit Insurance Corporation (the "FDIC") and the FDIC's Material Loss Review,[1] these representations were untrue and/or failed to disclose that: (1) Advanta was engaged in unsafe and unsound banking practices that had caused "significant financial deterioration"; (2) Advanta operated with inadequate capital for its risk profile; (3) Advanta operated in a manner that did not sustain satisfactory earnings performance to maintain sufficient capital for its risk profile; (4) Advanta was engaged in illegal and unfair business practices, including unjustifiably and unreasonably increasing the rates it charged its credit card holders; (5) Advanta's management had failed to develop an adequate contingency plan for responding to an early amortization of the Advanta's credit card securitizations and, accordingly, failed to incorporate an adequate plan into Advanta's capital planning model; and (6) Advanta was failing to incorporate adverse credit trends into its loan loss methodology and was understating its loan losses.

6. Meanwhile, the true facts were:

---

[1] Plaintiffs incorporate the Material Loss Review by reference. It was submitted by the Advanta Defendants as Exhibit H to their motion to dismiss (ECF No. 38-2).

A.      As described in an order dated June 30, 2009 ("FDIC Order #1), the FDIC
        determined that Advanta[2] was engaged in "unsafe or unsound banking
        practices" and that these practices had caused "significant financial
        deterioration" such that, in a cease and desist order issued on June 30,
        2009, the FDIC ordered Advanta to retain competent management capable
        of operating Advanta in a "safe and sound manner." The FDIC further
        ordered that Advanta's Board of Directors (the "Board") "shall increase its
        participation in the affairs of the Bank." The disarray was so severe that
        the FDIC ordered Advanta to submit a plan for discontinuance of deposit-
        taking operations and the voluntary termination of deposit insurance after
        the repayment in full of all deposits.

B.      As described in FDIC Order #1, the FDIC found that Advanta operated
        with inadequate capital for its risk profile and that Advanta required a plan
        addressing, *inter alia*, its: (i) current and future capital requirements;
        (ii) level of concentrations of credit; and (iii) volume of adversely
        classified assets.

C.      As described in FDIC Order #1, Advanta operated in a manner that did not
        sustain satisfactory earnings performance to maintain sufficient capital for
        Advanta's risk profile.

---

[2] The Order was directed at Advanta's most important subsidiary, the Advanta Bank Corp.
According to its U.S. Securities and Exchange Commission ("SEC") filings, Advanta primarily
operated its business through the Advanta Bank Corp. For example, Advanta stated in its 2007
SEC Form 10-K "Advanta is one of the nation's largest credit card issuers (through Advanta
Bank Corp.)" This complaint refers to both Advanta Corp. and the Advanta Bank Corp. as
"Advanta."

3

D.   As described in the second order from the FDIC ("FDIC Order #2") and a July 1, 2009 press release, the FDIC determined that Advanta was unfairly increasing the interest rate it charged its customers even when customers had neither exceeded their limits nor were delinquent in making payments on their accounts. The FDIC further determined that Advanta had failed to adequately notify accountholders that their interest rates were increasing. These violations resulted in a $150,000 fine and Advanta having to pay $21 million in restitution for the "substantial injury" it caused customers.

E.   As described in the FDIC's Material Loss Review, dated October 2010, Advanta did not have an adequate contingency plan for addressing an early amortization of the Advanta's credit card securitizations and did not incorporate an adequate plan into its capital planning model.

F.   Advanta overstated its financial position by failing to maintain an adequate allowance for loan and lease losses and failed to incorporate into its allowance for loan and lease loss methodology: (i) the impact of the early amortization of Advanta's 's securitization trust; (ii) anticipated and actual changes in portfolio behavior associated with the continued economic downturn, the aggressive re-pricing strategy and the cut-off in credit card account utility; and (iii) the impact of management's change to a 120-day charge-off period.

7.    In short, in the RediReserve registration statements, defendants painted far too rosy a picture of the state of Advanta's business and materially understated the risk of investing in the RediReserve notes.

8.    The defendants in this action are those individuals and entities responsible for causing Advanta to file untrue registration statements for the RediReserve notes. Advanta's directors signed and vouched for the untrue registration statement and KPMG LLP ("KPMG"), Advanta's auditor, vouched for the financial statements that were incorporated into the registration statement. This action involves solely strict liability and negligence claims under the 1933 Act. Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

9.    As a result of the deficient business practices described above, Advanta entered bankruptcy on November 8, 2009. At that time, Advanta reported that approximately $138 million in notes were outstanding.

## JURISDICTION AND VENUE

10.    The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act. *See* 15 U.S.C. §§77k, 77l(a)(2) and 77o.

11.    Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

12.    Venue is appropriate because the violations of law complained of herein substantially occurred in this District, including the preparation and dissemination of the materially false and misleading registration statement complained of herein. Each of the individual defendants and KPMG conducted business in this District.

5

## PARTIES

13.     Plaintiff William E. Underland acquired RediReserve notes traceable to the untrue registration statement complained of herein.     A certification detailing Mr. Underland's transactions in RediReserve notes was filed in this Court as ECF No. 20-4.

14.     Plaintiff Mark Schaller acquired RediReserve notes traceable to the untrue registration statement complained of herein. A certification detailing Mr. Schaller's transactions in RediReserve notes was filed in this Court as ECF No. 20-5.

15.     Advanta is not a defendant in this action. Advanta is headquartered at Welsh & McKean Roads, P.O. Box. 844, Spring House, PA, 19477, and is a financial holding company that, along with its subsidiaries, provides credit cards to small business.     Advanta entered bankruptcy on November 8, 2009.

16.     Defendant Dennis Alter ("Alter") served as Chairman of the Board and as Advanta's Chief Executive Officer ("CEO").     Alter signed and vouched for the untrue registration statement complained of herein. According to the FDIC's Material Loss Review, as of December 2007, Alter controlled 32% of Advanta's Class A voting stock and was the largest individual shareholder.

17.     Defendant William A. Rosoff ("Rosoff") served as Vice Chairman of the Board and as Advanta's President. Rosoff signed and vouched for the untrue registration statement complained of herein.

18.     Defendant Philip M. Browne ("Browne") served as Advanta's Senior Vice President and Chief Financial Officer ("CFO").     Browne signed and vouched for the untrue registration statement complained of herein.

19.     Defendant David B. Weinstock ("Weinstock") served as Advanta's Vice President and Chief Accounting Officer ("CAO"). Weinstock signed and vouched for the untrue registration statement complained of herein.

20.     Defendant Max Botel ("Botel") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

21.     Defendant Thomas Costello ("Costello") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

22.     Defendant Dana Becker Dunn ("Dunn") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

23.     Defendant Ronald Lubner ("Lubner") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

24.     Defendant Olaf Olafsson ("Olafsson") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

25.     Defendant Michael Stolper ("Stolper") served as a director of Advanta and signed and vouched for the untrue registration statement complained of herein.

26.     Defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson, and Stolper are collectively referred to herein as the "Individual Defendants."

27.     Defendant KPMG is an international accounting and auditing firm that served as Advanta's independent auditor. KPMG vouched, as experts, for the accuracy of Advanta's financial statements, which were incorporated into the untrue Registration Statement complained of herein. As detailed in the attached declaration of Colin A. Johns, dated October 6, 2011 ("Johns Decl.") and in the paragaphs set forth below, KPMG's statements regarding Advanta's financial statements were false, misleading and lacked a reasonable basis.

7

## SUBSTANTIVE ALLEGATIONS

28. This is a securities class action brought on behalf of persons who, between February 28, 2008 and November 8, 2009, purchased RediReserve notes traceable to a registration statement filed with the SEC on August 18, 2006 (the "Registration Statement") as amended on February 28, 2008 (the "2008 Amendment"), February 9, 2009 (the "February 2009 Amendment"), and March 12, 2009 (the "March 2009 Amendment") (collectively, the "Amendments").

## I. Defendants Caused Advanta to File the Untrue Registration Statement and Amendments Thereto in Connection with the Shelf Registration of Advanta Notes to Individual Investors

### A. The Registration Statements and Amendments Thereto

29. Defendants caused the Registration Statement to be filed with the SEC so that Advanta could commence a shelf registration and sale of RediReserve notes. Pursuant to the Registration Statement and the Amendments thereto, Advanta offered $500 million worth of RediReserve notes. A shelf registration is a type of registration that allows the issuer to register a set of securities and then sell them over time as needed. Thus, in this case, defendants caused Advanta to register $350 million worth of notes on August 18, 2006 and an additional $150 million worth of notes on February 9, 2009. Advanta was then able to sell these notes periodically, including throughout the Class Period.

30. The Registration Statement incorporated Advanta's subsequent annual reports on SEC Form 10-K, which were made pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"):

"We incorporate by reference in this prospectus all the documents listed below and any filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before all the securities offered by this prospectus have been sold or de-registered."

8

31.    Pursuant to federal law, the Registration Statement further provided that:

"(b) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof."

32.    Thus, pursuant to this provision, Advanta's subsequent annual reports acted as registration statements in connection with the shelf registration and sale of the RediReserve notes for purposes of determining liability under the 1933 Act.

33.    On February 28, 2008, defendants caused Advanta's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 to be filed with the SEC. Under federal law and the terms of the Registration Statement, this annual report was incorporated by reference into the Registration Statement and acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to Advanta's Annual Report, dated February 28, 2008, as the "2008 Amendment." The 2008 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

34.    On February 9, 2009, defendants caused to be filed a post-effective amendment to the Registration Statement. The post-effective amendment registered an additional $150,000,000 in new RediReserve notes and re-registered $60,000,000 in unsold notes. Under federal law and the terms of the Registration Statement, for the purposes of determining liability under the 1933 Act, "each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be

9

deemed to be the initial *bona fide* offering thereof." Thus, the post-effective amendment filed on February 9, 2009 acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to the February 9, 2009 post-effective amendment as the "February 2009 Amendment." The February 2009 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

35.    On March 13, 2009, defendants caused Advanta's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 to be filed with the SEC. Under federal law and the terms of the Registration Statement, this annual report was incorporated by reference into the Registration Statement and acted as a new registration statement relating to the RediReserve notes for purposes of determining liability under the 1933 Act. This complaint refers to Advanta's Annual Report, dated March 13, 2009, as the "March 2009 Amendment." The March 2009 Amendment was signed by defendants Alter, Rosoff, Browne, Weinstock, Botel, Costello, Dunn, Lubner, Olafsson and Stolper.

B.    The RediReserve Notes

36.    The RediReserve notes at issue in this case are senior, unsecured debt securities of Advanta. The RediReserve notes rank junior to all secured debt of Advanta. The notes are non-negotiable and it does not appear that any secondary market ever developed for them. As Advanta stated in its public filings: "We do not expect there will be a trading market for the investment notes or the RediReserve certificates."

37.    The RediReserve notes paid holders varying interest rates depending upon how much a particular individual invested in the notes and the duration of the note.

38.     Advanta did not establish a so-called "sinking fund," security or other precaution to protect the RediReserve notes in the event that Advanta was unable to pay. In addition, the RediReserve notes were not insured or guaranteed by the FDIC. Thus, holders of RediReserve notes depended solely on Advanta's revenues from operations and other sources of funds for repayment of principal and interest upon a RediReserve note's maturity.

39.     In November 2009, upon its entrance into bankruptcy, Advanta indicated that there was approximately $138,000,000 of principal and accrued and unpaid interest on outstanding debt securities in the form of retail Investment Notes and RediReserve Certificates.

C.     Defendants Caused Advanta to Target Individual Investors

40.     Defendants intended for individual investors, rather than sophisticated institutional investors, to buy the RediReserve notes.

41.     Advanta advertised the RediReserve notes in newspapers and capped investment in the RediReserve notes at $500,000, measures evincing an intent to sell to individual investors as opposed to institutions.

42.     Advanta's own SEC filings referred to the target customers for the RediReserve notes as "retail investors." Advanta also referred to the RediReserve notes as "retail notes." Advanta further noted that its sold these "retail notes . . . predominantly on a direct basis" to retail investors. Based on a review of the February 2009 Amendment, it appears that an individual could invest in RediReserve notes with as little as $100.

II.     **The Registration Statement, as Amended, Contained Numerous Untrue Statements of Material Fact and Omitted Material Facts**

43.     The Registration Statement, as amended, dramatically overstated the strength of Advanta's business and financial strength and omitted numerous material facts about Advanta's illegal and unsound business and accounting practices.

11

A.  Untrue Statements and Omissions of Material Fact in the 2008 Amendment

44.  The 2008 Amendment represented that "Management believes that at December 31, 2007, Advanta Bank Corp. was in compliance with the capital adequacy requirements to which it was subject." This statement was untrue and omitted material facts because:

• As the FDIC confirmed in its cease and desist order, Advanta operated with insufficient capital for its risk profile as a risky monoline credit card issuer. Accordingly, the FDIC later revealed that Advanta required a plan addressing: (i) current and future capital requirements; (ii) level of concentrations of credit; and (iii) the volume of adversely classified assets.

• Advanta was overstating its financial position by maintaining inadequate loan and lease losses allowances. Thus, the amount of capital that Advanta reported was overstated.

• Advanta's capital planning model did not incorporate an adequate contingency plan for Advanta to survive an early amortization event for its credit card securitizations. By discussing Advanta's compliance with capital requirements, the 2008 Amendment put the issue "in play," triggering an obligation to disclose this fact.

45.  The 2008 Amendment indicated that for 2007, Advanta had net income of approximately $72 million and had a provision for loan losses of approximately $58 million. This was untrue because Advanta was understating its loan losses and, in calculating loan losses, failing to account for changes in customer behavior driven by the economic downturn and Advanta's aggressive repricing.

46.  The 2008 Amendment represented that Advanta calculated its allowance for loan losses as follows:

Receivables on the consolidated balance sheets are presented net of the allowance for receivable losses. *The allowance for receivable losses represents*

12

*management's estimate of probable losses inherent in the on-balance sheet
receivable portfolio. We establish the allowance for receivable losses through
provisions charged to earnings.* We report provisions for credit losses,
representing the portion of receivable losses attributable to principal, separately
on the consolidated income statements. We record provisions for interest and fee
receivable losses as direct reductions to interest and fee income. *The allowance
for receivable losses is evaluated on a regular basis by management and is
based upon management's review of the collectibility of receivables in light of
historical experience by receivable type, the nature and volume of the receivable
portfolio, adverse situations that may affect the borrowers' ability to repay and
prevailing economic conditions.* Since our business credit card receivable
portfolio is comprised of smaller balance homogeneous receivables, we generally
evaluate the receivables collectively for impairment through the use of a
migration analysis as well as the consideration of other factors that may indicate
increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts
that have been re-aged or entered a workout program. A migration analysis is a
technique used to estimate the likelihood that a receivable or pool of receivables
will progress through various delinquency stages and charge off. The allowance
evaluation is inherently subjective as it requires estimates that are susceptible to
significant revision as more information becomes available.   Changes in
economic conditions, the composition and risk characteristics of the receivables
portfolio, bankruptcy laws or regulatory policies could impact our credit losses.
A 10% change in the allowance for business credit card receivable losses at
December 31, 2007 would impact the allowance for receivable losses and pretax
income of the Advanta Business Cards segment by \$6.7 million. [emphasis
added]

47.     This statement was untrue and contained omissions of material fact because, as

stated by the FDIC, Advanta was not calculating its loan loss allowance as described in the 2008

Amendment.  To the contrary, Advanta ignored the adverse credit effects caused by its

aggressive repricing campaign and the economic downturn and, consequently, took an

inadequate provision for loan losses.

B.     Untrue Statements and Omissions of Material Fact in the February 2009
       Amendment

48.     The February 2009 Amendment expressly incorporated the 2008 Amendment and

the false statements therein.

C.   Untrue Statements and Omissions of Material Fact in the March 2009 Amendment

49.   The March 2009 Amendment stated that "Management believes that at December 31, 2008, Advanta Bank Corp. was in compliance with the capital adequacy requirements to which it was subject." This statement was false and misleading for the reasons stated in paragraph 44.

50.   The March 2009 Amendment stated that for 2008, Advanta had net income of approximately negative $44 million and a provision for credit losses of approximately $123 million. The allowance for losses was purportedly calculated as follows:

Receivables on the consolidated balance sheets are presented net of an allowance for receivable losses.   The allowance for receivable losses represents management's estimate of probable losses inherent in the on-balance sheet receivable portfolio. We establish the allowance for receivable losses through provisions charged to earnings.   We report provisions for credit losses, representing the portion of receivable losses attributable to principal, separately on the consolidated income statements. We record provisions for interest and fee receivable losses as direct reductions to interest and fee income. The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectibility of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions.   Since our business credit card receivable portfolio is comprised of smaller balance homogeneous receivables, we generally evaluate the receivables collectively for impairment through the use of a migration analysis as well as the consideration of other factors that may indicate increased risk of loss, such as bankrupt accounts, overlimit accounts or accounts that have been re-aged or entered a workout program. A migration analysis is a technique used to estimate the likelihood that a receivable or pool of receivables will progress through various delinquency stages and charge off. The allowance evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available.   Changes in economic conditions, the composition and risk characteristics of the receivables portfolio, bankruptcy laws or regulatory policies could impact our credit losses. A 10% change in the allowance for business credit card receivable losses at December 31, 2008 would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $10.3 million.

These statements were untrue and omitted material facts for the reasons set forth in paragraph 47.

D.  The 2008 Amendment, February 2009 Amendment and March 2009 Amendment Violated the Duty to Disclose Material Trends Imposed by 17 C.F.R. §229.303(a)(3)(ii) and Thereby Violated Section 11 of the 1933 Act

51.    In addition to the false statements and omissions described above, the 2008 Amendment, the February 2009 Amendment, and the March 2009 Amendment violated the duty to disclose material trends, which is imposed by Item 303 of 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") by failing to disclose (1) the fact that Advanta was engaged in a massive illegal credit repricing affecting approximately 68% of its credit card customers, and that (2) the severe and unwarranted credit card interest rate increases imposed by Advanta were fueling a severe spike in nonpayment that could be expected to cause Advanta significant losses.

52.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), provides that a registrant must "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Instruction 3 to Item 303(a) provides that "'[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (citing 17 C.F.R. §229.303(a) instruction 3). The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Id.* (citation omitted).

15

53.    The failure to disclose in the registration statement a trend known to management and "reasonably likely to have material effects on the registrant's financial condition or results of operations" constitutes an independent violation of §11 of the 1933 Act. *See generally In re Adams Golf, Inc., Sec. Litig.*, 618 F. Supp. 2d 343 (D. Del. 2009) (denying motion for summary judgment on §11 claims premised on violation of Item 303).

54.    According to the FDIC, Advanta repriced 68% of its credit card loan portfolio. A large number of accountholders received substantial rate increases that raised their annual percentage rate as high as 37%. In particular, Advanta engaged in over 1 million re-pricing actions on existing credit card accounts between June 2007 and November 2008.

55.    The FDIC further found that these actions violated §5 of the Federal Trade Commission Act because Advanta imposed credit card increases based on criteria that were neither known nor communicated to customers. In addition, the bank did not adequately notify customers that their applicable interest rate had been increased, did not disclose the amount of the increased interest rate, did not effectively disclose the customers' right to opt-out of the rate increase, and did not provide customers with sufficient time to exercise their right to opt out.

56.    Further, the repricing violated Regulation B, which implements the Equal Credit Opportunity Act, because Advanta did not provide complete and/or sufficient notification letters to it accountholders. In particular, the notification letters did not provide customers with specific reasons for the adverse actions, disclose the customers' right to receive a statement of specific reasons, and/or provide the name and address of the FDIC's Consumer Response Center.

57.    Within the November 2008 examination report, the FDIC reported that the effect of rapidly increasing finance charge rates on minimum payments contributed to the acceleration of charge-offs and delinquencies in the latter half of 2008 and early 2009.

16

58.    The 2008 Amendment was filed in February 2008, in the middle of the June 2007 to November 2008 period when, according to the FDIC, Advanta was engaged in the repricing. The February 2009 Amendment and March 2009 Amendment were filed in the immediate aftermath of the repricing, when, according to the FDIC, Advanta was seeing the effects of the repricing in the form of increased charge-offs and delinquencies. Further, at the time of these latter two Amendments, Advanta faced legal jeopardy flowing from its illegal repricing.

59.    These trends were clearly known to management at the time of the 2008 Amendment, the February 2009 Amendment, and the March 2009 Amendment. The illegal repricing was a huge change to Advanta's primary business and affected 68% of Advanta's customer base. A policy change of that scale could not have been implemented without the knowledge of Advanta's management. Moreover, the rise in charge-offs associated with the repricing was apparent to individuals with access to Advanta's data. For example, the FDIC was able to identify the rise in charge-offs in its November 2008 examination.

60.    These trends were reasonably likely to have a material effect on Advanta's financial condition or results of operations. Advanta's decision to engage in a severe and illegal repricing across 68% of its customer base had obvious implications for its legal liability and the likelihood of additional charge-offs as customers disgusted by Advanta's tactics stopped paying. Indeed, the FDIC found that Advanta's "price increases resulted in much higher minimum payments for customers, making it very difficult for customers already struggling to make their minimum payments to cure any outstanding delinquencies." Further, Advanta's acts resulted in it having to pay a $150,000 fine and pay $21 million in restitution for the "substantial injury" it caused its customers.

61.    Because these undisclosed contemporaneous facts affected the value of Advanta itself and its future profitability, they were highly material to reasonable investors deciding whether to purchase RediReserve notes dependent on Advanta's ability to continue earning profits in order to pay off the notes.  For example, the Third Circuit has held that similar omissions were material and actionable under §11 of the 1933 Act, stating:

> A quite different situation is presented, however, when the value of disclosure does not depend solely on whether there has been a breach of faith or ineptitude on the part of management. . . *we believe the concerns of the securities acts are implicated by allegations that the prospectus failed to disclose facts material to the evaluation of the offered security such as:* 1) the success of the advertising, promotion, and marketing program depended on deceptive, illegal practices, ¶49(a); 2) *the program violated various consumer protection laws and consent orders entered into between Craftmatic and federal and state governments,* ¶49(b), (c); 3) *the program resulted in an abnormally high level of consumer complaints,* ¶49(h); . . . If plaintiffs can prove these alleged facts, we believe a jury could conclude that the prospectus failed to disclose material facts necessary to make the disclosed material statements not misleading in violation of §11(a), §12(2), and Rule 10b-5.  Accordingly, we will reverse the district court's dismissal with respect to subparagraphs 49(a), (b), (c), (h), and (n).

*Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 640 (3d Cir. 1989) (emphasis added); *see also id.* at 640 n.16 ("the nondisclosure of a statutory violation may be an omission of information necessary to make other statements not misleading.  To that extent, a violation of consumer laws that is substantially likely to be significant to a reasonable investor is a fact that must be disclosed, even though the legal consequence of the violation may be a contingency").

E.    KPMG's Statements in the March 2009 Amendment Were False and Misleading and Lacked a Reasonable Basis

62.    In its Report of Independent Registered Accounting Firm dated March 12, 2009, KPMG stated, in part, as follows:

> We have audited the accompanying consolidated balance sheets of Advanta Corp. and subsidiaries (the "Company") as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the there-year period ended December 31,

18

2008. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

*We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, *the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2008* and 2007, and the results of its operations and its cash flows for each of the years in the there-year period ended December 31, 2008, *in conformity with U.S. generally accepted accounting principles.*

[Emphasis added.]

63.     KPMG's statement, "We conducted our audits in accordance with the standards of

the Public Company Accounting Oversight Board (United States)" was false and misleading and

lacked a reasonable basis. Johns Decl., ¶17. The standards of the Public Company Accounting

Oversight Board ("PCAOB") required KPMG to evaluate the reasonableness of Advanta's loan

loss reserves and earnings statements by, among other things:

• Obtain[ing] an understanding of the process management used to set loss reserves. *See id.*, ¶10(b);

• Identify the sources of data that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable and sufficient for the purpose based on information gathered in other audit tests. *See id.*, ¶10(c);

• Consider whether there are additional key factors or alternative assumptions about the factors. *See id.*;

• Consider whether changes in the business or industry may cause other factors to become significant in the assumption. *See id.*;

• Test the calculations used by management to translate the assumptions and key factors into the accounting estimate. *See id.*

19

64.     Further, the Audit and Accounting Guide published by the American Institute of

Certified Public Accountants provides further guidance regarding the calculation of loan losses.

*See id.*, ¶¶12-13.  "Although different institutions may use different methods, there are certain

common elements that should be included in any methodology for it to be effective."  The

method should:

• Include a detailed and regular analysis of the loan portfolio and off-balance-sheet
instruments with credit risk.

• Include procedures for timely identification of problem credits.

• Be used consistently.

• Consider all known relevant internal and external factors that may affect collectability.

• Consider all loans (whether on an individual or pool-of-loans basis) and other relevant
credit exposure.

• Consider the particular risks inherent in the different kinds of lending.

• Consider current collateral fair values, where applicable.

• Be performed by competent and well-trained personnel.

• Be based on current and reliable data.

• Be well documented, with clear explanations of the supporting analyses and rationale.

*Id.*, ¶13.

65.     Further, Advanta stated that its credit card receivables were comprised of "smaller

balance homogenous receivables."  To set the loan loss reserves for a pool of homogenous loans,

one should consider "trends and conditions" within that pool, such as:

• Levels of and trends in delinquencies;

• Trends in volumes and terms of loans;

• Effects of any changes in lending policies and procedures;

• National and local economic trends and conditions.

*Id.*, ¶13(d).

66.     In addition, "If a regulatory examination is in process, the independent accountant should discuss the status and preliminary findings of the examination with institution management and the examiners." *Id.*, ¶13(e).

67.     In light of the factual findings of the FDIC that Advanta was failing to incorporate into its loan loss methodology, anticipated and actual changes in portfolio behavior associated with the continued economic downturn, and the aggressive repricing, and that Advanta's loan loss allowance was inadequate, it appears that KPMG ignored significant adverse credit data that was available to it at the time, which is a violation of PCAOB and standards. *Id.*, ¶¶21, 24.

68.     KPMG's statement that Advanta's financial statements were "in conformity with U.S. generally accepted accounting principles" as of December 31, 2008 was false, misleading and lacked a reasonable basis.

69.     FASB Statement No. 5 is the primary guidance on the accounting and reporting of loss contingencies, including credit losses. *Id.*, ¶13(f). "FASB Statement No. 5 states that if a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset (whether related to contractual principal or interest) can range from remote to probable. *Probable* means the future event or events are likely to occur; however, the conditions for accrual are not intended to be so rigid that they require virtual certainty before a loss is accrued. The conditions may be considered in relation to individual loans or groups of loans. However, if the conditions are met, a loss should be recognized even though the particular loans that are uncollectible may not be identifiable, such as large groups of loans for which credit losses have been incurred but which have not been associated with specific loans." *Id.*, ¶13(g). The allowance for loan losses should be appropriate in accordance with GAAP to cover probable

21

credit losses related to specifically identified loans as well as probable credit losses inherent in the remainder of the portfolio. *Id.*, ¶13(h).

70. Further, as discussed above, the loan reserve for Advanta's homogenous credit card receivables should have reflected "trends and conditions," including:

- Levels of and trends in delinquencies;
- Trends in volumes and terms of loans;
- Effects of any changes in lending policies and procedures;
- National and local economic trends and conditions.

*Id.*, ¶13(d).

71. Therefore, it was not consistent with GAAP for Advanta's loan loss reserve to ignore adverse credit data. Moreover, had KPMG either (1) reviewed the same data as was reviewed by the FDIC examiners in reaching their determination, or (2) performed the procedures called for in the professional standards with respect to the auditing of accounting estimates, the failure of Advanta's management to include all relevant factors in its determination of the allowance for loan losses would have represented a red flag to the KPMG auditors that Advanta's financial statements for the period ended December 31, 2008 were not "in conformity with U.S. generally accepted accounting principles." *Id.*, ¶¶21-22.

72. For similar reasons, KPMG's statement that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2008" was false, misleading and lacked a reasonable basis. To say that Advanta's financial statements "fairly" represented its financial position means that KPMG incorporated the available information pertaining to Advanta's loan loss reserves and profits, which, apparently, it did not. *Id.*, ¶21. At minimum, this statement put the issue "in play" and it

was misleading for KPMG to fail to disclose that Advanta's financial statements did not incorporate contemporaneous adverse credit data.

73.    Although KPMG's statements lacked a reasonable basis, Plaintiffs do not contend that KPMG made its false statements with fraudulent intent. That is, Plaintiffs do not allege that KPMG sought to defraud Plaintiffs and other investors in RediReserve notes. Nevertheless, KPMG was negligent in publishing its statements lacking a reasonable basis because it should have known that reasonable investors would rely on KPMG's statements in deciding whether to purchase RediReserve notes.

## III.    The Truth Emerges

74.    On July 1, 2009, Advanta filed an SEC Form 8-K making the two FDIC orders publicly available. The restitution payments required in connection with Advanta's credit card repricing further weakened Advanta financially.

75.    On November 8, 2009, without prior notice to the FDIC, Advanta filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. As the FDIC later explained, a major cause of Advanta's failure was the fact that it did not develop an adequate contingency plan for dealing with an early amortization event. This failure contributed to additional loan losses when an amortization event occurred in 2009, ultimately leading to Advanta's failure. At that time, Advanta represented that approximately $138 million in notes were outstanding.

76.    On December 16, 2009, the FDIC found that there was a "substantial threat" that yet another of Advanta's subsidiary banks, Advanta Bank, would "engage in violations of law and/or unsafe or unsound business practices" and instituted a proceeding to determine whether an appropriate order should be issued against the subsidiary bank under the provisions of section

23

8(b) of the Federal Deposit Insurance Act. Among other things, the FDIC charged that the Advanta Bank's Board, which included defendants Alter, Rosoff, Costello and Browne, lacked independence from Advanta Bank's bankrupt parent company, Advanta, which was "in need of capital." The FDIC further charged that Advanta Bank failed to maintain adequate records and that Alter, Rosoff, Costello and Browne "hindered" the FDIC's efforts to monitor the financial condition of the Advanta Bank.

77.     During October 2010, the FDIC made available its Material Loss Review for Advanta.

78.     In light of Advanta's bankruptcy, it is unclear whether the Class will be able to recoup the principal and interest owed them in connection with the RediReserve notes.

## RELIANCE PRESUMED

79.     Because Plaintiffs and members of the Class acquired RediReserve notes prior to the issuance of an earnings statement covering a 12 month period after the issuance of the Registration Statement, as amended by the 2008 Amendment, the February 2009 Amendment and the March 2009 Amendment, reliance on the Registration Statement is presumed under the 1933 Act.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action as a class action on behalf of a class consisting of all persons or entities who, during the Class Period, acquired RediReserve notes pursuant and/or traceable to the Registration Statement, as amended by the 2008 Amendment, the February 2009 Amendment and the March 2009 Amendment, and were damaged thereby (the "Class"). The Class Period runs from February 28, 2008 through Advanta's bankruptcy on November 8, 2009. Excluded from the Class are defendants, members of their immediate family and their legal

representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Advanta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' conduct in violation of federal law that is complained of herein.

83.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants violated the 1933 Act; (b) whether the Registration Statement, the 2008 Amendment, the February 2009 Amendment and the March 2009 Amendment, misrepresented and/or omitted facts about the business operations and/or management of Advanta; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

85.     A class action is superior to all other available methods for fair and efficient adjudication of this controversy since joinder of each member is impracticable. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Violations of §11 of the 1933 Act Against All Defendants

86.     Plaintiffs repeat and reallege each and every allegation contained above.

87.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

88.     The Registration Statement, as amended, contained untrue statements of material facts, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, including the disclosure of material trends required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii).

89.     The Individual Defendants were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants signed or authorized the signing of the Registration Statement as amended. KPMG consented to the incorporation of the audited financial statements into the Registration Statement, as amended. The Individual Defendants and KPMG did not make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Registration Statement, as amended, were true and without omissions of any material facts and were not misleading.

26

90. By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

91. Plaintiffs acquired RediReserve notes pursuant and/or traceable to the Registration Statement, as amended, for the offering.

92. Plaintiffs and the Class have sustained damages. At the time they purchased RediReserve notes, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2009. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## SECOND CAUSE OF ACTION

### Violations of §12(a)(2) of the 1933 Act Against the Individual Defendants

93. Plaintiffs repeat and reallege each and every allegation contained above. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

94. By means of the defective Registration Statement, as amended, the Individual Defendants assisted in the sale of the Company's securities to Plaintiffs and the other members of the Class.

95. The Registration Statement, as amended, was inaccurate as detailed above. The Individual Defendants owed Plaintiffs and the other members of the Class who acquired

27

RediReserve notes pursuant to the Registration Statement, as amended, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, as amended, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Individual Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement, as amended, that are set forth above.

96. At the time they purchased RediReserve notes, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2009.

97. By reason of the conduct alleged herein, the Individual Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who acquired RediReserve notes pursuant to the Registration Statement, as amended, sustained substantial damages in connection with their acquisition of RediReserve notes. Accordingly, Plaintiffs and the other members of the Class who hold such shares have the right to rescind and recover the cash value of the consideration exchanged for their shares, and thereby tender their shares to the Individual Defendants.

## THIRD CAUSE OF ACTION

### Violations of §15 of the 1933 Act Against the Individual Defendants

98. Plaintiffs repeat and reallege each and every allegation contained above.

99. This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants. For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless

28

misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

100.    Each of the Individual Defendants was a control person of Advanta by virtue of his or her position as a director, senior officer and/or major shareholder of the Company, which allowed each of the Individual Defendants to exercise control over Advanta and its operations.

101.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement, as amended, and having otherwise participated in the process which allowed the offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class Representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/ injunctive or other relief as deemed appropriate by the Court.

## JURY DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 7, 2011

THE WEISER LAW FIRM, P.C.

Robert B. Weiser (PA #81575)
Brett D. Stecker (PA #86242)
Jeffrey J. Ciarlanto (PA #205838)
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

SCOTT+SCOTT LLP
Thomas L. Laughlin IV
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

SCOTT+SCOTT LLP
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092

*Counsel for Lead Plaintiffs*